UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| JON ARNE TOFT, Individually and on behalf of all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> HARBOR DIVERSIFIED, INC., CHRISTINE R. DEISTER, LIAM MACKAY, and GREGG GARVEY. <br><br> Defendants. | **Case No: 24-C-556** <br><br> **AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** <br><br> <u>JURY TRIAL DEMANDED</u> |

Lead Plaintiff Jon Arne Toft ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of public documents, United States ("U.S.") Securities and Exchange Commission ("SEC") filings, analysts' reports and advisories regarding Harbor Diversified, Inc. ("Harbor Diversified" or the "Company"), and other information readily obtainable on the Internet. Plaintiff believes that substantial, additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants that purchased or otherwise acquired Harbor Diversified

securities between March 30, 2022 and March 29, 2024, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2.      Harbor Diversified is a holding company for Air Wisconsin Airlines LLC ("Air Wisconsin"), a regional airline.  In February 2017, Air Wisconsin and United Airlines, Inc. ("United") entered into a capacity purchase agreement ("CPA") pursuant to which United agreed to purchase the capacity of the Air Wisconsin CRJ-200 regional jets covered under the agreement. Pursuant to the CPA, Air Wisconsin operated *exclusively* as a United Express regional air carrier out of Chicago O'Hare and Washington-Dulles airports.  The Company earned *approximately 100%* of its operating revenues under the CPA.  Air Wisconsin received fixed daily revenue for each aircraft covered under the agreement, a fixed payment for each departure and block hour flown, and reimbursement of certain direct operating expenses in exchange for providing regional flying service for United. The CPA also provided for the payment or accrual of certain amounts by United to Air Wisconsin based on certain scheduling benchmarks.

3.      On July 10, 2020, Defendants filed a Form 10-K reporting financial results for the year ended December 31, 2019, wherein they admitted to a material weakness in internal control over financial reporting relating to, *inter alia*, "***the adoption of new accounting standards related to Topic 606***."  In that same filing, and in three subsequent Forms 10-Q, Defendants assured investors that the material weakness relating to Accounting Standards Codification Topic 606, Revenue from Contracts with Customers (also referred to herein as "ASC 606"), "have been

remediated as of the date of the filing of this [] Report." Throughout the Class Period, Defendants reported that the Company's internal control over financial reporting was effective.

4. Moreover, Defendants assured investors in every quarterly and annual filing both before and during the Class Period that, "[t]he accompanying consolidated financial statements have been prepared in conformity with accounting principles generally accepted in the United States of America (GAAP)." Defendants also acknowledged their familiarity with the requirements of ASC 606.

5. Under ASC 606, a company is not permitted to recognize revenue unless various criteria are satisfied including that, "**It is probable that the entity will collect substantially all of the consideration to which it will be entitled in exchange for the goods or services that will be transferred to the customer** … . In evaluating whether collectability of an amount of consideration is probable, an entity shall consider only the **customer's ability and intention to pay that amount of consideration when it is due**."

6. Beginning in its Form 10-K for the year ended December 31, 2021 filed on the first day of the Class Period, March 30, 2022, Defendants disclosed that "a dispute exists under the United capacity purchase agreement with respect to certain amounts owed to Air Wisconsin by United" but did not provide any information regarding the nature of the dispute.

7. Then, in the Form 10-Q the Company filed for the second quarter ended June 30, 2022, while disclosing certain disputed components of revenue amounts related to provisional cash payments for projected flight schedules as well as notes for the stand ready obligation created by the October 2020 amendment to the CPA (described below), *Defendants never disclosed how high the disputed amounts could grow nor did they disclose that their recognition of this revenue violated ASC 606 and would ultimately necessitate a restatement as United made clear its position*

*that it did not owe the disputed amounts.* Defendants continued to report on the dispute in each subsequent filing, including the updated amounts in dispute, and repeatedly stated—even after United initiated arbitration regarding the dispute in October 2022 (two months after Air Wisconsin executed a new CPA with American Airlines)--- that, "***Air Wisconsin [] maintains that it has a strong position… that it is entitled to the disputed amounts, including the amounts recorded in the consolidated balance sheets, under the terms of the agreement.***"

  *8.* At no point during the Class Period did Defendants alert investors that the amounts in dispute would continue to climb unabated, reaching over $52 million, until a termination of the CPA or an arbitral resolution . Moreover, Defendants failed to disclose that in recognizing the full amount of disputed revenue under the CPA and assessing the probability of collecting substantially all of the consideration to which Air Wisconsin claimed it was entitled under the CPA, they failed to properly consider, or ignored, United's intention not to pay the disputed amounts and thus misstated the total amount of contract revenue the Company actually earned. This raised a substantial undisclosed risk that Defendants would have to undertake a material restatement of its financial results for each quarter in which they recognized the disputed revenue.

  9. Lastly, Defendants falsely stated that the Company had effective internal control over financial reporting when they did not. The material weakness in internal controls enabled Defendants' non-compliance with GAAP and ASC 606, which spanned seven quarters.

  10. On March 29, 2024, Harbor Diversified filed with the SEC a current report on Form 8-K in which it announced that certain of its previously-issued financial statements would need to be restated as a result of improper revenue recognition and should not be relied upon.

  11. Specifically, Defendants revealed that the arbitrators had concluded in February 2024 that United did not owe Air Wisconsin ***any*** of the $52.3 million in revenue and interest

income the two parties disputed (the full amount of which was not disclosed to investors until November 14, 2023), and admitted that Harbor Diversified had improperly recognized that revenue in contravention of Accounting Standards Codification Topic 606, Revenue from Contracts with Customers ("ASC 606"), and would need to issue restatements of the:

> (i) consolidated financial statements and related disclosures as of and for the year ended December 31, 2022 contained in the Company's Annual Report on Form 10-K, (ii) interim consolidated financial statements and related disclosures contained in the Quarterly Reports on Form 10-Q as of and for the first three quarters of the year ended December 31, 2022, and (iii) interim consolidated financial statements and related disclosures contained in the Quarterly Reports on Form 10-Q as of and for the first three quarters of the year ended December 31, 2023

12. Further, Harbor Diversified disclosed that despite its prior assurances to investors that it had remediated a material weakness in internal control over financial reporting relating to its adherence to ASC 606, the Company in fact still had a material weakness in its internal control over financial reporting related to its adherence to ASC 606.

13. As a result of this shocking news, the price of Harbor Diversified stock fell by $0.28 per share, or 14.25%, to close at $1.73 on April 1, 2024. The Company has yet to restate any of its misstated financials and has not filed any financial statements with the SEC since November 14, 2023. Due to its non-compliance with SEC filing requirements, Harbor Diversified's stock now trades on the Expert Market. The stock price has never recovered, closing at $.9000 on the Expert Market on September 6, 2024.

14. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

15. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

16. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act (15 U.S.C. §78aa).

17. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)) as the alleged misstatements entered and the subsequent damages took place in this judicial district.

18. In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the OTC Market.

## PARTIES

19. Plaintiff, as set forth in the certification previously filed with this Court, acquired Harbor Diversified securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

20. Defendant Harbor Diversified describes itself as "a non-operating holding company that is the parent of a consolidated group of subsidiaries, including AWAC Aviation, Inc. ("AWAC"), which is the sole member of Air Wisconsin Airlines LLC ("Air Wisconsin"), a regional air carrier. Harbor is also the direct parent of three other subsidiaries: (1) Lotus Aviation Leasing, LLC ("Lotus"), which leases flight equipment to Air Wisconsin, (2) Air Wisconsin Funding LLC ("AWF"), which provides flight equipment financing to Air Wisconsin, and (3)

Harbor Therapeutics, Inc. ("Therapeutics"), which is a non-operating entity with no material assets."

21.     Harbor Diversified is incorporated in Delaware and its head office is located at W6390 Challenger Drive, Suite 203, Appleton, Wisconsin 54914-9120. Harbor Diversified's common stock trades on the OTC Market ("OTC") under the ticker symbol "HRBR".

22.     Defendant Christine R. Deister ("Deister") served as the Company's Chief Executive Officer ("CEO") and Secretary throughout the Class Period.  Additionally, Defendant Deister has served as Chief Financial Officer and Secretary of both Air Wisconsin Funding LLC ("AWF") since April 2020, Vice President of Special Projects for Air Wisconsin since April 2020, and Executive Vice President and a director of AWAC Aviation, Inc. ("AWAC"). Defendant Deister was initially appointed Chief Financial Officer and Secretary of the Company in March 2012 and was subsequently appointed President of the Company in July 2019. Previously, Defendant Deister served as President and Chief Executive Officer of Air Wisconsin from April 2015 until March 2019 and as Chief Executive Officer until March 2020. From November 2014 to April 2015, Defendant Deister served as Chief Commercial Officer of Air Wisconsin. From November 2004 to November 2014, Defendant Deister served as Executive Vice President and Chief Financial Officer of Air Wisconsin.

23.     Defendant Liam Mackay ("Mackay") served as the Company's Chief Financial Officer ("CFO") throughout the Class Period.

24.     Defendant Gregg Garvey ("Garvey") served as the Senior Vice President, Chief Accounting Officer and Treasurer, and Air Wisconsin Airlines LLC's Principal Accounting Officer throughout the Class Period.

25.     Defendants Deister, Mackay, and Garvey are collectively referred to herein as the "Individual Defendants."

26.     Each of the Individual Defendants:

(a)     directly participated in the management of the Company;

(b)     was directly involved in the day-to-day operations of the Company at the highest levels;

(c)     was privy to confidential proprietary information concerning the Company and its business and operations;

(d)     was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e)     was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(f)     was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(g)     approved or ratified these statements in violation of the federal securities laws.

27.     Harbor Diversified is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

28.     The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to the Company under *respondeat superior* and agency principles.

29.     Harbor Diversified and the Individual Defendants are collectively referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

30.     Harbor Diversified is a holding company for Air Wisconsin.  Air Wisconsin, founded in 1965 in Appleton, Wisconsin, is a regional airline that provides scheduled passenger service to more than 81 cities in 31 states. Regional airlines provide short/medium-haul scheduled flights that connect more isolated cities with larger cities that serve as domestic or international hubs. The larger airlines cannot park their larger aircraft (like a Boeing 747) at a tiny regional airport and do not want to spend additional capital on acquiring smaller aircrafts so they enter into contracts with smaller regional airlines called capacity purchase agreements, where the large airline provides the smaller regional airline with fixed daily revenue for each aircraft covered under the agreement, a fixed payment for each departure and block hour flown, and reimbursement of certain direct operating expenses in exchange for providing flying service.  The capacity agreements protect the regional airline from risk factors that typically cause volatility in airline financial performance (e.g., fuel prices, variations in ticket prices, and fluctuations in passengers). The regional airline uses the larger airline's logos, service marks, and aircraft paint scheme, and also follows the larger airline's route selection, pricing, seat inventories, marketing and scheduling.

31.     Harbor Diversified was originally formed in November 1992 as Initial Acquisition Corp., a Delaware corporation.  In March 1997, Initial Acquisition Corp. merged with Hollis-Eden, Inc., becoming Hollis-Eden Pharmaceuticals, Inc. In February 2010, Hollis-Eden Pharmaceuticals, Inc. merged with its wholly owned subsidiary and renamed Harbor BioSciences, Inc.  In July 2011, Harbor BioSciences sold 2 million shares of Pref A stock to Amun LLC, giving Amun 28% economic interest in the Company, 38% voting interest in the Company, and the right to appoint

three directors to the Board, all of which was recorded in the Proxy the Company filed the following month.

32.     In October 2011, the Company did a reverse and forward split to reduce shareholders to less than 300 so it could de-register from the SEC.  Indeed, on January 12, 2012, Harbor BioSciences filed a Form 15 to de-register from the SEC.  After filing one last 10-K on January 20, 2012, Harbor BioSciences went dark and stopped publishing SEC filings.  Ten days later, on January 30, 2012, Harbor BioSciences incorporated Harbor Diversified in Delaware.

### Harbor Diversified's Acquisition of Air Wisconsin

33.     According to a Request for Waiver of Section 1.948 filed with the FCC on Form 603 by Air Wisconsin, on January 31, 2012, a reorganization of parent entities of Air Wisconsin was consummated pursuant to which the stock held by the seven shareholders of AWAC Aviation, Inc., the immediate parent company of Air Wisconsin, was transferred to a new intermediate subsidiary, Amun LLC.  The same day, Amun LLC then sold 80% of the stock of AWAC Aviation to Harbor Diversified in exchange for, *inter alia*,  shares of Harbor Diversified common stock and three seats on the Board, with the result that Amun became the single largest shareholder in the Company, with approximately one third of the total issued and outstanding stock.  Amun, together with Southshore Aircraft Holdings, LLC (owned by the same individuals as Amun--Richard Bartlett, Jerry Seslowe, John Shaw, Geoffrey Crowley, William Jordan, and Patrick Thompson), collectively own over 50% of the Company's fully diluted shares of capital stock.  Per the Company's Forms 10-K:

> As a result, Amun and Southshore collectively control a majority of the voting power of the Company's outstanding capital stock and, therefore, are able to exercise significant influence over the establishment and implementation of the Company's business plans and strategic objectives, as well as to control all matters submitted to the Company's stockholders for approval.

34.     Richard Bartlett, who has the largest ownership stake in both Amun and Southshore, has sat on Harbor Diversified's Board of Directors at all relevant times.

35.     In January 2016, the Company acquired the remaining 20% of the issued and outstanding capital stock of AWAC from Amun. AWAC owns all of the equity interests of Air Wisconsin.

36.     On October 22, 2018 Harbor Diversified investor Travis Martin filed an action under Section 220 of the Delaware General Corporation Law ("DGCL") to inspect books and records, and Section 211 of the DGCL to compel Harbor Diversified to hold an annual stockholder's meeting given that the Company had more than 300 shareholders at the time. Consequently, Harbor Diversified released its first 2019 10-K in nine years on July 10, 2020, revealing the Company's acquisition of Air Wisconsin, and, as set forth below, a material weakness in its internal control over financial reporting relating to, *inter alia*, its adherence to Accounting Standards Codification Topic 606: Revenue from Contracts with Customers ("ASC 606").

### Air Wisconsin's Capacity Purchase Agreement with United

37.     In February 2017, one year after the Company completed its acquisition of AWAC from Amun, Air Wisconsin and United Airlines, Inc. ("United") entered into a capacity purchase agreement ("CPA") pursuant to which United agreed to purchase the capacity of the Air Wisconsin CRJ-200 regional jets covered under the agreement.  Pursuant to the CPA, Air Wisconsin operated its flights as United Express out of Chicago O'Hare and Washington-Dulles airports.  Operating *exclusively* as a United Express regional air carrier, the Company earned *approximately 100%* of its operating revenues under the CPA.  Air Wisconsin received fixed daily revenue for each aircraft covered under the agreement, a fixed payment for each departure and block hour flown, and

reimbursement of certain direct operating expenses in exchange for providing regional flying service for United. The CPA also provided for the payment or accrual of certain amounts by United to Air Wisconsin based on certain scheduling benchmarks.

38. The CPA was amended in October 2020 and April 2021. The October 2020 amendment settled previous disputes between Air Wisconsin and United and created a new performance obligation requiring Air Wisconsin to stand ready to deliver flight services and provides for the payment or accrual of certain amounts by United to Air Wisconsin based on certain scheduling benchmarks. The October 2020 amendment provided an extension of the CPA until February 2023, with two renewal options to 2025 and to 2027. The April 2021 amendment addressed the scheduling of block hours after a certain date and through the balance of the agreement.

39. The most significant revenue streams under the CPA thus included:

(1) fixed payments for the covered aircraft per day and fixed payment for each departure and block hour flown,

(2) incentive payments, net of penalties, based upon Air Wisconsin's operational performance and the results of customer satisfaction surveys,

(3) quarterly payments or interest-bearing notes payable for the fulfillment of the stand ready obligation determined based on certain scheduling benchmarks,

(4) other payments and expense reimbursements (these may have been recorded as reduction of expenses rather than revenue).

40. Amounts due for items (1), (2), and (4) were included in accounts receivable on Harbor Diversified's balance sheet. Amounts due for item (3) were included in notes receivable. Interest on the notes under item (3), however, were included in accounts receivable. United made provisional weekly payments to Air Wisconsin with respect to item (1) based on the number of departures and block hours flown. It also made certain pre-payments with respect to item (4).

## The Company Flouted its Duty to Adhere to GAAP and Revenue Recognition Guidance

41.    Throughout the Class Period, and indeed throughout the duration of the CPA, Harbor Diversified represented in its SEC filings that it recognized revenue under the CPA in conformity with Generally Accepted Accounting Principles.

42.    Generally Accepted Accounting Principles ("GAAP") are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a particular time. The SEC Rules and interpretive releases and the Financial Accounting Standards Board ("FASB") Accounting Standards Codification ("ASC") represent sources of authoritative GAAP for SEC registrants.  In addition, the SEC issues Staff Accounting Bulletins, which represent practices followed by the SEC staff  in administering SEC disclosure requirements. (ASC 105-10-05-1)  If the guidance for a transaction or event is not specified within a source of authoritative GAAP, an entity is supposed to consider accounting principles for similar transactions or events within a source of authoritative GAAP and then consider nonauthoritative guidance from other sources, such as practices that are widely recognized and prevalent either generally or in the industry, FASB concepts statements, American Institute of Certified Public Accountants ("AICPA") issues papers, professional associations' or regulatory agencies' pronouncements, and others. (ASC 105-10-05-2 – 05-3)

43.    Regulation S-X (17 C.F.R. § 210.4-01(a)(1)) states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate. Regulation S-X requires interim financial statements to also comply with GAAP, with the exception that interim financial statements need not include disclosure which would be duplicative of disclosures accompanying annual financial statements. (17 C.F.R. § 210.10-01(a)).

44.     In May 2014, the Financial Accounting Standards Board ("FASB") issued Accounting Standards Update ("ASU") No. 2014-09, Revenue from Contracts with Customers (Accounting Standards Codification "ASC" Topic 606). This new standard replaced all previous accounting guidance on this topic and eliminated all industry-specific guidance. The revenue recognition standard became effective in 2018.

45.     The new revenue recognition guidance provides a unified model to determine how revenue is recognized. The core principle of the guidance is that an entity should recognize revenue to depict the transfer of promised goods or services to customers in an amount that reflects the consideration to which the entity expects to be entitled in exchange for those goods or services. ASC 606-10-05-3. An entity is required to recognize revenue in accordance with the following five steps:

- Step 1: Identify the contract(s) with a customer—A contract is an agreement between two or more parties that creates enforceable rights and obligations. The guidance in this Topic applies to each contract that has been agreed upon with a customer and meets specified criteria. In some cases, this Topic requires an entity to combine contracts and account for them as one contract. This Topic also provides requirements for the accounting for contract modifications. (*See* paragraphs 606-10-25-1 through 25-13.)

- Step 2: Identify the performance obligations in the contract—A contract includes promises to transfer goods or services to a customer. If those goods or services are distinct, the promises are performance obligations and are accounted for separately. A good or service is distinct if the customer can benefit from the good or service on its own or together with other resources that are readily available to the customer and the entity's promise to transfer the good or service to the customer is separately identifiable from other promises in the contract. (*See* paragraphs 606-10-25-14 through 25-22.)

- Step 3: Determine the transaction price—The transaction price is the amount of consideration in a contract to which an entity expects to be entitled in exchange for transferring promised goods or services to a customer. The transaction price can be a fixed amount of customer consideration, but it may sometimes include variable consideration or consideration in a form other than cash. The transaction price also is adjusted for the effects of the time value of money if the contract includes a significant financing component and for any consideration payable to the customer.

If the consideration is variable, an entity estimates the amount of consideration to which it will be entitled in exchange for the promised goods or services. The estimated amount of variable consideration will be included in the transaction price only to the extent that it is probable that a significant reversal in the amount of cumulative revenue recognized will not occur when the uncertainty associated with the variable consideration is subsequently resolved. (*See* paragraphs 606-10-32-2 through 32-27.)

- Step 4: Allocate the transaction price to the performance obligations in the contract—An entity typically allocates the transaction price to each performance obligation on the basis of the relative standalone selling prices of each distinct good or service promised in the contract. If a standalone selling price is not observable, an entity estimates it. Sometimes, the transaction price includes a discount or a variable amount of consideration that relates entirely to a part of the contract. The requirements specify when an entity allocates the discount or variable consideration to one or more, but not all, performance obligations (or distinct goods or services) in the contract. (*See* paragraphs 606-10-32-28 through 32-41.)

- Step 5: Recognize revenue when (or as) the entity satisfies a performance obligation—An entity recognizes revenue when (or as) it satisfies a performance obligation by transferring a promised good or service to a customer (which is when the customer obtains control of that good or service). The amount of revenue recognized is the amount allocated to the satisfied performance obligation. A performance obligation may be satisfied at a point in time (typically for promises to transfer goods to a customer) or over time (typically for promises to transfer services to a customer). For performance obligations satisfied over time, an entity recognizes revenue over time by selecting an appropriate method for measuring the entity's progress toward complete satisfaction of that performance obligation. (*See* paragraphs 606-10-25-23 through 25-30.)"

Emphasis added. ASC 606-10-05-4.

46.     ASC 606 prohibits revenue recognition *unless* a contract with a customer meets all of the following criteria[1]:

a. The parties to the contract have approved the contract (in writing, orally, or in accordance with other customary business practices) and are committed to perform their respective obligations.

b. The entity can identify each party's rights regarding the goods or services to be transferred.

---

[1] An entity may still recognize revenue if it received non-refundable consideration from a customer and one or more of the following has occurred: (a) it has no remaining obligations to transfer goods or services to the customer, (b) contract with the customer has been terminated, or (c) the entity has transferred control of goods or services to the customer and has no further obligation to do so. ASC 606-10-25-7

c.  The entity can identify the payment terms for the goods or services to be transferred.

d.  The contract has commercial substance (that is, the risk, timing, or amount of the entity's future cash flows is expected to change as a result of the contract).

e.  **It is probable that the entity will collect substantially all of the consideration to which it will be entitled in exchange for the goods or services that will be transferred to the customer** … . In evaluating whether collectability of an amount of consideration is probable, an entity shall consider only the **customer's ability and intention to pay that amount of consideration when it is due**. …

Emphasis added.  ASC 606-10-25-1.

47.    The collectability assessment, "which is part of identifying whether there is a contract with a customer, is based on whether the customer has the ability and intention to pay the consideration to which the entity will be entitled in exchange for the goods or services that will be transferred to the customer. The objective of this assessment is to evaluate whether there is a substantive transaction between the entity and the customer, which is a necessary condition for the contract to be accounted for under the revenue model in this Topic." Emphasis added. ASC 606-10-55-3A.

48.    According to ASC 606-10-55-3B:

The collectability assessment in paragraph 606-10-25-1(e) is partly a forward-looking assessment. It requires an entity to use judgment and consider all of the facts and circumstances, including the entity's customary business practices and its knowledge of the customer, in determining whether it is probable that the entity will collect substantially all of the consideration to which it will be entitled in exchange for the goods or services that the entity expects to transfer to the customer. The assessment is not necessarily based on the customer's ability and intention to pay the entire amount of promised consideration for the entire duration of the contract.

49.    With respect to recording revenue, when the amount of consideration in a contract to which an entity expects to be entitled in exchange for transferring promised goods or services to a customer is variable, GAAP requires the revenue estimate to be constrained so that it is

probable that a significant reversal in the amount of cumulative revenue recognized will not occur when the uncertainty associated with the variable consideration is subsequently resolved:

> If the consideration promised in a contract includes a variable amount, an entity shall estimate the amount of consideration to which the entity will be entitled in exchange for transferring the promised goods or services to a customer. ASC 606-10-32-5.

> An entity shall estimate an amount of variable consideration by using either of the following methods, depending on which method the entity expects to better predict the amount of consideration to which it will be entitled:

> a. The expected value—The expected value is the sum of probability-weighted amounts in a range of possible consideration amounts. An expected value may be an appropriate estimate of the amount of variable consideration if an entity has a large number of contracts with similar characteristics.

> b. The most likely amount—The most likely amount is the single most likely amount in a range of possible consideration amounts (that is, the single most likely outcome of the contract). The most likely amount may be an appropriate estimate of the amount of variable consideration if the contract has only two possible outcomes (for example, an entity either achieves a performance bonus or does not). ASC 606-10-32-8.

> An entity shall include in the transaction price some or all of an amount of variable consideration estimated in accordance with paragraph 606-10-32-8 **only to the extent that it is probable that a significant reversal in the amount of cumulative revenue recognized will not occur when the uncertainty associated with the variable consideration is subsequently resolved**. ASC 606-10-32-11

> In assessing whether it is probable that a significant reversal in the amount of cumulative revenue recognized will not occur once the uncertainty related to the variable consideration is subsequently resolved, an entity shall consider both the likelihood and the magnitude of the revenue reversal. Factors that could increase the likelihood or the magnitude of a revenue reversal include, but are not limited to, any of the following:

> a. The amount of consideration is highly susceptible to factors outside the entity's influence. Those factors may include volatility in a market, the judgment or actions of third parties, weather conditions, and a high risk of obsolescence of the promised good or service.

> b. **The uncertainty about the amount of consideration is not expected to be resolved for a long period of time**.

> c. The entity's experience (or other evidence) with similar types of contracts is limited, or that experience (or other evidence) has limited predictive value.

d.  The entity has a practice of either offering a broad range of price concessions or changing the payment terms and conditions of similar contracts in similar circumstances.

e.  **The contract has a large number and broad range of possible consideration amounts**. ASC 606-10-32-12.

At the end of each reporting period, an entity shall update the estimated transaction price (including updating its assessment of whether an estimate of variable consideration is constrained) to represent faithfully the circumstances present at the end of the reporting period and the changes in circumstances during the reporting period. ASC 606-10-32-14.

50.    Whenever there is a contract modification, GAAP requires the reporting entity to assess whether the contract modification creates a separate contract.

An entity shall account for a contract modification as a separate contract if both of the following conditions are present:

a.  The scope of the contract increases because of the addition of promised goods or services that are distinct … .

b.  The price of the contract increases by an amount of consideration that reflects the entity's standalone selling prices of the additional promised goods or services and any appropriate adjustments to that price to reflect the circumstances of the particular contract. …" ASC 606-10-25-12.

51.    ASC 606-10-25-11:

A contract modification may exist even though the parties to the contract have a dispute about the scope or price (or both) of the modification or the parties have approved a change in the scope of the contract but have not yet determined the corresponding change in price. In determining whether the rights and obligations that are created or changed by a modification are enforceable, an entity shall consider all relevant facts and circumstances including the terms of the contract and other evidence. If the parties to a contract have approved a change in the scope of the contract but have not yet determined the corresponding change in price, an entity shall estimate the change to the transaction price arising from the modification in accordance with [the guidance] on estimating variable consideration and … on constraining estimates of variable consideration.

52.    With respect to performance obligations satisfied over time, ASC 606 requires companies to "recognize revenue over time by measuring the progress toward complete satisfaction of that performance obligation. The objective when measuring progress is to depict an

entity's performance in transferring control of goods or services promised to a customer (that is, the satisfaction of an entity's performance obligation)." ASC 606-10-25-31.

53.    Under ASC 606-10-25-32:

> An entity shall apply a single method of measuring progress for each performance obligation satisfied over time, and the entity shall apply that method consistently to similar performance obligations and in similar circumstances. At the end of each reporting period, an entity shall remeasure its progress toward complete satisfaction of a performance obligation satisfied over time.

54.    "Appropriate methods of measuring progress include output methods and input methods." ASC 606-10-25-33. "Output methods recognize revenue on the basis of direct measurements of the value to the customer of the goods or services transferred to date relative to the remaining goods or services promised under the contract. Output methods include methods such as surveys of performance completed to date, appraisals of results achieved, milestones reached, time elapsed, and units produced or units delivered. When an entity evaluates whether to apply an output method to measure its progress, the entity should consider whether the output selected would faithfully depict the entity's performance toward complete satisfaction of the performance obligation." ASC 606-10-55-17. "Input methods recognize revenue on the basis of the entity's efforts or inputs to the satisfaction of a performance obligation (for example, resources consumed, labor hours expended, costs incurred, time elapsed, or machine hours used) relative to the total expected inputs to the satisfaction of that performance obligation. If the entity's efforts or inputs are expended evenly throughout the performance period, it may be appropriate for the entity to recognize revenue on a straight-line basis." ASC 606-10-55-20.

55.    Defendants acknowledged their familiarity with the dictates of ASC 606 in each quarterly and annual financial statement they filed with the SEC. For example, in Harbor Diversified's Form 10-K for the year ended December 31, 2021, Defendants stated:

Under the United capacity purchase agreement, Air Wisconsin is also eligible to receive incentive payments, or may be required to pay penalties, upon the achievement of, or failure to achieve, certain performance criteria. The incentives are defined in the agreement and performance is measured on a monthly basis. At the end of each month during the term of the agreement, Air Wisconsin calculates the incentives achieved, or penalties payable, during that period and recognizes revenue accordingly, subject to the variable constraint guidance under Financial Accounting Standards Board (FASB) Accounting Standards Update (ASU) No. 606, Revenue from Contracts with Customers (Topic 606).

56. In its SEC filings, Harbor Diversified further disclosed that it received a fixed amount per covered aircraft per day and earned variable revenue based on the number of block hours and departures. The Company recognized revenue on a per completed flight basis, using departures. The Company disclosed that, due to a significant decrease in its completed flights due to the COVID-19 pandemic, it determined that the amount in fixed payments it received based on a daily rate for each aircraft was disproportionately high relative to the number of departures completed. Therefore, between April 2020 and June 2021, it deferred $58.6 million of revenues ($43.2 million in 2020 and $15.4 in 2021). The Company began amortizing the deferred amounts back into revenue in July 2021. Harbor also disclosed that every month, it calculated revenues to be recognized from incentives, net of penalties, subject to the GAAP constraint provisions.

57. As set forth above, the Company also disclosed that it determined that the October 2020 CPA amendment created a new performance obligation requiring Air Wisconsin to stand ready to deliver flight services at a stand-alone selling price. The Company accounted for the revenue related to the stand-ready obligation as a separate contract and recognized that revenue over time on a straight-line basis based on the number of unscheduled block hours below a minimum threshold at the stand ready rate.

58. The Company periodically reconciled the amounts it was due from United.

59.     Beginning in its Form 10-K for the year ended December 31, 2021 ("2021 10-K"), Defendants disclosed that "a dispute exists under the United capacity purchase agreement with respect to certain amounts owed to Air Wisconsin by United" but did not provide any information regarding the nature of the dispute.

60.     Beginning with the Form 10-Q the Company filed for the second quarter ended June 30, 2022 ("2Q 2022"), while disclosing the disputed components of revenue amounts related to provisional cash payments for projected flight schedules as well as notes for the stand ready obligation created by the October 2020 amendment to the CPA, *Defendants never disclosed how high the disputed amounts could grow nor did they disclose that their recognition of this revenue in fact violated ASC 606 and would ultimately necessitate a restatement.*

61.     For example, in the Q2 2022, while comprehensively describing the nature of at least some of the contract revenue Air Wisconsin earned, and Harbor Diversified recorded, under the CPA from United, Defendants quantified the amounts then in dispute as follows:

> **United makes provisional cash payments to Air Wisconsin during each month of service based on projected flight schedules. These provisional cash payments are subsequently reconciled with United based on actual completed flight activity**. As of the date of this filing, these payments are reconciled through January 2022. Subject to final reconciliation of the provisional cash payments for the periods after January 31, 2022, as of June 30, 2022, **United owed Air Wisconsin approximately $14,185, which is recorded in accounts receivable, net, on the consolidated balance sheets. United is disputing that it owes $10,462 of this amount.** For additional information regarding the dispute with United, refer to Note 8, *Commitments and Contingencies.*
>
> ***
>
> The CPA Amendment provided, among other things, for the payment or accrual of certain amounts by United to Air Wisconsin based on certain scheduling benchmarks. In conjunction with the significant reduction in departures and block hours resulting from the COVID-19 pandemic in 2020, and consistent with the terms of the CPA Amendment, management determined that, **from an accounting perspective, a new performance obligation was created by United, requiring Air Wisconsin to stand ready to deliver flight services.** Air Wisconsin

determined, using the expected cost plus a margin method, that the United "stand ready" rate represents the relative stand-alone selling price of the performance obligation. The stand ready performance obligation will be recognized over time on a straight-line basis based on the number of unscheduled block hours below a minimum threshold at the stand ready rate as determined in a manner consistent with the CPA Amendment. For the three and six months ended June 30, 2022, Air Wisconsin recorded $4,099 and $7,608, respectively, in revenue related to this performance obligation compared to $5,736 and $12,972 for the three and six months ended June 30, 2021, respectively. **Under the CPA Amendment, United is required to pay this amount by the delivery of a note each quarter, which notes are due and payable at the end of the contract term in February 2023. Therefore, this amount was recorded in notes receivable on the consolidated balance sheets.** The notes receivable contain a significant financing component and any interest income is separately reported in the consolidated statements of operations. As of June 30, 2022, the principal amount of these notes totaled $55,177, bore interest at the rate of 4.5%, and had a maturity date of February 28, 2023. As of June 30, 2022, interest receivable on these notes totaled $3,303. **United has disputed that it owes these amounts in respect of certain quarters and has refused to deliver notes for those quarters. The amount in dispute in respect of those notes as of the date of this filing totals $9,109, including interest receivable of $71.** For additional information regarding the dispute with United, refer to Note 8, *Commitments and Contingencies.*

Emphasis added.

62.     Defendants continued to report on the dispute in each subsequent Form 10-Q and Form 10-K filed during the Class Period, providing nary a clue as to whether a cap existed on how high the dispute amounts could go and nary an indication that the Company should not have recorded the disputed amounts as revenue under ASC 606.

63.     *Specifically, in recognizing the full amount of disputed revenue under the CPA and assessing the probability of collecting substantially all of the consideration to which Air Wisconsin claimed it was entitled under the CPA, Defendants failed to properly consider, or ignored, United's stated intention not to pay the disputed amounts and thus misstated the total amount of contract revenue the Company actually earned.  As such, Defendants violated ASC 606.*

64.     In August 2022, Air Wisconsin entered into a new five-year capacity purchase agreement with American Airlines. Two months later, in October 2022, United initiated arbitration regarding more than $52 million worth of payments that Air Wisconsin claimed it was owed *and had recorded as revenue on the books* despite the ongoing dispute. Despite the initiation of this arbitration and the fact that United had never paid any of the disputed $52.3 million amount and had commenced legal action to not only avoid paying this amount but to seek "certain amounts" from Air Wisconsin for its allegedly wrongful termination of the CPA, Defendants continued to recklessly record the disputed revenue.

65.     The following month, on November 4, 2022, United paid $50.1 million to Air Wisconsin to satisfy all of the outstanding, undisputed notes receivable, including all accrued interest, issued pursuant to the stand ready obligation (Item 3, above) incurred through Q3 2021.

66.     In December 2022 and February 2023, Air Wisconsin sent United notices of termination of the CPA. In the arbitration, United contested Air Wisconsin's right to terminate the CPA. In accordance with the termination provisions of the CPA, and in response to Air Wisconsin's first termination notice, United delivered a revised wind-down schedule in January 2023. Following the delivery of that revised schedule, in February 2023, the parties agreed, in a sixth amendment to the CPA, to a wind-down schedule that provides for the withdrawal of aircraft from the agreement beginning in January 2023 and continuing until June 2023, at which time all of Air Wisconsin's remaining aircraft would be withdrawn from the CPA, and Air Wisconsin would cease flying for United.

67.     In February 2024, arbitrators determined that United did not owe Air Wisconsin the disputed payments. Given that Defendants recorded these disputed payments as revenue in the

Company's financial statements in contravention of ASC 606, the Company now must restate its financials from the first quarter of fiscal year 2022 through the third quarter of fiscal year 2023.

68.     Shocked by the arbitral determination, investors fled the stock causing the Company's stock price to plummet more than 15% following the announcement.

**Defendants' Non-Compliance with ASC 606 Requires Restatement of Financials**

69.     GAAP requires any error in the financial statements of a prior period revealed after the financial statements are issued to be reported as an error correction by restating the prior-period financial statements and providing a description of the nature of the error and its effect on the financial statements. ASC 250-10-45-23 and ASC 250-10-50-7.

70.     ASC 250 distinguishes errors from accounting changes and defines an error as "an error in recognition, measurement, presentation, or disclosure in financial statements resulting from mathematical mistakes, mistakes in the application of generally accepted accounting principles (GAAP), or oversight or misuse of facts that existed at the time the financial statements were prepared. A change from an accounting principle that is not generally accepted to one that is generally accepted is a correction of an error." (ASC 250-10-20 – Glossary)

71.     ASC 250-10-45-23 states that if a company must correct a prior period error, it should do so by restating the prior-period financial statements including the following:

    a.  The cumulative effect of the error on periods prior to those presented shall be reflected in the carrying amounts of assets and liabilities as of the beginning of the first period presented.

    b.  An offsetting adjustment, if any, shall be made to the opening balance of retained earnings (or other appropriate components of equity or net assets in the statement of financial position) for that period.

    c.  Financial statements for each individual prior period presented shall be adjusted to reflect correction of the period-specific effects of the error.

72. ASC 250 further requires disclosure that "previously issued financial statements have been restated, along with a description of the nature of the error", including "the effect of the correction on each financial statement line item… for each prior period presented" and "the cumulative effect of the change on retained earnings …as of the beginning of the earliest period presented."

73. *Notably, GAAP does not apply to immaterial items per ASC 105-10-05-6, so restatements are only required for items deemed material.*

74. In addition, Item 4.02 of Form 8-K requires specific disclosures when "the registrant's board of directors …concludes that any previously issued financial statements …should no longer be relied upon because of an error in such financial statements."

75. On March 29, 2024, Defendants announced via Form 8-K that the Company would restate financial statements for the periods from Q1 2022 to Q3 2023 and that those financial statements should no longer be relied upon. The Form 8-K revealed that the need to restate stemmed from the arbitrators' determination denying Air Wisconsin's claims that United owed it $52.3 million in revenue under the CPA. The Form 8-K reported that the Company analyzed its accounting treatment pertaining to the disputed amounts along with Grant Thornton, its auditor, and legal advisors, and concluded that:

> (i) its prior determination as to the amount of the disputed revenue and interest income under the United Agreement was inconsistent with the guidance in ASC 606, resulting in an **accounting error as that concept is defined in the accounting guidance**, and (ii) its financial statements for the Non-Reliance Periods should be restated.

76. A disclosure to investors of non-reliance on previously issued financial statements is associated with what is colloquially called by the accounting profession a "Big R restatement." *A Big R restatement occurs when the error is material to the prior period financial statements.*

When the error is material, the entity is required to alert the users of these financial statements that they, and the related auditor's report, can no longer be relied upon.

77.     FASB's Statements of Financial Accounting Concepts No. 8 ("CON 8") states the following:

> The omission or misstatement of an item in a financial report is material if, in light of surrounding circumstances, the magnitude of the item is such that it is probable that the judgment of a reasonable person relying upon the report would have been changed or influenced by the inclusion or correction of the item." (CON 8 ¶ QC11)

78.     SEC Staff Accounting Bulletin: No. 99 - Materiality ("SAB 99") offers the most comprehensive guidance on the determination of materiality of misstatements of financial statements. SAB 99 brings together guidance from financial accounting standards, auditing standards, and decisions of the United States Supreme Court. SAB 99 addresses misstatements or omission of amounts, classifications, manner of presentation and disclosures in financial statements. SAB 99 provides that the materiality assessment must be based on consideration of all relevant circumstances or the "total mix" of information, including the size of the misstatement and the context in which the user of the financial statements would view the item. SAB 99 sets forth the SEC Staff's view that there are circumstances in which misstatements below a percentage threshold (e.g., 5 percent) could be material:

> Among the considerations that may well render material a quantitatively small misstatement of a financial statement item are –
>
> - whether the misstatement arises from an item capable of precise measurement or whether it arises from an estimate and, if so, the degree of imprecision inherent in the estimate
> - whether the misstatement masks a change in earnings or other trends
> - whether the misstatement hides a failure to meet analysts' consensus expectations for the enterprise
> - whether the misstatement changes a loss into income or vice versa
> - whether the misstatement concerns a segment or other portion of the registrant's business that has been identified as playing a significant role in the registrant's operations or profitability

- whether the misstatement affects the registrant's compliance with regulatory requirements
- whether the misstatement affects the registrant's compliance with loan covenants or other contractual requirements
- whether the misstatement has the effect of increasing management's compensation – for example, by satisfying requirements for the award of bonuses or other forms of incentive compensation
- whether the misstatement involves concealment of an unlawful transaction.

79. According to SAB 99, "[t]he shorthand in the accounting and auditing literature for this analysis is that financial management and the auditor must consider both 'quantitative' and 'qualitative' factors in assessing an item's materiality."

80. Because GAAP does not apply to immaterial items according to ASC 105-10-05-6, a restatement is required only for items deemed to be material. *By announcing that a restatement was necessary, the Company admitted that its Q1 2022 through Q3 2023 financial statements were materially misstated.*

81. To date, the Company has yet to file the restated financial statements, and as a result is not trading only on the Expert Market (defined below).

**<u>Defendants' Persistent Internal Control Deficiencies Relating to Topic 606</u>**

82. In addition to their undisclosed violations of ASC 606, Defendants also misled investors by stating that the Company maintained effective internal control over financial reporting throughout the Class Period. Due to its size, the Company was not required to have its auditor issue an opinion on its internal control over financial reporting. However, management had an obligation to provide an assessment of the effectiveness of the Company's disclosure controls and procedures and internal control over financial reporting.

83. In each Form 10-K that Harbor Diversified filed, Defendants made clear that the Board of Directors along with executive management held the responsibility of insuring that the Company had effective internal controls in place:

> The Company's board of directors provides oversight with respect to our management of risk, both as a whole and through the audit committee. The Company's board of directors typically reviews and discusses with management at each of its regular meetings information presented by management relating to our financial and operational results and outlook, including risks related to our business and operations. The audit committee oversees the management of risk as part of its responsibilities related to the oversight of the Company's independent registered public accounting firm, and the review of the Company's financial results and internal control over financial reporting.
>
> ***
>
> [t]he audit committee's principal functions [include] to: (ii) *review the Company's internal control over financial reporting*; and (iii) facilitate communication among the Independent Auditors, the Company's financial and senior management, and the board of directors of the Company. The audit committee is directly responsible for oversight of the work of the Independent Auditors, *including resolution of any disagreements between management and the Independent Auditors regarding financial reporting or the application of accounting policies*. This oversight includes review and discussion with management and the Independent Auditors of (i) the Company's financial statements and the reports or information delivered to the audit committee by the Independent Auditors; and (ii) analyses prepared by management and the Independent Auditors setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements, *as well as assessment of the Company's system of internal control over financial reporting*.

84. Following its reemergence as a SEC-registered Company, the Company filed a Form 10-K n July 10, 2020, reporting financial results for the year ended December 31, 2019, wherein Defendants admitted to a material weakness in internal control over financial reporting relating to:

a. the application of accounting treatment for certain complex and non-routine transactions, including certain lease termination transactions;

b. *the adoption of new accounting standards related to Topic 606* and Topic 842;

c. the establishment and design of processes and controls to document and monitor certain controls over financial reporting, including the review of journal entries;

d. the design of controls for user access rights related to certain information technology systems, including payroll; and

e. the accounting for valuation allowances on deferred tax assets.

85. While Defendants warned that they were still in the process of undertaking measures to remediate three of the foregoing identified weaknesses, and "cannot be certain that these measures will be successful in remediating the material weakness or preventing future significant deficiencies or material weaknesses in internal control over financial reporting," *Defendants assured investors that they had already successfully remediated two of the foregoing identified weaknesses, including the internal control weaknesses pertaining to "the adoption of new accounting standards related to Topic 606 and Topic 842*:

> Our management has concluded that the following material weaknesses identified above have been remediated as of the date of the filing of this Annual Report: (i) the adoption of new accounting standards related to Topic 606 and Topic 842; and (ii) the accounting for valuation allowances on deferred tax assets.

Emphasis added.

86. In the Forms 10-Q the Company filed on October 22, 2020, January 14, 2021, and February 10, 2021, reporting financial results for the quarters ended March 31, 2020, June 30, 2020, and September 30, 2020 respectively, Defendants once again told investors that "management has concluded that the following material weaknesses identified in the 2019 Annual Report *have been remediated as of the date of the filing of this Quarterly Report: the adoption of new accounting standards related to Topic 606 and Topic 842*." Emphasis added.

87. In the Form 10-K for the year ended December 31, 2020 ("2020 10-K), which the Company filed on April 1, 2021, Defendants explained the steps they had purportedly taken in the

first quarter of 2020 to "remediate[] the material weaknesses relating to the adoption of new accounting standards, specifically Topic 606…," which included:

- Developing and implementing formal processes, procedures, and controls pertaining to the adoption of the new accounting standards, including those related to Topic 606 and Topic 842, and the accounting for valuation allowances on deferred tax assets; and

- The hiring of outside consultants to assist management with the implementation of the new accounting standards and the evaluation of the need for valuation allowances on deferred tax assets.

88. In reality, Defendants had not successfully remediated the material weakness in internal control over financial reporting relating to application of Topic 606, and a risk thus remained that the Company would continue to misstate financial results due to misapplication of Topic 606 going forward.

89. Specifically, due to a continuing weakness in internal control over financial reporting, Defendants repeatedly booked revenue in violation of Topic 606 that United made clear it had no intention of paying relating to at least two sources of revenue under the CPA, including provisional cash payments based on projected flight schedules which the Company recorded under accounts receivable and the stand ready performance obligation which the Company recorded under notes receivable. Indeed, United initiated arbitration to avoid paying the disputed amounts and to seek payment from Air Wisconsin of "certain amounts" due to Air Wisconsin's allegedly wrongful termination of the CPA.

90. Nevertheless, in the 2020 10-K and in each subsequent quarterly and annual filing, Defendants falsely stated that, "management, including our principal executive officers and principal financial and accounting officer, concluded that…our internal control over financial reporting was effective at the reasonable assurance level."

## Materially False and Misleading Statements Issued During the Class Period

91.     In every Harbor Diversified quarterly and annual filing during the Class Period, Defendants assured investors, "The accompanying consolidated financial statements have been prepared in conformity with accounting principles generally accepted in the United States of America (GAAP)."

92.     The foregoing statement was false and misleading because Defendants misstated revenue in every Form 10-Q and Form 10-K Harbor Diversified filed during the Class Period.

93.     On March 30, 2022, Harbor Diversified filed its Form 10-K for the year ended December 31, 2021 ("2021 10-K"), signed by Defendant Deister, Defendant Mackay, Defendant Garvey, Richard Bartlett, Nolan Bederman, and Kevin J. Degen.  Attached to the 2021 10-K were certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Deister and Mackay attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

94.     In the 2021 10-K, Defendants told investors that a dispute existed between United and Air Wisconsin under the CPA but did not describe the nature of the dispute or the amounts in dispute:

> Currently, a dispute between United and Air Wisconsin exists with respect to certain amounts owed to Air Wisconsin under the United capacity purchase agreement. We cannot predict the outcome of this dispute, or any related negotiations, on the terms of the United capacity purchase agreement or our relationship with United.
>
> ***
>
> The effect of economic downturns on our results of operations is currently somewhat mitigated by the terms of the United capacity purchase agreement, but there is an ongoing dispute with United regarding certain terms of the agreement, and the extension of Air Wisconsin's partnership with United beyond the current term is not certain.

95.     The foregoing statements misled investors because, while acknowledging the existence of the dispute, Defendants did not disclose that they had recognized the amounts in dispute as revenue in contravention of ASC 606, did not disclose that the disputed amounts would continue to grow until the ultimate termination of the CPA to well over $52 million, and did not disclose that their recognition of disputed revenue created a material risk that the Company would have to restate its financials for every quarter in which they recognized disputed revenue.

96.     Moreover, the 2021 10-K reported contract revenues of $247,519,000 and described the Company's recognition of revenue from, *inter alia*, the CPA relating to provisional cash payments and its stand ready obligation under the October 2020 CPA amendment:

> The United capacity purchase agreement includes provisional cash payments four times per month based on a projected level of flying each month. Air Wisconsin and United subsequently reconcile these payments to the actual completed flight activity on a monthly basis.

***

> The CPA Amendment provided, among other things, for the payment or accrual of certain amounts by United to Air Wisconsin based on certain scheduling benchmarks. In conjunction with the significant reduction in departures and block hours resulting from the COVID-19 pandemic in 2020, and consistent with the terms of the CPA Amendment, management determined that, from an accounting perspective, a new performance obligation was created by United, requiring Air Wisconsin to stand ready to deliver flight services. Air Wisconsin determined, using the expected cost plus a margin method, that the United "stand ready" rate represents the relative stand-alone selling price of the performance obligation. The stand ready performance obligation will be recognized over time on a straight-line basis based on the number of unscheduled block hours below a minimum threshold at the stand ready rate as determined in a manner consistent with the CPA Amendment. For the years ended December 31, 2021 and December 31, 2020, Air Wisconsin recorded $15,128 and $21,392, respectively, in revenue related to this performance obligation. Under the CPA Amendment, United pays this amount by the delivery of a long-term note. Therefore, this amount was recorded in long-term notes receivable on the audited consolidated balance sheets. The long-term notes receivable contain a significant financing component and any interest income is separately reported in the consolidated statements of operations. As of December 31, 2021, these notes totaled $47,568, bore interest at the rate of 4.5%, and had a maturity date of February 28, 2023. As of December 31, 2021, interest receivable on these notes totaled $2,166.

97.     The foregoing statements misled investors because the amount of contract revenue was misstated and while describing the nature of revenue relating to provisional cash payments and the stand ready obligation, Defendants failed to reveal that United disputed, and would likely never pay, a material portion of that revenue.

98.     In the 2021 10-K, Defendants warned of a risk that the Company may not succeed in preventing *future* material weakness in internal control over financial reporting:

> We cannot be certain that we will be successful in preventing or remediating future material weaknesses or significant deficiencies in internal control over financial reporting…Any newly identified material weaknesses could result in material misstatements of our annual or interim consolidated financial statements that would not be prevented or detected. Any such misstatements of our financial statements could lead to restatements of our financial statements, which could result in an adverse impact to our financial results and a decline in the trading price of the Company's common stock.

99.     The foregoing statements were false and misleading because Defendants knew of a "*certain*" and *existing* material weakness and significant deficiency in internal control over financial reporting that they had not prevented or adequately remediated relating to their application of ASC 606 and the Company thus faced a substantial risk that it would have to restate its financial statements.

100.    In the 2021 10-K, Defendants further represented that the Company had effective internal control over financial reporting:

> Our management, under the supervision and with the participation of our principal executive officer, our principal financial officer and our principal accounting officer, evaluated the effectiveness of our internal control over financial reporting as of December 31, 2021 (the end of our fiscal year), based on the framework and criteria established in the 2013 Internal Control Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission. ***Based on this evaluation, our management, including our principal executive officer, our principal financial officer and our principal accounting officer, concluded that our internal control over financial reporting was effective as of December 31, 2021.***

101.    The foregoing statements were false and misleading because the Company did not have effective internal control over financial reporting relating to its application of ASC 606 and thus faced a substantial risk that the Company would have to restate financial statements.

102.    Defendants' boilerplate warning that due to "*inherent limitations in all control systems, no evaluation of controls can provide absolute assurance that all control failures and instances of fraud, if any, within the Company have been detected*," further misled investors because Defendants knew or were reckless in not knowing that *Harbor Diversified's* internal control system weakness was not hypothetical but actual.  Indeed, the Company's deficient internal control system had already failed to prevent Defendants' non-compliance with ASC 606 when booking revenue that United made clear it had no intention of paying relating to at least two sources of revenue under the CPA, including provisional cash payments based on projected flight schedules which the Company recorded under accounts receivable and the stand ready performance obligation which the Company recorded under notes receivable, raising a substantial risk that the Company would have to restate its financials.

103.    On May 9, 2022, Harbor Diversified filed with the SEC its quarterly report on Form 10-Q for the period ended March 31, 2022 (the "1Q22 Report"), signed by Defendants Deister, Mackay, and Garvey. Attached to the 1Q22 Report were certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Deister and Mackay attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

104.    In the 1Q22 Report, Defendants once again reported on the existence of a dispute between Air Wisconsin and United without quantifying the amount in dispute or providing complete information regarding the nature of the dispute:

United makes provisional cash payments to Air Wisconsin during each month of service based on projected flight schedules. These provisional cash payments are subsequently reconciled with United based on actual completed flight activity. As of the date of this filing, these payments are reconciled through December 2021. As of March 31, 2022, United owed Air Wisconsin $5,066 pursuant to the United capacity purchase agreement, which is recorded in accounts receivable, net, on the consolidated balance sheets. United has disputed that it owes a portion of that amount.

*** 

Currently, a dispute exists under the United capacity purchase agreement with respect to certain recurring amounts owed to Air Wisconsin by United. As of March 31, 2022, the amount in dispute was approximately $9,371. The Company believes that United's claims have no support under the United capacity purchase agreement, however the outcome cannot be predicted. The Company has recognized all disputed amounts through March 31, 2022 in the consolidated financial statements.

105.    The foregoing statements misled investors because, while acknowledging the existence of the dispute and the Company's recognition of the disputed amounts in the financial statements, Defendants did not disclose that they had recognized the amounts in dispute as revenue in contravention of ASC 606, did not disclose that its belief that it would collect the disputed amounts from United had no reasonable basis, did not disclose that the disputed amounts would balloon to $52 million by the termination of the CPA, and did not disclose that their recognition of disputed revenue created a material risk that the Company would have to restate its financials for every quarter in which they recognized disputed revenue.

106.    Moreover, the 1Q22 Report reported contract revenues for that quarter of $66,968,000 and described the Company's recognition of revenue relating to, *inter alia*, its stand ready obligation under the October 2020 CPA amendment:

The CPA Amendment provided, among other things, for the payment or accrual of certain amounts by United to Air Wisconsin based on certain scheduling benchmarks. In conjunction with the significant reduction in departures and block hours resulting from the COVID-19 pandemic in 2020, and consistent with the terms of the CPA Amendment, management determined that, from an accounting perspective, a new performance obligation was created by United, requiring Air

Wisconsin to stand ready to deliver flight services. Air Wisconsin determined, using the expected cost plus a margin method, that the United "stand ready" rate represents the relative stand-alone selling price of the performance obligation. The stand ready performance obligation will be recognized over time on a straight-line basis based on the number of unscheduled block hours below a minimum threshold at the stand ready rate as determined in a manner consistent with the CPA Amendment. For the three months ended March 31, 2022 and 2021, Air Wisconsin recorded $3,509 and $7,235, respectively, in revenue related to this performance obligation. Under the CPA Amendment, United pays this amount by the delivery of a note due at the end of the contract term in February 2023. Therefore, this amount was recorded in notes receivable on the consolidated balance sheets. The notes receivable contain a significant financing component and any interest income is separately reported in the consolidated statements of operations. As of March 31, 2022, these notes totaled $51,078, bore interest at the rate of 4.5%, and had a maturity date of February 28, 2023. As of March 31, 2022, interest receivable on these notes totaled $2,710.

107. The foregoing statements misled investors because the amount of contract revenue was misstated and while describing the nature of revenue relating to the stand ready obligation, Defendants failed to reveal that United disputed, and would likely never pay, a material portion of that revenue.

108. In the 1Q22 Report, Defendants warned of a risk that the Company may not succeed in preventing *future* material weakness in internal control over financial reporting:

We cannot be certain that we will be successful in preventing or remediating future material weaknesses or significant deficiencies in internal control over financial reporting…Any newly identified material weaknesses could result in material misstatements of our annual or interim consolidated financial statements that would not be prevented or detected. Any such misstatements of our financial statements could lead to restatements of our financial statements, which could result in an adverse impact to our financial results and a decline in the trading price of the Company's common stock.

109. The foregoing statements were false and misleading because Defendants knew of a "*certain*" and *existing* material weakness and significant deficiency in internal control over financial reporting that they had not prevented or adequately remediated relating to their

application of ASC 606 and the Company thus faced a substantial risk that it would have to restate its financial statements.

110. In the 1Q22 Report, Defendants once again represented that the Company maintained effective internal control over financial reporting:

> As required by Rule 15d-15(b) under the Exchange Act, our management, including our principal executive officer, principal financial officer and principal accounting officer, carried out an evaluation of the effectiveness of the design and operation of our disclosure controls and procedures (as defined in Rule 15d-15(e) under the Exchange Act) as of March 31, 2022, the last day of the period covered by this Quarterly Report. ***Based on this evaluation, our management, including our principal executive officer, principal financial officer and principal accounting officer, concluded that, as of March 31, 2022, our disclosure controls and procedures were effective at the reasonable assurance level***.

Emphasis added.

111. The foregoing statements were false and misleading because the Company did not have effective internal control over financial reporting relating to its application of ASC 606 and thus faced a substantial risk that the Company would have to restate financial statements.

112. Defendants' boilerplate warning that due to "*inherent limitations in __all__ control systems, no evaluation of controls can provide absolute assurance that all control failures and instances of fraud, if any, within the Company have been detected*," further misled investors because Defendants knew or were reckless in not knowing that *Harbor Diversified's* internal control system weakness was not hypothetical but actual. Indeed, the Company's deficient internal control system had already failed to prevent Defendants' repeated non-compliance with ASC 606 when booking revenue that United made clear it had no intention of paying relating to at least two sources of revenue under the CPA, including provisional cash payments based on projected flight schedules which the Company recorded under accounts receivable and the stand ready

performance obligation which the Company recorded under notes receivable, raising a substantial risk that the Company would have to restate its financials.

113. On August 10, 2022, Harbor Diversified filed with the SEC its quarterly report on Form 10-Q for the period ended June 30, 2022 (the "2Q22 Report"), signed by Defendants Deister, Mackay, and Garvey. Attached to the 2Q22 Report were certifications pursuant to SOX signed by Defendants Deister and Mackay attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

114. In the 2Q22 Report, Defendants reported contract revenue of $77,923,000 for the quarter and once again reported on the existence of a dispute between Air Wisconsin and United, and disclosed for the first time the disputed components of revenue amounts related to provisional cash payments for projected flight schedules as well as notes for the stand ready obligation created by the October 2020 amendment to the CPA:

> United makes provisional cash payments to Air Wisconsin during each month of service based on projected flight schedules. These provisional cash payments are subsequently reconciled with United based on actual completed flight activity. As of the date of this filing, these payments are reconciled through January 2022. Subject to final reconciliation of the provisional cash payments for the periods after January 31, 2022, as of June 30, 2022, United owed Air Wisconsin approximately $14,185, which is recorded in accounts receivable, net, on the consolidated balance sheets. ***United is disputing that it owes $10,462 of this amount. For additional information regarding the dispute with United, refer to Note 8, Commitments and Contingencies.***

> ***

> The CPA Amendment provided, among other things, for the payment or accrual of certain amounts by United to Air Wisconsin based on certain scheduling benchmarks. In conjunction with the significant reduction in departures and block hours resulting from the COVID-19 pandemic in 2020, and consistent with the terms of the CPA Amendment, management determined that, from an accounting perspective, a new performance obligation was created by United, requiring Air Wisconsin to stand ready to deliver flight services. Air Wisconsin determined,

using the expected cost plus a margin method, that the United "stand ready" rate represents the relative stand-alone selling price of the performance obligation. The stand ready performance obligation will be recognized over time on a straight-line basis based on the number of unscheduled block hours below a minimum threshold at the stand ready rate as determined in a manner consistent with the CPA Amendment. For the three and six months ended June 30, 2022, Air Wisconsin recorded $4,099 and $7,608, respectively, in revenue related to this performance obligation compared to $5,736 and $12,972 for the three and six months ended June 30, 2021, respectively. Under the CPA Amendment, United is required to pay this amount by the delivery of a note each quarter, which notes are due and payable at the end of the contract term in February 2023. Therefore, this amount was recorded in notes receivable on the consolidated balance sheets. The notes receivable contain a significant financing component and any interest income is separately reported in the consolidated statements of operations. As of June 30, 2022, the principal amount of these notes totaled $55,177, bore interest at the rate of 4.5%, and had a maturity date of February 28, 2023. As of June 30, 2022, interest receivable on these notes totaled $3,303. ***United has disputed that it owes these amounts in respect of certain quarters and has refused to deliver notes for those quarters. The amount in dispute in respect of those notes as of the date of this filing totals $9,109, including interest receivable of $71. For additional information regarding the dispute with United, refer to Note 8, Commitments and Contingencies***.

***

***Currently, a dispute exists under the United capacity purchase agreement with respect to certain recurring amounts owed to Air Wisconsin by United. As of June 30, 2022, the aggregate amount in dispute was approximately $19,571. The Company believes it has a strong position under the United capacity purchase agreement, and believes the probability of an adverse outcome is remote. The Company is also unable to predict the amount or range of potential losses resulting from this dispute. As a result, the Company has recognized all disputed amounts through June 30, 2022 in the consolidated financial statements.*** While the parties are actively engaging to resolve or minimize the dispute, if the parties are unable to negotiate a mutually agreeable resolution, the dispute resolution provisions under the United capacity purchase agreement require arbitration.

115. Regarding the dispute, the 2Q22 Report further disclosed:

The fixed amount Air Wisconsin is entitled to receive under the United capacity purchase agreement is based on a fixed contractual rate and number of covered aircraft, although there is currently a dispute with United as to the number of covered aircraft for which it is required to pay the fixed contractual rate.

116. The foregoing statements misled investors because Defendants misstated contract revenue by including the disputed amounts and, while acknowledging the existence of the dispute

and the Company's recognition of the disputed amounts in the financial statements, Defendants did not disclose that they had recognized the amounts in dispute as revenue in contravention of ASC 606, did not disclose that its belief that it would collect the disputed amounts from United had no reasonable basis, did not disclose that the disputed amounts would balloon to $52 million by the termination of the CPA, and did not disclose that their recognition of disputed revenue created a material risk that the Company would have to restate its financials for every quarter in which they recognized disputed revenue.

117. In the 2Q22 Report, Defendants again warned of a risk that the Company may not succeed in preventing *future* material weakness in internal control over financial reporting:

> We cannot be certain that we will be successful in preventing or remediating future material weaknesses or significant deficiencies in internal control over financial reporting…Any newly identified material weaknesses could result in material misstatements of our annual or interim consolidated financial statements that would not be prevented or detected. Any such misstatements of our financial statements could lead to restatements of our financial statements, which could result in an adverse impact to our financial results and a decline in the trading price of the Company's common stock.

118. The foregoing statements were false and misleading because Defendants knew of a "*certain*" and *existing* material weakness and significant deficiency in internal control over financial reporting that they had not prevented or adequately remediated relating to their application of ASC 606 and the Company thus faced a substantial risk that it would have to restate its financial statements.

119. In the 2Q22 Report, Defendants further represented that the Company had effective internal control over financial reporting:

> As required by Rule 15d-15(b) under the Exchange Act, our management, including our principal executive officer, principal financial officer and principal accounting officer, carried out an evaluation of the effectiveness of the design and operation of our disclosure controls and procedures (as defined in Rule 15d-15(e) under the Exchange Act) as of June 30, 2022, the last day of the period covered by this

Quarterly Report. ***Based on this evaluation, our management, including our principal executive officer, principal financial officer and principal accounting officer, concluded that, as of June 30, 2022, our disclosure controls and procedures were effective at the reasonable assurance level.***

Emphasis added.

120.    The foregoing statements were false and misleading because the Company did not have effective internal control over financial reporting relating to its application of ASC 606 and thus faced a substantial risk that the Company would have to restate financial statements.

121.    Defendants' boilerplate warning that due to "*inherent limitations in <u>all</u> control systems, no evaluation of controls can provide absolute assurance that all control failures and instances of fraud, if any, within the Company have been detected*," further misled investors because Defendants knew or were reckless in not knowing that *Harbor Diversified's* internal control system weakness was not hypothetical but actual. Indeed, the Company's deficient internal control system had already failed to prevent Defendants' repeated non-compliance with ASC 606 when booking revenue that United made clear it had no intention of paying relating to at least two sources of revenue under the CPA, including provisional cash payments based on projected flight schedules which the Company recorded under accounts receivable and the stand ready performance obligation which the Company recorded under notes receivable, raising a substantial risk that the Company would have to restate its financials.

122.    On November 21, 2022, Harbor Diversified filed with the SEC its quarterly report on Form 10-Q for the period ended September 30, 2022 (the "3Q22 Report"), signed by Defendants Deister, Mackay, and Garvey. Attached to the 3Q22 Report were certifications pursuant to SOX signed by Defendants Deister and Mackay attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

123.     In the 3Q22 Report, Defendants reported contract revenue of $68,389,000 for the quarter and once again reported on the existence of a dispute between Air Wisconsin and United, and disclosed for the first time the disputed components of revenue amounts related to provisional cash payments for projected flight schedules as well as notes for the stand ready obligation created by the October 2020 amendment to the CPA:

> United makes provisional cash payments to Air Wisconsin during each month of service based on projected flight schedules. These provisional cash payments are subsequently reconciled with United based on actual completed flight activity. As of the date of this filing, these payments are reconciled through July 2022. Subject to final reconciliation of the provisional cash payments for the periods after July 31, 2022, as of September 30, 2022, United owed Air Wisconsin approximately $22,302, which is recorded in accounts receivable, net, on the consolidated balance sheets. **United is disputing that it owes $18,693 of this amount. For additional information regarding the dispute with United, refer to Note 8, Commitments and Contingencies.**
>
> ***
>
> The CPA Amendment provided, among other things, for the payment or accrual of certain amounts by United to Air Wisconsin based on certain scheduling benchmarks. In conjunction with the significant reduction in departures and block hours resulting from the COVID-19 pandemic in 2020, and consistent with the terms of the CPA Amendment, management determined that, from an accounting perspective, a new performance obligation was created by United, requiring Air Wisconsin to stand ready to deliver flight services. Air Wisconsin determined, using the expected cost plus a margin method, that the United "stand ready" rate represents the relative stand-alone selling price of the performance obligation. The stand ready performance obligation will be recognized over time on a straight-line basis based on the number of unscheduled block hours below a minimum threshold at the stand ready rate as determined in a manner consistent with the CPA Amendment. For the three and nine months ended September 30, 2022, Air Wisconsin recorded $5,138 and $12,746, respectively, in revenue related to this performance obligation compared to $728 and $13,699 for the three and nine months ended September 30, 2021, respectively. Under the CPA Amendment, United is required to accrue this amount and, upon request by Air Wisconsin, deliver a note evidencing this amount each quarter, which notes are due and payable in February 2023. Therefore, this amount is recorded in notes receivable on the consolidated balance sheets. The notes receivable contain a significant financing component and any interest income is separately reported in the consolidated statements of operations. As of September 30, 2022, the principal amount of these notes totaled $60,315, including the $11,048 note receivable described above, bore interest at the rate of 4.5%, and had a maturity date of February 28, 2023. As of

September 30, 2022, interest receivable on these notes, including the disputed notes, totaled $3,954 and is recorded in accounts receivable, net on the consolidated balance sheets. ***United has disputed that it owes these amounts in respect of certain quarters and has refused to deliver notes for those quarters. The amount in dispute in respect of those notes as of the date of this filing totals $14,175, including interest receivable of $174.*** On November 4, 2022, United prepaid to Air Wisconsin $50,126 to satisfy all of the outstanding, undisputed notes receivable, including all accrued interest, pursuant to the CPA Amendment in respect of the period of the second quarter 2020 through the third quarter 2021 and the $11,048 note receivable described above. For additional information regarding the dispute with United, refer to Note 8, *Commitments and Contingencies.*

***

A dispute exists under the United capacity purchase agreement with respect to certain recurring amounts owed to Air Wisconsin by United. As of September 30, 2022, the aggregate amount in dispute was approximately $33,042.  In October 2022, United initiated arbitration under the agreement and requested a declaration that it does not owe any of the disputed amounts as claimed by Air Wisconsin. As Air Wisconsin and United are in the early stages of arbitration, Air Wisconsin cannot, with any degree of certainty, estimate the likely outcome of the arbitration including any potential award of the disputed amounts. ***Air Wisconsin, however, maintains that it has a strong position and is entitled to the disputed amounts under the terms of the United capacity purchase agreement. As a result, the Company has recognized all disputed amounts through September 30, 2022.***

124.    The foregoing statements misled investors because Defendants misstated contract revenue by including the disputed amounts and, while acknowledging the existence of the dispute and the Company's recognition of the disputed amounts in the financial statements, Defendants did not disclose that they had recognized the amounts in dispute as revenue in contravention of ASC 606, did not disclose that its belief that it would collect the disputed amounts from United had no reasonable basis, did not disclose that the disputed amounts would balloon to $52 million by the termination of the CPA, and did not disclose that their recognition of disputed revenue created a material risk that the Company would have to restate its financials for every quarter in which they recognized disputed revenue.

125. In the 3Q22 Report, Defendants repeated their warning of a risk that the Company may not succeed in preventing *future* material weakness in internal control over financial reporting:

> We cannot be certain that we will be successful in preventing or remediating future material weaknesses or significant deficiencies in internal control over financial reporting…Any newly identified material weaknesses could result in material misstatements of our annual or interim consolidated financial statements that would not be prevented or detected. Any such misstatements of our financial statements could lead to restatements of our financial statements, which could result in an adverse impact to our financial results and a decline in the trading price of the Company's common stock.

126. The foregoing statements were false and misleading because Defendants knew of a "*certain*" and *existing* material weakness and significant deficiency in internal control over financial reporting that they had not prevented or adequately remediated relating to their application of ASC 606 and the Company thus faced a substantial risk that it would have to restate its financial statements.

127. In the 3Q22 Report, Defendants further represented that the Company had effective internal control over financial reporting:

> As required by Rule 15d-15(b) under the Exchange Act, our management, including our principal executive officer, principal financial officer and principal accounting officer, carried out an evaluation of the effectiveness of the design and operation of our disclosure controls and procedures (as defined in Rule 15d-15(e) under the Exchange Act) as of September 30, 2022, the last day of the period covered by this Quarterly Report. ***Based on this evaluation, our management, including our principal executive officer, principal financial officer and principal accounting officer, concluded that, as of September 30, 2022, our disclosure controls and procedures were effective at the reasonable assurance level***.

Emphasis added.

128. The foregoing statements were false and misleading because the Company did not have effective internal control over financial reporting relating to its application of ASC 606 and thus faced a substantial risk that the Company would have to restate financial statements.

129.     Defendants' boilerplate warning that due to "*inherent limitations in <u>all</u> control systems, no evaluation of controls can provide absolute assurance that all control failures and instances of fraud, if any, within the Company have been detected*," further misled investors because Defendants knew or were reckless in not knowing that *Harbor Diversified's* internal control system weakness was not hypothetical but actual. Indeed, the Company's deficient internal control system had already failed to prevent Defendants' repeated non-compliance with ASC 606 when booking revenue that United made clear it had no intention of paying relating to at least two sources of revenue under the CPA, including provisional cash payments based on projected flight schedules which the Company recorded under accounts receivable and the stand ready performance obligation which the Company recorded under notes receivable, raising a substantial risk that the Company would have to restate its financials.

130.     On April 3, 2023, Harbor Diversified filed with the SEC its annual report on Form 10-K for the period ended December 31, 2022 (the "2022 10-K"), signed by Defendant Deister, Defendant Mackay, Defendant Garvey, Richard Bartlett, Nolan Bederman, and Kevin J. Degen. Attached to the 2022 10-K were certifications pursuant to SOX signed by Defendants Deister and Mackay attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

131.     In the 2022 10-K, Defendants reported contract revenue of $280,737,000 and once again reported on the dispute between Air Wisconsin and United:

> United makes provisional cash payments to Air Wisconsin during each month of service based on projected flight schedules. These provisional cash payments are subsequently reconciled with United based on actual completed flight activity. As of the date of this filing, these payments are reconciled through October 2022. Subject to final reconciliation of the provisional cash payments for the periods after October 31, 2022, as of December 31, 2022, United owed Air Wisconsin approximately $29,435, which is recorded in accounts receivable, net, on the

consolidated balance sheets. ***United is disputing that it owes $28,071 of this amount.***

\*\*\*

The CPA Amendment provided, among other things, for the payment or accrual of certain amounts by United to Air Wisconsin based on certain scheduling benchmarks. In conjunction with the significant reduction in departures and block hours resulting from the COVID-19 pandemic in 2020, and consistent with the terms of the CPA Amendment, management determined that, from an accounting perspective, a new performance obligation was created by United, requiring Air Wisconsin to stand ready to deliver flight services. Air Wisconsin determined, using the expected cost plus a margin method, that the United "stand ready" rate represents the relative stand-alone selling price of the performance obligation. The stand ready performance obligation is being recognized over time on a straight-line basis based on the number of unscheduled block hours below a minimum threshold at the stand ready rate as determined in a manner consistent with the CPA Amendment. For the year ended December 31, 2022, Air Wisconsin recorded $18,023 in revenue related to this performance obligation compared to $15,128 for the year ended December 31, 2021. Under the CPA Amendment, United is required to accrue this amount and, upon request by Air Wisconsin, deliver a note evidencing this amount each quarter. Therefore, this amount is recorded in notes receivable on the consolidated balance sheets. The notes receivable contain a significant financing component and any interest income is separately reported in the consolidated statements of operations. ***United has disputed that it owes these amounts in respect of certain quarters and has refused to deliver notes for those quarters.*** On November 4, 2022, United prepaid to Air Wisconsin $50,126 to satisfy all of the outstanding, undisputed notes receivable, including all accrued interest, pursuant to the CPA Amendment in respect of the period of the second quarter 2020 through the third quarter 2021 and the $11,048 note receivable described above. As of December 31, 2022, the principal amount of the unpaid disputed notes totaled $19,452, bore interest at the rate of 4.5%, and had a maturity date of February 28, 2023. ***As of December 31, 2022, interest receivable on the disputed notes totaled $335 and is recorded in accounts receivable, net on the consolidated balance sheets.***

\*\*\*

A dispute exists under the United capacity purchase agreement with respect to certain recurring amounts owed to Air Wisconsin by United. In October 2022, United initiated arbitration under the United capacity purchase agreement and requested a declaration that it does not owe any of the amounts claimed by Air Wisconsin. Air Wisconsin expects that, unless the parties reach a settlement before then, the arbitration hearing will occur in July 2023 and that the arbitrators will make their award in August 2023. In December 2022 and February 2023, Air Wisconsin sent United notices of termination of the agreement. In the arbitration,

United has contested Air Wisconsin's right to terminate the agreement. In accordance with the termination provisions of the agreement, and in response to Air Wisconsin's first termination notice, United delivered a revised wind-down schedule in January 2023. Following the delivery of that revised schedule, in February 2023, the parties agreed, in a sixth amendment to the United capacity purchase agreement, to a wind-down schedule that provides for the withdrawal of aircraft from the agreement beginning in January 2023 and continuing until June 2023, at which time all of Air Wisconsin's remaining aircraft would be withdrawn from the agreement, and Air Wisconsin would cease flying for United. ***As of December 31, 2022, the aggregate amount in dispute was approximately $47.9 million.*** As Air Wisconsin and United are in the early stages of arbitration, Air Wisconsin cannot, with any degree of certainty, estimate the likely outcome of the arbitration including any potential award of the disputed amounts. ***Air Wisconsin, however, maintains that it has a strong position and is entitled to the disputed amounts under the terms of the United capacity purchase agreement. As a result, the Company has recognized all disputed amounts through December 31, 2022.***

132.     The foregoing statements misled investors because Defendants misstated contract revenue by including the disputed amounts and, while acknowledging the existence of the dispute and the Company's recognition of the disputed amounts in the financial statements, Defendants did not disclose that they had recognized the amounts in dispute as revenue in contravention of ASC 606 despite United's stated intention not to pay and initiation of arbitration, did not disclose that its belief that it would collect the disputed amounts from United had no reasonable basis, did not disclose that the disputed amounts would balloon to $52 million by the termination of the CPA, and did not disclose that their recognition of disputed revenue created a material risk that the Company would have to restate its financials for every quarter in which they recognized disputed revenue.

133.     In the 2022 10-K, Defendants warned of a risk that the Company may not succeed in preventing *future* material weakness in internal control over financial reporting:

We cannot be certain that we will be successful in preventing or remediating future material weaknesses or significant deficiencies in internal control over financial reporting…Any newly identified material weaknesses could result in material misstatements of our annual or interim consolidated financial statements that would

not be prevented or detected. Any such misstatements of our financial statements could lead to restatements of our financial statements, which could result in an adverse impact to our financial results and a decline in the trading price of the Company's common stock.

134. The foregoing statements were false and misleading because Defendants knew of a "*certain*" and *existing* material weakness and significant deficiency in internal control over financial reporting that they had not prevented or adequately remediated relating to their application of ASC 606 and the Company thus faced a substantial risk that it would have to restate its financial statements.

135. In the 2022 10-K, Defendants further represented that the Company had effective internal control over financial reporting:

As required by Rule 15d-15(b) under the Exchange Act, our management, under the supervision and with the participation of our principal executive officer, our principal financial officer and our principal accounting officer, carried out an evaluation of the effectiveness of the design and operation of our disclosure controls and procedures (as defined in Rule 15d-15(e) under the Exchange Act) as of December 31, 2022, the last day of the period covered by this Annual Report. ***Based on this evaluation, our management, including our principal executive officer, our principal financial officer and our principal accounting officer, concluded that, as of December 31, 2022, our disclosure controls and procedures were effective at the reasonable assurance level***.

Emphasis added.

136. The foregoing statements were false and misleading because the Company did not have effective internal control over financial reporting relating to its application of ASC 606 and thus faced a substantial risk that the Company would have to restate financial statements.

137. Defendants' boilerplate warning that due to "*inherent limitations in* _all_ *control systems, no evaluation of controls can provide absolute assurance that all control failures and instances of fraud, if any, within the Company have been detected*," further misled investors because Defendants knew or were reckless in not knowing that *Harbor Diversified's* internal

control system weakness was not hypothetical but actual. Indeed, the Company's deficient internal control system had already failed to prevent Defendants' repeated non-compliance with ASC 606 when booking revenue that United made clear it had no intention of paying relating to at least two sources of revenue under the CPA, including provisional cash payments based on projected flight schedules which the Company recorded under accounts receivable and the stand ready performance obligation which the Company recorded under notes receivable, raising a substantial risk that the Company would have to restate its financials.

138.     On May 15, 2023, Harbor Diversified filed with the SEC its quarterly report on Form 10-Q for the period ended March 31, 2023 (the "1Q23 Report"), signed by Defendants Deister, Mackay, and Garvey. Attached to the 1Q23 Report were certifications pursuant to SOX signed by Defendants Deister and Mackay attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

139.     In the 1Q23 Report, Defendants reported contract revenue of $59,037,000 for the quarter and once again reported on the existence of a dispute between Air Wisconsin and United:

> United makes provisional cash payments to Air Wisconsin during each month of service based on projected flight schedules. These provisional cash payments are subsequently reconciled with United based on actual completed flight activity. As of May 12, 2023 these payments were reconciled through October 2022. Subject to final reconciliation of the provisional cash payments for the periods after October 31, 2022, as of March 31, 2023, United owed Air Wisconsin approximately $30,499, which is recorded in accounts receivable, net, on the consolidated balance sheets. ***United is disputing that it owes $30,148 of this amount.***

> ***

> The CPA Amendment provided, among other things, for the payment or accrual of certain amounts by United to Air Wisconsin based on certain scheduling benchmarks. In conjunction with the significant reduction in departures and block hours resulting from the COVID-19 pandemic in 2020, and consistent with the

terms of the CPA Amendment, management determined that, from an accounting perspective, a new performance obligation was created by United, requiring Air Wisconsin to stand ready to deliver flight services. Air Wisconsin determined, using the expected cost plus a margin method, that the United "stand ready" rate represents the relative stand-alone selling price of the performance obligation. The stand ready performance obligation is being recognized over time on a straight-line basis based on the number of unscheduled block hours below a minimum threshold at the stand ready rate as determined in a manner consistent with the CPA Amendment. For the three months ended March 31, 2023, Air Wisconsin recorded $1,641 in revenue related to this performance obligation compared to $3,509 for the three months ended March 31, 2022. Under the CPA Amendment, United is required to accrue this amount and, upon request by Air Wisconsin, deliver a note evidencing this amount each quarter. Therefore, this amount is recorded in notes receivable on the consolidated balance sheets. The notes receivable contain a significant financing component and any interest income is separately reported on the consolidated statements of operations. ***United has disputed that it owes these amounts in respect of certain quarters and has refused to deliver notes for those quarters.*** On November 4, 2022, United prepaid to Air Wisconsin $50,126 to satisfy all of the outstanding, undisputed notes receivable, including all accrued interest, pursuant to the CPA Amendment in respect of the period from the second quarter of 2020 through the third quarter 2021 and the $11,048 note receivable described above. As of March 31, 2023, the principal amount of the unpaid disputed notes totaled $21,093, bore interest at the rate of 4.5%, and had a maturity date of February 28, 2023. ***As of March 31, 2023, interest receivable on the disputed notes totaled $551 and is recorded in accounts receivable, net, on the consolidated balance sheets.***

***

A dispute exists under the United capacity purchase agreement with respect to certain recurring amounts owed to Air Wisconsin by United. ***As of March 31, 2023, in accordance with applicable accounting standards, the Company has recorded $30,699 of the disputed amounts in accounts receivable, net, and $21,093 of the disputed amounts in notes receivable, on the consolidated balance sheets.*** In October 2022, United initiated arbitration under the agreement. In the arbitration, United has requested a declaration that it does not owe any of the disputed amounts claimed by Air Wisconsin, has asserted that Air Wisconsin improperly terminated the agreement and has asserted a claim for damages for wrongful termination. Since the arbitration process is still on-going, the hearing has not yet occurred and no award has been issued, Air Wisconsin cannot reasonably estimate the likely outcome of the arbitration including any potential award of the disputed amounts. ***Air Wisconsin, however, maintains that it has a strong position, that it was entitled to terminate the agreement and that it is entitled to the disputed amounts, including the amounts recorded in the consolidated balance sheets, under the terms of the agreement.*** For additional information, refer to Note 3, Capacity Purchase Agreements with United and American.

140.     The foregoing statements misled investors because Defendants misstated contract revenue by including the disputed amounts and, while acknowledging the existence of the dispute and the Company's recognition of the disputed amounts in the financial statements, Defendants did not disclose that they had recognized the amounts in dispute as revenue in contravention of ASC 606 despite United's stated intention not to pay, did not disclose that its belief that it would collect the disputed amounts from United had no reasonable basis, did not disclose that the disputed amounts would balloon to $52 million by the termination of the CPA, and did not disclose that their recognition of disputed revenue created a material risk that the Company would have to restate its financials for every quarter in which they recognized disputed revenue.

141.     In the 1Q23 Report, Defendants warned of a risk that the Company may not succeed in preventing *future* material weakness in internal control over financial reporting:

> We cannot be certain that we will be successful in preventing or remediating future material weaknesses or significant deficiencies in internal control over financial reporting…Any newly identified material weaknesses could result in material misstatements of our annual or interim consolidated financial statements that would not be prevented or detected. Any such misstatements of our financial statements could lead to restatements of our financial statements, which could result in an adverse impact to our financial results and a decline in the trading price of the Company's common stock.

142.     The foregoing statements were false and misleading because Defendants knew of a "*certain*" and *existing* material weakness and significant deficiency in internal control over financial reporting that they had not prevented or adequately remediated relating to their application of ASC 606 and the Company thus faced a substantial risk that it would have to restate its financial statements.

143.     In the 1Q23 Report, Defendants further represented that the Company had effective internal control over financial reporting:

As required by Rule 15d-15(b) under the Exchange Act, our management, including our principal executive officer, principal financial officer and principal accounting officer, carried out an evaluation of the effectiveness of the design and operation of our disclosure controls and procedures (as defined in Rule 15d-15(e) under the Exchange Act) as of March 31, 2023, the last day of the period covered by this Quarterly Report. ***Based on this evaluation, our management, including our principal executive officer, principal financial officer and principal accounting officer, concluded that, as of March 31, 2023, our disclosure controls and procedures were effective at the reasonable assurance level***.

Emphasis added.

144.    The foregoing statements were false and misleading because the Company did not have effective internal control over financial reporting relating to its application of ASC 606 and thus faced a substantial risk that the Company would have to restate financial statements.

145.    Defendants' boilerplate warning that due to "*inherent limitations in <u>all</u> control systems, no evaluation of controls can provide absolute assurance that all control failures and instances of fraud, if any, within the Company have been detected*," further misled investors because Defendants knew or were reckless in not knowing that *Harbor Diversified's* internal control system weakness was not hypothetical but actual. Indeed, the Company's deficient internal control system had already failed to prevent Defendants' repeated non-compliance with ASC 606 when booking revenue that United made clear it had no intention of paying relating to at least two sources of revenue under the CPA, including provisional cash payments based on projected flight schedules which the Company recorded under accounts receivable and the stand ready performance obligation which the Company recorded under notes receivable, raising a substantial risk that the Company would have to restate its financials.

146.    On August 14, 2023, Harbor Diversified filed with the SEC its quarterly report on Form 10-Q for the period ended June 30, 2023 (the "2Q23 Report"), signed by Defendants Deister, Mackay, and Garvey. Attached to the 2Q23 Report were certifications pursuant to SOX signed by

Defendants Deister and Mackay attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

147.     In the 2Q23 Report, Defendants reported contract revenue of $50,970,000 for the quarter and once again reported on the existence of a dispute between Air Wisconsin and United:

> Prior to the termination of the United capacity purchase agreement in early June 2023, United made provisional cash payments to Air Wisconsin during each month of service based on projected flight schedules. These provisional cash payments were then subsequently reconciled with United based on actual completed flight activity. As of the date of this filing, these payments were reconciled through April 2023. Subject to final reconciliation of the provisional cash payments for the periods after April 2023, as of June 30, 2023, United owed Air Wisconsin approximately $29,896, which is recorded in accounts receivable, net of amounts owed to United, on the condensed consolidated balance sheets. ***United is disputing that it owes $30,149.***

***

> The CPA Amendment provided, among other things, for the payment or accrual of certain amounts by United to Air Wisconsin based on certain scheduling benchmarks. In conjunction with the significant reduction in departures and block hours resulting from the COVID-19 pandemic in 2020, and consistent with the terms of the CPA Amendment, management determined that, from an accounting perspective, a new performance obligation was created by United, requiring Air Wisconsin to stand ready to deliver flight services. Air Wisconsin determined, using the expected cost plus a margin method, that the United "stand ready" rate represented the relative stand-alone selling price of the performance obligation. The stand ready performance obligation was recognized over time on a straight-line basis based on the number of unscheduled block hours below a minimum threshold at the stand ready rate as determined in a manner consistent with the CPA Amendment. For the three and six months ended June 30, 2023, Air Wisconsin recorded $0 and $1,641, respectively, in revenue related to this performance obligation compared to $4,099 and $7,608 for the three and six months ended June 30, 2022, respectively. Under the CPA Amendment, United was required to accrue this amount and, upon request by Air Wisconsin, deliver a note evidencing this amount each quarter. Therefore, this amount is recorded in notes receivable on the condensed consolidated balance sheets. The notes receivable contain a significant financing component and any interest income is separately reported on the condensed consolidated statements of operations. ***United has disputed that it owes these amounts in respect of certain quarters and has refused to deliver notes for those quarters.*** On November 4, 2022, United prepaid to Air Wisconsin $50,126

to satisfy all of the outstanding, undisputed notes receivable, including all accrued interest, pursuant to the CPA Amendment in respect of the period from the second quarter of 2020 through the third quarter 2021 and the $11,048 note receivable described above. The unpaid disputed notes came due on February 28, 2023. As of June 30, 2023, the principal amount of the unpaid disputed notes totaled $21,093. Prior to February 28, 2023, the unpaid disputed notes bore interest at the rate of 4.5% per annum. After February 28, 2023, the notes bear interest at the default interest rate of 12% per annum. *As of June 30, 2023, interest receivable on the disputed notes, calculated at the pre-default contractual rate without any default interest, totaled $790 and is recorded in accounts receivable, net, on the condensed consolidated balance sheets*.

***

Although the United capacity purchase agreement terminated in early June 2023, a dispute continues to exist under that agreement. Air Wisconsin has claimed that United owes it certain amounts under the capacity purchase agreement. United has denied that it owes those amounts and has claimed that Air Wisconsin improperly terminated the agreement and that Air Wisconsin owes it certain amounts for the alleged wrongful termination. *As of June 30, 2023, the aggregate amount in dispute recorded in the condensed consolidated financial statements was approximately $52,032.* In October 2022, United initiated arbitration under the agreement. An arbitration hearing commenced in July 2023 before three arbitrators. Air Wisconsin expects the arbitrators will issue their decision and award in the fourth quarter of 2023. Air Wisconsin cannot reasonably estimate the likely outcome of the arbitration including any potential award of the disputed amounts. *Air Wisconsin, however, maintains that it has a strong position, that it was entitled to terminate the agreement and that it is entitled to the disputed amounts, including the amounts recorded in the condensed consolidated balance sheets, under the terms of the agreement.* For additional information, refer to Note 1, Summary of Significant Accounting Policies – Contract Revenues, and Note 3, Capacity Purchase Agreements with United and American.

148.    The foregoing statements misled investors because Defendants misstated contract revenue by including the disputed amounts and, while acknowledging the existence of the dispute and the Company's recognition of the disputed amounts in the financial statements, Defendants did not disclose that they had recognized the amounts in dispute as revenue in contravention of ASC 606 despite United's stated intention not to pay, did not disclose that its belief that it would collect the disputed amounts from United had no reasonable basis, did not disclose that the disputed amounts would balloon to $52 million by the termination of the CPA, and did not disclose that

their recognition of disputed revenue created a material risk that the Company would have to restate its financials for every quarter in which they recognized disputed revenue.

149.    In the 2Q23 Report, Defendants warned of a risk that the Company may not succeed in preventing *future* material weakness in internal control over financial reporting:

> We cannot be certain that we will be successful in preventing or remediating future material weaknesses or significant deficiencies in internal control over financial reporting…Any newly identified material weaknesses could result in material misstatements of our annual or interim consolidated financial statements that would not be prevented or detected. Any such misstatements of our financial statements could lead to restatements of our financial statements, which could result in an adverse impact to our financial results and a decline in the trading price of the Company's common stock.

150.    The foregoing statements were false and misleading because Defendants knew of a "*certain*" and *existing* material weakness and significant deficiency in internal control over financial reporting that they had not prevented or adequately remediated relating to their application of ASC 606 and the Company thus faced a substantial risk that it would have to restate its financial statements.

151.    In the 2Q23, Defendants further represented that the Company had effective internal control over financial reporting:

> As required by Rule 15d-15(b) under the Exchange Act, our management, including our principal executive officer, principal financial officer and principal accounting officer, carried out an evaluation of the effectiveness of the design and operation of our disclosure controls and procedures (as defined in Rule 15d-15(e) under the Exchange Act) as of June 30, 2023, the last day of the period covered by this Quarterly Report. ***Based on this evaluation, our management, including our principal executive officer, principal financial officer and principal accounting officer, concluded that, as of June 30, 2023, our disclosure controls and procedures were effective at the reasonable assurance level***.

Emphasis added.

152. The foregoing statements were false and misleading because the Company did not have effective internal control over financial reporting relating to its application of ASC 606 and thus faced a substantial risk that the Company would have to restate financial statements.

153. Defendants' boilerplate warning that due to "*inherent limitations in all control systems, no evaluation of controls can provide absolute assurance that all control failures and instances of fraud, if any, within the Company have been detected*," further misled investors because Defendants knew or were reckless in not knowing that *Harbor Diversified's* internal control system weakness was not hypothetical but actual. Indeed, the Company's deficient internal control system had already failed to prevent Defendants' repeated non-compliance with ASC 606 when booking revenue that United made clear it had no intention of paying relating to at least two sources of revenue under the CPA, including provisional cash payments based on projected flight schedules which the Company recorded under accounts receivable and the stand ready performance obligation which the Company recorded under notes receivable, raising a substantial risk that the Company would have to restate its financials.

154. On November 14, 2023, Harbor Diversified filed with the SEC its quarterly report on Form 10-Q for the period ended September 30, 2023 (the "3Q23 Report"), signed by Defendants Deister, Mackay, and Garvey. Attached to the 3Q23 Report were certifications pursuant to SOX signed by Defendants Deister and Mackay attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

155. In the 3Q23 Report, Defendants reported contract revenue of $49,958,000 for the quarter and once again reported on the existence of a dispute between Air Wisconsin and United:

> Prior to the termination of the United capacity purchase agreement in early June 2023, United made provisional cash payments to Air Wisconsin during each month

of service based on projected flight schedules. These provisional cash payments were then subsequently reconciled with United based on actual completed flight activity. As of the date of this filing, these payments were reconciled through June 2023, the last month of United operations. *As of September 30, 2023, Air Wisconsin believes, but United disputes, that United owes Air Wisconsin $30,149, of which $29,509 is recorded in receivables, net on the condensed consolidated balance sheets.*

***

The CPA Amendment provided, among other things, for the payment or accrual of certain amounts by United to Air Wisconsin based on certain scheduling benchmarks. In conjunction with the significant reduction in departures and block hours resulting from the COVID-19 pandemic in 2020, and consistent with the terms of the CPA Amendment, management determined that, from an accounting perspective, a new performance obligation was created by United, requiring Air Wisconsin to stand ready to deliver flight services. Air Wisconsin determined, using the expected cost plus a margin method, that the United "stand ready" rate represented the relative stand-alone selling price of the performance obligation. The stand ready performance obligation was recognized over time on a straight-line basis based on the number of unscheduled block hours below a minimum threshold at the stand ready rate as determined in a manner consistent with the CPA Amendment. For the three and nine months ended September 30, 2023, Air Wisconsin recorded $0 and $1,641, respectively, in revenue related to this performance obligation compared to $5,138 and $12,746 for the three and nine months ended September 30, 2022, respectively. Under the CPA Amendment, United was required to accrue this amount and, upon request by Air Wisconsin, deliver a note evidencing this amount each quarter. Therefore, this amount is recorded in notes receivable on the condensed consolidated balance sheets. The notes receivable contain a significant financing component and any interest income is separately reported on the condensed consolidated statements of operations. *United has disputed that it owes these amounts in respect of certain quarters and has refused to deliver notes for those quarters.* On November 4, 2022, United prepaid to Air Wisconsin $50,126 to satisfy all of the outstanding, undisputed notes receivable, including all accrued interest, pursuant to the CPA Amendment in respect of the period from the second quarter of 2020 through the third quarter of 2021 and the $11,048 note receivable described above. The unpaid disputed notes came due on February 28, 2023. As of September 30, 2023, the principal amount of the unpaid disputed notes totaled $21,093. Prior to February 28, 2023, the unpaid disputed notes bore interest at the rate of 4.5% per annum. After February 28, 2023, the notes bear interest at the default interest rate of 12% per annum. *As of September 30, 2023, interest receivable on the disputed notes, calculated at the pre-default contractual rate without any default interest, totaled $1,034 and is recorded in receivables, net, on the condensed consolidated balance sheets.*

***

Although the United capacity purchase agreement has terminated, a dispute exists under the agreement. Air Wisconsin has claimed that United owes it certain amounts under the agreement. ***As of September 30, 2023, the aggregate amount in dispute recorded in the condensed consolidated financial statements was approximately $52.3 million.*** United has denied that it owes this amount and has claimed that Air Wisconsin improperly terminated the agreement and that Air Wisconsin owes it certain amounts for the alleged wrongful termination. In October 2022, United initiated arbitration under the agreement. An arbitration hearing commenced in July 2023 before three arbitrators. Air Wisconsin expects the arbitrators will issue their decision and award in the first quarter of 2024. Since the arbitration decision has not yet been issued, Air Wisconsin cannot reasonably estimate the likely outcome of the arbitration including any potential award of the disputed amounts. ***Air Wisconsin, however, maintains that it has a strong position, that it was entitled to terminate the agreement and that it is entitled to the disputed amounts, including the amounts recorded in the condensed consolidated financial statements, under the terms of the agreement.***

156.   The foregoing statements misled investors because Defendants misstated contract revenue by including the disputed amounts and, while acknowledging the existence of the dispute and the Company's recognition of the disputed amounts in the financial statements, Defendants did not disclose that they had recognized the amounts in dispute as revenue in contravention of ASC 606 despite United's stated intention not to pay, did not disclose that its belief that it would collect the disputed amounts from United had no reasonable basis, did not disclose that their recognition of disputed revenue created a material risk that the Company would have to restate its financials for every quarter in which they recognized disputed revenue.

157.   In the 3Q23 Report, Defendants warned of a risk that the Company may not succeed in preventing ***future*** material weakness in internal control over financial reporting:

> We cannot be certain that we will be successful in preventing or remediating future material weaknesses or significant deficiencies in internal control over financial reporting…Any newly identified material weaknesses could result in material misstatements of our annual or interim consolidated financial statements that would not be prevented or detected. Any such misstatements of our financial statements could lead to restatements of our financial statements, which could result in an adverse impact to our financial results and a decline in the trading price of the Company's common stock.

158.     The foregoing statements were false and misleading because Defendants knew of a "*certain*" and *existing* material weakness and significant deficiency in internal control over financial reporting that they had not prevented or adequately remediated relating to their application of ASC 606 and the Company thus faced a substantial risk that it would have to restate its financial statements.

159.     In the 3Q23 Report, Defendants further represented that the Company had effective internal control over financial reporting:

> As required by Rule 15d-15(b) under the Exchange Act, our management, including our principal executive officer, principal financial officer and principal accounting officer, carried out an evaluation of the effectiveness of the design and operation of our disclosure controls and procedures (as defined in Rule 15d-15(e) under the Exchange Act) as of September 30, 2023, the last day of the period covered by this Quarterly Report. ***Based on this evaluation, our management, including our principal executive officer, principal financial officer and principal accounting officer, concluded that, as of September 30, 2023, our disclosure controls and procedures were effective at the reasonable assurance level***.

Emphasis added.

160.     The foregoing statements were false and misleading because the Company did not have effective internal control over financial reporting relating to its application of ASC 606 and thus faced a substantial risk that the Company would have to restate financial statements.

161.     Defendants' boilerplate warning that due to "*inherent limitations in <u>all</u> control systems, no evaluation of controls can provide absolute assurance that all control failures and instances of fraud, if any, within the Company have been detected*," further misled investors because Defendants knew or were reckless in not knowing that *Harbor Diversified's* internal control system weakness was not hypothetical but actual. Indeed, the Company's deficient internal control system had already failed to prevent Defendants' repeated non-compliance with ASC 606 when booking revenue that United made clear it had no intention of paying relating to at least two

sources of revenue under the CPA, including provisional cash payments based on projected flight schedules which the Company recorded under accounts receivable and the stand ready performance obligation which the Company recorded under notes receivable, raising a substantial risk that the Company would have to restate its financials.

162.    The statements set forth in ¶¶91-161 were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) Harbor Diversified's financial statements from May 9, 2022 to the present were misstated due to improper revenue recognition; (2) Harbor Diversified lacked adequate internal controls; and (3) as a result, Defendants' statements about its business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all times.

## THE TRUTH BEGINS TO EMERGE

163.    On March 29, 2024, Harbor Diversified filed with the SEC a current report on Form 8-K in which it announced that certain of its previously-issued financial statements would need to be restated as a result of improper revenue recognition.

164.    Specifically, the Restatement Announcement stated the following:

On March 26, 2024, the audit committee (the "Audit Committee") of the board of directors of Harbor Diversified, Inc. (the "Company") concluded, after considering the recommendations of management, that the Company's previously issued (i) *consolidated financial statements and related disclosures as of and for the year ended December 31, 2022 contained in the Company's Annual Report on Form 10-K*, (ii) *interim consolidated financial statements and related disclosures contained in the Quarterly Reports on Form 10-Q as of and for the first three quarters of the year ended December 31, 2022*, and (iii) *interim consolidated financial statements and related disclosures contained in the Quarterly Reports on Form 10-Q as of and for the first three quarters of the year ended December 31, 2023* (collectively, the "Non-Reliance Periods") should no longer be relied upon

due to misstatements contained in such financial statements, and that such financial statements should be restated.

The Audit Committee's conclusion **was based on management's review of the accounting for certain revenue under the capacity purchase agreement (the "United Agreement") previously entered into between Air Wisconsin Airlines LLC ("Air Wisconsin"), a wholly owned subsidiary of the Company, and United Airlines, Inc. ("United").** As discussed in greater detail below, **management determined that the decision to recognize all of the approximately $52.3 million in revenue and interest income (the "Disputed Amounts") in the consolidated financial statements and related disclosures prepared for the Non-Reliance Periods relating to certain disputed amounts under the United Agreement was not consistent with Accounting Standards Codification Topic 606, Revenue from Contracts with Customers ("ASC 606").** The Audit Committee discussed its conclusion and management's determination, and the other matters described in this Current Report on Form 8-K (this "Current Report"), with the Company's independent registered public accounting firm, Grant Thornton LLP ("Grant Thornton").

*       *       *

<u>**Accounting Analysis**</u>

Upon its receipt of the Arbitration Award, the Company commenced an analysis of the complex accounting treatment leading to the recognition of the Disputed Amounts in revenue and interest income in light of the unexpected outcome of the arbitration. Following extensive discussions between Company management and Grant Thornton, as well as consultation between management and additional accounting and legal advisors, the Company concluded that (i) **its prior determination as to the amount of the disputed revenue and interest income under the United Agreement was inconsistent with the guidance in ASC 606, resulting in an accounting error as that concept is defined in the accounting guidance**, and (ii) its financial statements for the Non-Reliance Periods should be restated. Although cumulative revenue for the Non-Reliance Periods will change by approximately $52.3 million, this will be partially offset by changes to the provision for income taxes in 2022 and an income tax benefit in 2023 on the statements of operations included in the consolidated financial statements. In addition, the balance sheets included in the consolidated financial statements will change to remove the related receivables from United, as well as take into account the related changes to the income tax provision/benefit. The Company also expects to file amended tax returns and seek reimbursement of certain tax payments made based on the previously recognized revenue and interest income. As a result, the Company expects to record an income tax receivable related to the amended returns. **The Company continues to assess the scope of the expected adjustments to the consolidated financial statements**.

165. The Company also revealed for the first time that, despite Defendants' prior assurances that they had remediated any internal control deficiencies related to ASC 606 and maintained effective internal control over financial reporting, the Company in fact had a material weakness in internal control throughout the Class Period relating to its improper application of ASC 606 which resulted in the need to restate the Company's financial statements from the first quarter of 2022 through the third quarter of 2023:

### Controls and Procedures Assessment

Company management continues to assess its internal control over financial reporting and disclosure controls and procedures in light of its determination to restate the financial statements. ***The Company will report a material weakness in internal control over financial reporting in its Annual Report on Form 10-K for the year ended December 31, 2023***. Because of the weakness, the Company's management concluded that it did not maintain effective internal control over financial reporting and disclosure controls and procedures for the Non-Reliance Periods. Company management, at the direction of the Audit Committee, continues to evaluate appropriate remediation actions.

Emphasis added.

166. On this news, the price of Harbor Diversified stock fell by $0.28 per share, or 14.25%, to close at $1.73 on April 1, 2024.

167. To date, Harbor Diversified has not issued any restated financial statements and filed three late filing notices with the SEC on April 2, 2024, May 16, 2024, and August 14, 2024. In July 2024, the Company moved to the Expert Market given its lack of financial statement filings. Companies on the Expert Market provide the lowest level of disclosure in comparison to other OTC Market tiers. As a result, trading is limited to quotation on an unsolicited basis, which means that trades of securities subject to unsolicited quotation in the Expert Market are only available to broker-dealers, institutions and other sophisticated investors, as opposed to average investors. The Expert Market is made up of companies that are not in compliance with SEC public company reporting requirements (or companies not subject to those requirements).

168.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common shares, Plaintiff and the other Class members have suffered significant losses and damages.

## ALLEGATIONS OF SCIENTER

169.     Throughout the Class Period, Defendants made clear that "[m]ore than 99.9% of the Company's operating revenues … were derived from operations associated with the United capacity purchase agreement."

170.     Defendants admitted on March 29, 2024 that they improperly recognized $52.3 million in revenue in violation of ASC 606 and would therefore have to restate seven quarters worth of financial statements due to the material inaccuracies.

171.     The Company's Class Period filings make clear that Air Wisconsin and United met to reconcile provisional cash payments to actual completed flight activity on a monthly basis and that United communicated to Air Wisconsin that it disputed ***almost the entire amount*** in provisional cash payment revenue that Air Wisconsin told United it owed.  The Company recorded the entire amount each quarter despite United's stated intention not to pay.

172.     The Company's Class Period filings make clear that under the October 2020 CPA amendment, United is required to accrue amounts due under the stand ready performance obligation and, upon request by Air Wisconsin, deliver a note evidencing this amount each quarter. For each relevant quarter, the filings indicate that United disputed that it owes the ***entire amount*** and "refused to deliver notes for those quarters."

173.     Defendants previously admitted to a material weakness in internal control over financial reporting pertaining to the Company's adherence to ASC 606 and claimed to have fully remediated that deficiency.  Based on the Company's history of improperly applying ASC 606 and

the steps purportedly undertaken to remediate the deficiency in its internal controls, management should have been fully knowledgeable as to ASC 606's requirements and particularly focused on ensuring its proper application to its sole source of revenue.

174. In each Form 10-K that Harbor Diversified filed, Defendants made clear that the Board of Directors along with executive management held the responsibility of insuring that the Company had effective internal controls in place.

175. Further supporting the inference of scienter is the fact that Harbor Diversified identified revenue recognition as a "critical accounting policy," and contract revenue as a "significant accounting policy."

176. The auditor's reports included in the Company's financial statements make clear that "[t]hese financial statements are the responsibility of the Company's management," which would include the signatories to each misleading filing.

177. Further supporting Defendants Deister and Mackay's scienter is the fact that they executed certifications pursuant to SOX attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

178. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons other than defendants who acquired Harbor Diversified securities publicly traded on the OTC during the Class Period, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, members of the Individual Defendants' immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

179.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, the Company's securities were actively traded on the OTC. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds, if not thousands of members in the proposed Class.

180.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

181.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

182.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the Exchange Act was violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and financial condition of the Company;

- whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

- whether the Defendants caused the Company to issue false and misleading filings during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false filings;

- whether the prices of the Company's securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

183. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

184. Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- the Company's securities were actively traded on the OTC, an efficient market;

- as a public issuer, the Company filed public reports;

- the average weekly volume of the Company's securities applied as a percentage of the outstanding share float is 1.04% (*see In re Enron Corp. Sec.,* 529 F. Supp. 2d 644, 750 (S.D. Tex. 2006) ("weekly turnover of one % of a security's float would justify a substantial presumption" of market efficiency); and

- the Company was followed by securities analysts who wrote and distributed reports that were publicly available.

185.    Based on the foregoing, the market for the Company securities promptly digested current information regarding the Company from all publicly available sources and reflected such information in the prices of the common units, and Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

186.    Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information as detailed above.

## NO SAFE HARBOR

187.    The statutory safe harbor provided for forward-looking statements under certain conditions does not apply to any of the allegedly false statements pleaded in this Complaint. The specific statements pleaded herein were not identified as forward-looking statements when made.

188.    To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

## LOSS CAUSATION AND ECONOMIC LOSS

189.    During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the prices of Harbor Diversified publicly traded securities and operated as a fraud or deceit on purchasers of Harbor Diversified publicly traded securities. As detailed above, when the truth about Harbor Diversified's misconduct was revealed, the value of Harbor Diversified publicly traded securities declined

precipitously as the prior artificial inflation no longer propped up the price of the securities. The decline in the price of Harbor Diversified publicly traded securities was the direct result of the nature and extent of Defendants' fraud being revealed to investors and the market. The timing and magnitude of the price decline negates any inference that the losses suffered by Plaintiff and other members of the Class were caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct. The economic loss, i.e., damages, suffered by Plaintiff and other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the prices of Harbor Diversified publicly traded securities and the subsequent significant decline in the value of Harbor Diversified publicly traded securities when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

190.     At all relevant times, Defendants' materially false and misleading statements or omissions alleged herein directly or proximately caused the damages suffered by Plaintiffs and other Class members. Those statements were materially false and misleading through their failure to disclose a true and accurate picture of Harbor Diversified's business, operations, and financial results as alleged herein. Throughout the Class Period, Defendants issued materially false and misleading statements and omitted material facts necessary to make Defendants' statements not false or misleading, causing the price of Harbor Diversified publicly traded securities to be artificially inflated. Plaintiffs and other Class members purchased Harbor Diversified publicly traded securities at those artificially inflated prices, causing them to suffer damages as complained of herein.

191.     On this news, the price of Harbor Diversified stock fell by $0.28 per share, or 14.25%, to close at $1.73 on April 1, 2024.

192.     The corrective disclosure contradicted statements and/or revealed omissions Defendants made during the Class Period and were a causal element of the concurrent decline in the Company's share price.

## COUNT I

### For Violations of Section 10(b) And Rule 10b-5 Promulgated Thereunder Against All Defendants

193.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

194.     This Count asserted against Defendants is based upon Section 10(b) of the

195.     Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

196.     During the Class Period, Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

197.     Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

- employed devices, schemes and artifices to defraud;

- made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

- engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of the Company's securities during the Class Period.

198.     Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

199.     Individual Defendants, who are or were senior executives and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other Company's personnel to members of the investing public, including Plaintiff and the Class.

200.     As a result of the foregoing, the market price of the Company's securities was artificially inflated during the Class Period. In ignorance of the falsity of Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of the Company's securities during the Class Period in purchasing the Company's securities at prices that were artificially inflated as a result of Defendants' false and misleading statements.

201.    Had Plaintiff and the other members of the Class been aware that the market price of the Company's securities had been artificially and falsely inflated by Defendants' misleading statements and by the material adverse information which Defendants did not disclose, they would not have purchased the Company's securities at the artificially inflated prices that they did, or at all.

202.    As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

203.    By reason of the foregoing, Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchase of the Company's securities during the Class Period.

## COUNT II

### Violations of Section 20(a) of the Exchange Act
### Against the Individual Defendants

204.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

205.    During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information about the Company's business practice.

206.    As officers of a public business, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

207.     Because of their positions of control and authority as senior executives and/or directors, the Individual Defendants were able to, and did, control the contents of the various public filings which the Company disseminated in the marketplace during the Class Period concerning the Company's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Company securities.

208.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## PRAYER FOR RELIEF

**WHEREFORE**, plaintiff, on behalf of himself and the Class, prays for judgment and relief as follows:

(a)     declaring this action to be a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and designating plaintiff's counsel as Lead Counsel;

(b)     awarding damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, together with interest thereon;

(c)     awarding plaintiff and the Class reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)     awarding plaintiff and other members of the Class such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: September 10, 2024                  **POMERANTZ LLP**

By: *s/ Tamar A. Weinrib*
Jeremy A. Lieberman
Tamar A. Weinrib
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
Email: jalieberman@pomlaw.com
Email: taweinrib@pomlaw.com

*Lead Counsel for Plaintiff and the Class*