**UNITED STATES DISTRICT COURT FOR THE**
**EASTERN DISTRICT OF WISCONSIN**
**GREEN BAY DIVISION**

---

JON ARNE TOFT, Individually and on behalf
of all other similarly situated,

        Plaintiff,

    v.

HARBOR DIVERSIFIED, INC., CHRISTINE
R. DEISTER, LIAM MACKAY, and GREGG
GARVEY,

        Defendants.

Case No. 1:24-cv-00556-WCG

---

### DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT

---

John L. Kirtley
David R. Konkel
GODFREY & KAHN S.C.
833 East Michigan Street
Suite 1800
Milwaukee, Wisconsin 53202
Telephone: (414) 273-3500
Facsimile: (414) 273-5198

Jason de Bretteville
Wesley Horton
STRADLING YOCCA CARLSON & RAUTH LLP
660 Newport Center Drive, Suite 1600
Newport Beach, CA 92660
Telephone: (949) 725-4000
Facsimile: (949) 725-4100

*Counsel for Defendants*

September 24, 2024

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................5

HEIGHTENED PLEADING STANDARD FOR FEDERAL SECURITIES CLAIMS..............6

ALLEGATIONS OF THE FAC .......................................................................................8

ARGUMENT.................................................................................................................15

I.     The FAC Does Not Plead Scienter .................................................................15

     A.     The FAC's Scienter Allegations Remain Defective ...........................16

          1.     A restatement is not evidence of fraud ........................................18

          2.     Executive roles and SOX certifications are not evidence of fraud..............19

          3.     Harbor's 2020 Form 10-K is not evidence of fraud ...................21

     B.     The FAC's Facts Negate Any Inference of Scienter .........................23

II.     The FAC Does Not Attribute Loss to The Alleged Fraud...............................27

CONCLUSION...............................................................................................................29

4867-4225-9941v10/101468-0015

**Page(s)**

**Cases**

*In re Advanta Corp. Sec. Litig.*,
180 F.3d 525 (3rd Cir. 1999) ......................................................................................... 16

*Appvion, Inc. v. Bluth*,
2022 U.S. Dist. LEXIS 161343 (E.D. Wisc. 2022) ........................................................ 13

*Arazie Alizadeh v. Tellabs, Inc.*,
2015 U.S. Dist. LEXIS 15553 (N.D. Ill. 2015) .............................................................. 17

*In re Bally Total Fitness Securities Litigation*,
2006 U.S. Dist. LEXIS 93986 (N.D. Ill. 2006) .............................................................. 15

*Bartesch v. Cook*,
941 F. Supp. 2d 501 (D. Del. 2013)................................................................................. 21

*In re Bausch & Lomb, Inc. Sec. Litig.*,
592 F. Supp. 2d 323 (W.D.N.Y. 2008)............................................................................ 20

*Boca Raton Firefighters' & Police Pension Fund v. DeVry Inc.*,
2012 U.S. Dist. LEXIS 41305 (N.D. Ill. 2012) .............................................................. 18

*City of Brockton Ret. Sys. v. Shaw Grp. Inc.*,
540 F. Supp. 2d 464 (S.D.N.Y. 2008) ............................................................................ 14

*City of Livonia Emp. Ret. Sys. & Local 295/Local 851 v. Boeing Co.*,
711 F.3d 754 (7th Cir. 2013) ..................................................................................... 4, 11

*Colden v. W. Coast Life Ins. Co.*,
2013 U.S. Dist. LEXIS 37817 (D. Md. Mar. 19, 2013)................................................. 25

*DiLeo v. Ernst & Young*,
901 F.2d 624 (7th Cir. 1990) .................................................................................... 14, 23

*Espy v. J2 Glob., Inc.*,
2024 U.S. App. LEXIS 9487 (9th Cir. 2024) ................................................................... 4

*In re First Marblehead Corp. Sec. Litig.*,
639 F. Supp. 2d 145 (D. Mass. 2009)......................................................................... 20, 21

*Fulton Cnty. Emp. Ret. Sys. v. MGIC Inv. Corp.*,
675 F.3d 1047 (7th Cir. 2012) ........................................................................................ 19

*In re Gentiva Sec. Litig.*,
932 F. Supp. 2d 352 (E.D.N.Y. 2013) ............................................................................ 17

ii

*In re Harley-Davidson, Inc. Sec. Litig.*,
  660 F. Supp. 2d 969 (E.D. Wisc. 2009) ................................................................*passim*

*Higginbotham v. Baxter Int'l, Inc.*,
  495 F.3d 753 (7th Cir. 2007) ................................................................... 14, 15

*Hosack v. Utopian Wireless Corp.*,
  2011 U.S. Dist. LEXIS 48687 (D. Md. 2011) ............................................... 24

*In re Intelligroup Sec. Litig.*,
  527 F. Supp. 2d 262 (D.N.J. 2007) .............................................................. 20

*In re Jiangbo Pharma., Inc., Sec. Litig.*,
  884 F. Supp. 2d 1243 (S.D. Fla. 2012) ........................................................ 20

*In re Livent Noteholders Sec. Litig.*,
  151 F. Supp. 2d 371 (S.D.N.Y. 2001) ......................................................... 25

*Makor Issues & Rights, Ltd. v. Tellabs, Inc.*,
  437 F.3d 588 (7th Cir. 2006) ..................................................................... 4

*In re Mela Sciences Sec. Litig.*,
  2012 U.S. Dist. LEXIS 144150 (S.D.N.Y. 2012).......................................... 22

*Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*,
  547 U.S. 71 (2006)..................................................................................... 3

*Nguyen v. Endologix, Inc.*,
  962 F.3d 405 (9th Cir. 2020) ..................................................................... 23

*Payne v. DeLuca*,
  433 F. Supp. 2d 547 (W.D. Pa. 2006).......................................................... 24

*Pension Trust Fund For Operating Eng. v. Kohl's Corp.*,
  266 F. Supp. 3d 1154 (E.D. Wis. 2017) .................................................*passim*

*In re PetroChina Co.*,
  120 F. Supp. 3d 340 (S.D.N.Y. 2015) .......................................................... 18

*Plumbers & Pipefitters Local Union 719 Pension Fund v. Zimmer Holdings, Inc.*,
  673 F. Supp. 2d 718 (S.D. Ind. 2009)..................................................... 16, 22

*Ret. Sys. v. Hartford Fin. Servs. Grp.*,
  2011 U.S. Dist. LEXIS 106046 (S.D.N.Y. 2011).......................................... 18

*Roth v. OfficeMax, Inc.*,
  527 F. Supp. 2d 791 (N.D. Ill. 2007) ...................................................... 14, 16

*Stark Trading & Shepherd Invs. Int'l, Ltd. v. Falconbridge Ltd.*,
  2008 U.S. Dist. LEXIS 2677 (E.D. Wis. 2008).............................................. 22

4867-4225-9941v10/101468-0015

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007)...................................................................................................3

*Tricontinental Indus., Ltd. v. PricewaterhouseCoopers, LLP*,
  475 F.3d 824 (7th Cir. 2007) ...........................................................................4, 23, 24

**Statutes**

15 U.S.C. §§ 78u-4(b)(1)–(2), 78u-4(c) (2000) ......................................................................3

15 U.S.C. § 78u-4(b)(2)(A)..................................................................................................3

Exchange Act ......................................................................................................................20

Private Securities Litigation Reform Act of 1995 ........................................ 1, 2, 3, 4, 13, 16, 25

Securities Exchange Act of 1934 Rule 10b-5 ............................................................... 4, 23

**Other Authorities**

Federal Rule of Civil Procedure 9(b)................................................................................4, 16

Federal Rule of Civil Procedure 11..........................................................................3, 10, 23

H.R. Rep. No. 104-369 ........................................................................................................2, 3

...

4867-4225-9941v10/101468-0015

# INTRODUCTION

The First Amended Complaint (the "FAC"), like its predecessor, is a frivolous attempt to convert an accounting error into securities fraud based on nothing more than the company's announcement that it discovered the error and will correct it. Courts have consistently rejected far stronger attempts to do so as inconsistent with the heightened pleading requirements of the Private Securities Litigation Reform Act (the "Reform Act"). *See, e.g., Pension Trust Fund For Operating Eng. v. Kohl's Corp.*, 266 F. Supp. 3d 1154, 1157-58, 1166 (E.D. Wis. 2017) *aff'd*, 895 F.3d 933 (7th Cir. 2018). This Court should easily reach the same conclusion here.

The alleged accounting error relates to the accrual of receivables that were the subject of a contract dispute between Air Wisconsin Airlines LLC ("Air Wisconsin") and United Airlines. Throughout the class period, Air Wisconsin's parent, Harbor Diversified, Inc. ("Harbor" or the "Company"), disclosed the dispute, the disputed amounts (the "Disputed Amounts"), and the fact that it was accruing and paying taxes on the Disputed Amounts. The FAC calls this transparent reporting a fraud. It does so based solely on Harbor's subsequent determination that complex accounting guidance should be understood as requiring that the Disputed Amounts be "constrained," *i.e.*, that some or all of the Disputed Amounts should not have been accrued.

The FAC, however, again fails to allege a single fact indicating that anyone at Harbor previously knew, or even had reason to suspect, that Harbor's prior accounting treatment was flawed. Indeed, despite the benefit of extensive briefing and additional time to investigate, Plaintiff Jon Arne Toft ("Toft" or "Plaintiff") fails to improve upon the shoddy work of his predecessor by citing any of the typical sources that plaintiffs rely upon in attempting to plead fraud with the particularity required by the Reform Act:

- The FAC does not cite a single confidential witness, internal Harbor

4867-4225-9941v10/101468-0015

document, or insider stock sale, or any other evidence supporting a strong inference that any individual defendant knew, or was deliberately reckless in not knowing, about the Company's technical accounting error.

- The FAC does not allege that Harbor's external auditor told any Harbor employee, much less any individual defendant, about any error in the Company's accounting, or any material weakness in Harbor's internal controls, or issued anything other than a series of clean audit reports stating that the Company's accounting controls were functioning properly with respect to the Disputed Amounts.

- The FAC does not allege any government enforcement action regarding Harbor's accounting, investor disclosures, or anticipated restatement.

Thus, like his predecessor, Toft cannot allege any facts supporting even a weak inference that anyone at Harbor knew about the accounting error during the class period. Even worse, Toft continues to admit that Harbor's external auditor thoroughly reviewed the contract dispute and Harbor's accounting for the Disputed Amounts, and approved of the Company's accrual. As a result, the only available inference is that Harbor was unaware of the error, and sought to rectify the undetected error and related control weakness as soon as it learned of them. Toft is plainly incapable of pleading a fraud claim, and the FAC should be dismissed, with prejudice.

**HEIGHTENED PLEADING STANDARD FOR FEDERAL SECURITIES CLAIMS**

Securities fraud claims based on speculation, rather than facts, stifle economic vitality with no benefit beyond letting opportunistic lawyers "line their own pockets by bringing abusive and meritless lawsuits." H.R. Rep. No. 104-369, at 31–32. As the Supreme Court has emphasized, "[p]rivate securities fraud actions . . . , if not adequately contained, can be employed abusively to impose substantial costs on companies and individuals whose conduct conforms to law." *Tellabs,*

6

*Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007). Accordingly, Congress stepped in to put an end to abusive strike suits by enacting the Reform Act, which, among other things, raised the pleading standards for private securities claims, and increased the threat of sanctions under Federal Rule of Civil Procedure 11 ("Rule 11"). *See* 15 U.S.C. §§ 78u-4(b)(1)–(2), 78u-4(c) (2000); *In re Harley-Davidson, Inc. Sec. Litig.*, 660 F. Supp. 2d 969, 983 (E.D. Wisc. 2009) ("Congress enacted the [Reform Act] as a check against abusive litigation in private securities fraud actions.").

The Reform Act now imposes the "most stringent pleading standard" for alleging scienter on would-be securities litigation plaintiffs. H.R. Rep. No. 104-369, at 41; *See Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 81 (2006). Specifically, the Reform Act requires a complaint to "state with particularity facts giving rise to a *strong* inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A) (emphasis added). A "strong inference" of scienter "'must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent.'" *Harley-Davidson*, 660 F. Supp. 2d at 994 (quoting *Tellabs*, 551 U.S. at 314). To make such a determination, the Court must "weigh the strength of the plaintiffs' inferences in comparison to plausible nonculpable explanations for the defendants' conduct." *Id.* The purpose of this exacting pleading requirement is to serve the Reform Act's "twin goals" of curbing "frivolous, lawyer-driven litigation" while preserving plaintiffs' ability to "recover on meritorious claims." *Tellabs*, 551 U.S. at 322.

The "'required state of mind' is an intent to deceive, demonstrated by knowledge of the statement's falsity or reckless disregard of a substantial risk that the statement is false." *Harley-Davidson*, 660 F. Supp. 2d at 994 (quoting *Higginbotham v. Baxter Int'l Inc.*, 495 F.3d 753, 756 (7th Cir. 2007)). In order to plead deliberate recklessness under the Reform Act, Plaintiff must

4867-4225-9941v10/101468-0015

plead particularized facts showing both a false statement and an "*extreme departure* from the standards of ordinary care . . . that the danger was either *known* to the defendant or so obvious that the defendant *must have been aware* of it." *City of Livonia Emp. Ret. Sys. & Local 295/Local 851 v. Boeing Co.*, 711 F.3d 754, 756 (7th Cir. 2013) (quotation omitted) (emphasis added); *see Espy v. J2 Glob., Inc.*, 2024 U.S. App. LEXIS 9487 (9th Cir. 2024) ("Deliberate recklessness is a higher standard than mere recklessness.").

Thus, a securities fraud complaint under Section 10(b) and Rule 10b-5 must satisfy the dual pleading requirements of Federal Rule of Civil Procedure 9(b) and the Reform Act. *See Kohl's*, 266 F. Supp. 3d at 1157-58 ("Section 10(b) claims sound in fraud, and the rules of procedure require particularized pleading in fraud cases."). To state a claim under Section 10(b) a plaintiff must adequately plead that: (1) defendants made a false statement or omission; (2) of material fact; (3) with scienter; (4) in connection with the purchase or sale of securities; (5) upon which plaintiff justifiably relied; and (6) the false statement or omission proximately caused the plaintiff's damages. *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 437 F.3d 588, 595 (7th Cir. 2006). To plead loss causation, Plaintiff is required to establish "a causal connection between the material misrepresentation and the loss, not simply that the misrepresentation touches upon a later economic loss." *Tricontinental Indus., Ltd. v. PricewaterhouseCoopers, LLP*, 475 F.3d 824, 843 (7th Cir. 2007).

## ALLEGATIONS OF THE FAC[1]

### *The Company*

Harbor is a non-operating holding company whose business consists of the ownership of a group of entities, including Air Wisconsin, a regional carrier that provides passenger service to

---

[1] The following facts are drawn solely from the FAC, "documents incorporated therein by reference[,] and those matters of which a court may take judicial notice." *Harley-Davidson*, 660

4867-4225-9941v10/101468-0015

Case 1:24-cv-00556-WCG    Filed 09/24/24    Page 9 of 31    Document 41

major airlines under contracts called "capacity purchase agreements." FAC ¶ 2; Ex.[2] 1 (Harbor's Form 10-Q (May 9, 2022)) at 7. Harbor's business is dependent on the performance of Air Wisconsin. Ex. 1 at 7. Christine R. Deister is Harbor's CEO (FAC ¶ 22), Liam Mackay is CFO of Air Wisconsin (*id.* ¶ 23), and Gregg Garvey is Senior Vice President, Chief Accounting Officer and Treasurer of Air Wisconsin (*id.* ¶ 24) (together, the "Individual Defendants," and with Harbor "Defendants").

Between 2012 and 2020 the Company was not required to register with the SEC or make the attendant filings, because of the low number of shareholders. FAC ¶¶ 32, 36. In 2020, however, the Company crossed above 300 shareholders and was required to begin making certain public filings. *Id.* ¶ 36. At that point, the Company filed a Form 10-K, *id.*, which disclosed, *inter alia*, that since the Company would now have to "comply with the requirements of public reporting companies[,]" the Company needed to implement "disclosure controls and procedures and internal control over financial reporting." Ex. 6 (Harbor's Form 10-K (filed July 10, 2020)) at 25. As part of that implementation, the Company's auditors identified pre-existing material weaknesses involving several accounting policies that would need to be updated to comply with the requirements attendant on public companies, including with respect to "the adoption of new accounting standards related to Topic 606." *Id.* at 26.

Management concluded that the material weakness regarding the adoption of new accounting standards related to Topic 606 had been ameliorated by the time of the July 2020 filing. *Id.* at 86. Nevertheless, the Company disclosed that it planned to take several additional steps to shore up its internal controls over financial reporting, including: (1) "hir[ing] outside consultants

F. Supp. 2d at 973. For purposes of this motion only, Defendants assume the truth of Plaintiffs' factual allegations to the extent they are well pled and not conclusory or speculative.

[2] All six exhibits cited herein consist of SEC filings incorporated by the FAC, from the Declaration of Wesley Horton, dated September 24, 2024, submitted in support of this motion.

who possess the requisite skillsets in certain areas of accounting and financial reporting, including accounting for certain complex and non-routine transactions;" (2) "assess[ing] required training needs to promote the continued development of existing personnel;" (3) "perform[ing] a comprehensive review of our current procedures to ensure compliance with our accounting policies and generally accepted accounting principles;" and (4) "consider hiring additional financial and accounting personnel." *Id*. at 86. Plaintiff does not allege that the prior material weakness resulted in any accounting errors, or that the Company did not take the above-described steps to strengthen its internal controls.

### *The Contract Dispute*

For part of the Class Period (March 30, 2022 through March 29, 2024, FAC ¶ 1) (the "Class Period"), United Airlines was Air Wisconsin's "sole airline partner," pursuant to the terms of a February 2017 capacity purchase agreement (the "United Agreement") worth approximately $1.3 billion. Ex. 1 at 7. In its public filings during the Class Period, the Company disclosed the existence of a dispute between Air Wisconsin and United Airlines "with respect to certain recurring amounts owed to Air Wisconsin by United" and warned that the "outcome cannot be predicted." Ex. 1. at 19. The Company further explained that it was accruing "the disputed components of revenue amounts related to provisional cash payments for projected flight schedules as well as notes for the stand ready obligation created by the October 2020 amendment to the [United Agreement.]" FAC ¶ 60.

The Company repeatedly made detailed disclosures of the amounts at issue in the United Dispute (the "Disputed Amounts"), which involved a fraction of the amounts owed, and ultimately paid by United Airlines pursuant to the United Agreement. For instance, as of "March 31, 2022, the amount in dispute was approximately $9.4 million," and the Company told investors that it had

"recognized all disputed amounts through March 31, 2022 in the consolidated financial statements." FAC ¶ 61. The Company continued to describe that dispute and the related revenue recognition to investors throughout the Class Period. For instance, in its 10-Q for the second quarter of 2022, the Company disclosed that "[a]s of June 30, 2022, the aggregate amount in dispute was approximately $19,571,000." Ex. 2 (Harbor's Form 10-Q (Aug. 10, 2022)) at 18. "Defendants continued to report on the dispute in each subsequent filing, including the updated amounts in dispute." FAC ¶ 7.

When the Company filed its Form 10-Q for the third quarter of 2022, it again warned that "Air Wisconsin and United are in the early stages of arbitration, [and] Air Wisconsin cannot, with any degree of certainty, estimate the likely outcome of the arbitration including any potential award of the disputed amounts." Ex. 3 (Harbor's Form 10-Q (Nov. 21, 2022)) at 25. Plaintiff does not allege that the Company's disclosures describing the arbitration were in any way inadequate. The Company also disclosed that it had "recognized all disputed amounts through September 30, 2022" (*id.*), and paid taxes on those amounts. Notably, during this period, Harbor repurchased 7,664,033 shares of its common stock. *Id.* at 22, 33 ("During the nine months ended September 30, 2022, our cash flows used . . . $10.7 million to repurchase shares of our common stock.").

### The External Audit

In connection with the Company's 2022 annual report, Harbor's external auditor, Grant Thornton, issued a clean audit opinion stating that the Company's "financial statements present fairly, in all material respects, the financial position of the Company as of December 31, 2022, and 2021, and the results of its operations and its cash flows for each of the two years in the period ended December 31, 2022, in conformity with [GAAP]." Ex. 4 (Harbor's Form 10-K (December 31, 2022)) at 44. In that opinion, Grant Thornton notes that the proper treatment of revenue in

11

connection with the United Agreement involved "especially challenging, subjective, or complex judgments." Grant Thornton then summarized the audit procedures it used to confirm the correct application of GAAP to the Disputed Amounts, including:

- Gaining an "understanding of the relevant facts and circumstances related to matters in dispute, United's appeals with respect to amounts in dispute, Air Wisconsin's position and counterclaims, and the status of the related arbitration;"

- Reviewing "the relevant transaction and legal documents, including the [United Agreement] and related amendments, United's arbitration notice, Air Wisconsin's answer and counterclaims, and other letters between Air Wisconsin and United in connection with the ongoing dispute;"

- "[E]valuating responses to inquiry letters sent to internal and external legal counsel for additional information related to the dispute" and "the reasonableness of management's conclusions regarding the collectability of the disputed United receivables;" and,

- "[A]ssessing the sufficiency of management's disclosures related to the disputed United receivables and related arbitration, including [the fact that] United's intent to meet its payment obligations is largely dependent upon the resolution of arbitration and that the disputed receivables may not be collectable."

Ex. 4 at 45-46. Plaintiff does not allege that Grant Thornton's analysis was faulty, that Harbor misled Grant Thornton, that Grant Thornton ever expressed any concerns about the Company's internal controls or its accrual of the entirety of the Disputed Amounts, or that Grant Thornton was reckless or somehow complicit in any alleged accounting fraud.

4867-4225-9941v10/101468-0015

*The Adverse Arbitration Outcome and Anticipated Restatement*

In February 2024, the arbitrators "denied Air Wisconsin's claims that United owed it [certain disputed] amounts under the United [CPA]." Ex. 5 (Harbor's Form 8-K (Mar. 29, 2024)) at 2. Following this development, "the Company commenced an analysis of the complex accounting treatment leading to the recognition of the Disputed Amounts in revenue and interest income in light of the unexpected outcome of the arbitration." *Id.*; FAC ¶ 67. The analysis was not an easy one, and it involved "extensive discussions between Company management and Grant Thornton, as well as consultation between management and additional accounting and legal advisors." Ex. 5 (Harbor's Form 8-K (Mar. 29, 2024)) at 2. Three days after those extensive discussions concluded, on March 29, 2024, the Company disclosed the arbitrators' denial of its claim for the Disputed Amounts. *Id.* According to the FAC, investors were "[s]hocked by the arbitral determination" and "fled the stock causing the Company[']s stock price to plummet more than 15% following the announcement." FAC ¶ 68.

In its March 29, 2024 disclosure, the Company also stated that "(i) its prior determination as to the amount of the disputed revenue and interest income under the United Agreement was inconsistent with the guidance in ASC 606, resulting in an accounting error as that concept is defined in the accounting guidance, and (ii) its financial statements for the Non-Reliance Periods should be restated" to remove "the related receivables from United." *Id.* In addition, the Company disclosed that "the restatement is not expected to have an adverse effect on the Company's operations or business plan" and "will not have any impact on the Company's cash and cash equivalents, restricted cash or marketable securities balances." *Id.* Nonetheless, in light of the technical accounting error, "the Company's management concluded that it did not maintain

4867-4225-9941v10/101468-0015

effective internal control over financial reporting and disclosure controls and procedures for the Non-Reliance Periods." *Id.*

### *The Fraud Allegations*

The Rosen Law firm responded to the March 29, 2024 announcement by filing a placeholder complaint on behalf of plaintiff Viral Kothari ("Kothari"). After Defendants filed their first motion to dismiss and served Kothari with a Rule 11 motion, Kothari withdrew his application to serve as lead plaintiff, resulting in the appointment of Toft to lead the putative class. Toft proceeded to file the FAC, which alleges no additional facts in support of its scienter allegations, with the exception of the July 2020 disclosure by the Company (FAC ¶¶ 3, 36), *i.e.*, a disclosure made before the contractual amendments giving rise to the Disputed Amounts (*id.* ¶¶ 38, 57, 60) and the Class Period (*id.* ¶¶ 3, 36).

The FAC, like its predecessor, asserts broad categories of alleged misstatements based on the Company's own discovery and disclosure of an error in the previously disclosed accrual of the Disputed Amounts, relying entirely on the Company's own disclosures. For example, Plaintiff asserts that the Company's disclosure stating that "[t]he accompanying consolidated financial statements have been prepared in conformity with accounting principles generally accepted in the United States of America (GAAP)[,]" (FAC ¶ 91), was fraudulent because Defendants "misstated revenue in every Form 10-Q and Form 10-K" filed during the Class Period (*id.* ¶ 92). Plaintiff admits that the Company told investors about the Disputed Amounts, but asserts that Harbor's disclosures were misleading because Defendants did not disclose that the accrual of the Disputed Amounts conflicted with the proper application of ASC 606. *Id.* ¶ 95. The FAC thus asserts that Harbor should have specified the nature of its mistake before it knew it had made one.

Finally, the FAC attacks the Company's risk disclosures regarding the possibility of future material weaknesses in internal controls, (*id.* ¶ 98), and the Company's disclosures regarding the present effectiveness of their internal controls (*id.* ¶ 99), because Defendants supposedly "knew of a 'certain' and existing material weakness and significant deficiency in internal control over financial reporting that they had not prevented or adequately remediated relating to their application of ASC 606[,]" (*id.*). Plaintiff provides no facts regarding (i) the state of the Company's internal controls, (ii) the specific nature of any "certain" inadequacy in those controls, (iii) how any such inadequacy contributed to the alleged accounting error, or (iv) the knowledge of anyone at the Company regarding any accounting error or any specific control deficiency that purportedly contributed to the accounting error. Despite this attempt to allege a fraud based on an historical accounting error, Toft attributes losses allegedly suffered by the putative class to Harbor's defeat in its litigation with United Airlines. *Id.* ¶ 68.

## ARGUMENT

### I. The FAC Does Not Plead Scienter

Despite now slandering a third individual with accusations of fraud, the FAC makes no attempt to plead any facts speaking to a fraudulent intent on the part of any of the three Individual Defendants. Toft relegates his scienter allegations to eight paragraphs at the end of the FAC, none of which describe a fraud, identifies any purported motive, or alleges any facts to back up any such theory. FAC ¶¶ 169-177 ("Allegations of Scienter"). As the Seventh Circuit has recognized, "[w]ithout a motive to commit securities fraud, businessmen are unlikely to commit it." *City of Livonia*, 711 F.3d at 758 (affirming dismissal of securities class action). Toft, however, does not present any theory of motive, much less plead particularized facts as to the knowledge or state of mind of Ms. Deister, Mr. Mackay, or Mr. Garvey. *See* FAC ¶¶ 169-77. That ends the inquiry

15

because "the plaintiff[] must create a strong inference of scienter as to each individual defendant." *Kohl's*, 266 F. Supp. 3d at 1165 (citing *Pugh v. Tribune Co.*, 521 F.3d 686, 693 (7th Cir. 2008)).

Toft not only fails to allege any motive or facts supporting any inference of scienter, he ignores facts in the disclosures he cites that strongly point in the opposite direction. For example, throughout the relevant period, the Company had an active stock buyback program and, based on the FAC's allegations, purchased more than 7.6 million shares at inflated prices. *See* Ex. 3 at 22, 33; Ex. 5 at 2. The Company also paid income tax on the Disputed Amounts. It makes little sense for a Company to overstate revenue intentionally when doing so increased its taxes and caused it to pay more for its stock. But worst of all, while failing to allege any facts indicating that anyone at the Company knew about any accounting error during the Class Period, Toft continues to ignore the fact that Grant Thornton thoroughly examined the Company's accounting for the Disputed Amounts and agreed with the accrual. *See* Ex. 4 at 44-46. As a result, the only inference available from the FAC is that the Company—and its auditors—believed that the Disputed Amounts should be accrued. The FAC is a stunningly defective complaint.

## A. The FAC's Scienter Allegations Remain Defective

Toft's scienter allegations are defective for each of the reasons carefully explained in Defendants' prior motion to dismiss, and in dozens of cases spanning decades, including the decision in *Kohl's*. 266 F. Supp. 3d at 1157-68. As explained in *Kohl's*, "knowing an accounting rule and knowing that it is not being followed by your company's accountants are two different things." *Id.* at 1157-58. Accordingly, the court dismissed an amended complaint that "provide[d] details about the history of Kohl's accounting errors and their effect on the company's financial statements, but [] contained very little factual information that ties any individual defendant directly to the receipt of information or knowledge that would contradict a statement he made

16

during the Class Period." *Id.* at 1166. Here, the FAC is even more deficient in that it contains *no* factual information that ties any Individual Defendant to the receipt of information during the Class Period that would contradict any alleged misstatement.

Despite extensive prior briefing on this issue, Toft continues to admit that the Company disclosed both the dispute and the accrual to its investors for years. *See, e.g.*, FAC ¶ 61. Toft also continues to repeatedly cite, but ignore, disclosures that painstakingly describe the fact that Harbor's outside auditors, after examining both the dispute with United Airlines and the Company's accounting for the Disputed Amounts, issued a clean audit letter approving the accrual. *See, e.g.,* Ex. 4 (Harbor's Form 10-K (December 31, 2022) at 44); FAC ¶¶ 130-31, 133 135. The auditors' clean opinion letter identifies the especially challenging, subjective, and complex accounting for the Disputed Amounts, details the auditors' examination of facts, circumstances and legal issues in the dispute, and expresses the auditors' view that the Company's financial statements—which accrued the disputed amounts—complied with GAAP. *See* Ex. 4 at 44-46. Yet, Toft does not, and cannot, claim that the auditors—much less any Individual Defendant—knew that their conclusion was wrong.

After failing to discover any facts indicating that anyone at Harbor knew of any accounting error during the class period, Toft should have walked away from this strike suit. Instead, he pushed forward with a bloated and yet frivolous complaint that relies on a set of circumstances long held to be incapable of supporting even a weak inference of scienter. The Court should enforce the "exacting pleading requirements" Congress included in the Reform Act in order "to stem the filing of frivolous federal securities lawsuits[,]" and dismiss this action with prejudice. *Appvion, Inc. v. Bluth*, 2022 U.S. Dist. LEXIS 161343, at *9 (E.D. Wisc. 2022) (citing *Tellabs,*

*Inc.*, 551 U.S. at 313). None of the circumstances described in the FAC even begins to suggest that Toft might be capable of alleging any fraud.

### 1. A restatement is not evidence of fraud

"[I]t is well settled that the mere fact of a restatement of earnings does not support a strong, or even a *weak*, inference of scienter." *City of Brockton Ret. Sys. v. Shaw Grp. Inc.*, 540 F. Supp. 2d 464, 472 (S.D.N.Y. 2008) (emphasis added). That is because "[r]estatements of earnings are common," *Goldberg v. Household Bank, F.S.B.*, 890 F.2d 965, 967 (7th Cir. 1989), and "mere allegations of GAAP violations [or] the restatement of income . . . are not sufficient to demonstrate that those who made the statements committed securities fraud," *Roth v. OfficeMax, Inc.*, 527 F. Supp. 2d 791, 797 (N.D. Ill. 2007). Even "a large column of big numbers need not add up to fraud," *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990) ($4 billion financial restatement did not support inference of scienter). "The fact of an error, even a large error, does not suggest knowledge or intent to misstate when the financial results were originally published, particularly when the error was a matter of judgment." *In re Turquoise Hill Res. Ltd. Sec. Litig.*, 2014 LEXIS 174096, at *19 (S.D.N.Y. 2014). Accordingly, courts routinely dismiss cases involving restatements where plaintiffs have not pled facts giving rise to a "strong inference" that any individual defendant knew about, or was deliberately reckless in ignoring, the accounting errors that caused those restatements. *See, e.g., Kohl's Corp.*, 266 F. Supp. 3d at 1157-58; *In re Harley-Davidson, Inc*, 660 F. Supp. 2d at 1003.

For example, in *Higginbotham*, the company and certain officers were sued for securities fraud after the company "announced that it would restate the preceding three years' earnings in order to correct errors created by fraud[.]" *Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 755 (7th Cir. 2007). The court affirmed dismissal for failure to allege scienter because the complaint

18

4867-4225-9941v10/101468-0015

offered "very little reason to infer knowledge (or reckless indifference)" prior to the date of the last alleged misstatement. *Id*. at 758. Similarly, in *In re Bally Total Fitness Securities Litigation*, the defendant "filed a restatement that comprehensively restated its financial results for 2000, 2001, 2002, and 2003." 2006 U.S. Dist. LEXIS 93986, at *11 (N.D. Ill. 2006). Because "even a very large restatement is not itself evidence of scienter," the district court dismissed plaintiffs' securities fraud claims, finding that "plaintiffs ha[d] failed to allege particularized facts sufficient to give rise to a strong inference that any of the defendants acted with the requisite intent or recklessness." *Id*. at *24, *41. The same is true here, only more so.

"[I]t is difficult to build inferences of scienter upon accounting errors because such errors often involve complex calculations about which reasonable people can differ in opinion." *In re Allscripts, Inc. Sec. Litig.*, 2001 LEXIS 8897, at *31-*32 (N.D. Ill. 2001). Toft ignores this difficulty and again cites no facts—no confidential-witness statements, no communications, no meetings, no terminations, no insider stock sales, no auditor concerns or other evidence— supporting any inference, much less a strong inference, that Ms. Deister, Mr. Mackay or Mr. Garvey knew, or were deliberately reckless in not knowing, about the Company's technical misapplication of a complex accounting standard. Clearly, Toft cannot allege "with sufficient particularity why or how senior executives at [Harbor] would have been so familiar with those rules so as to see a problem in the company's accounting before their auditors did." *Kohl's*, 266 F.3d at 1167; *see* Ex. 4 at 45-46.

### 2. Executive roles and SOX certifications are not evidence of fraud

The FAC's boilerplate assertions that management was responsible for ensuring adequate internal controls (FAC ¶ 174), that the Company had identified "revenue recognition as a critical accounting policy" (*id*. ¶ 175), that the financial statements were the responsibility of management

(*id*. ¶ 176), and that Ms. Deister and Mr. Mackay executed SOX certifications (*id*. ¶ 177), also fail to save Plaintiff's unfounded claims. Courts routinely reject speculation "that defendants must have been aware of the misstatement based on their positions within the company." *In re Harley Davidson*, 660 F. Supp. 2d at 995 (quotation omitted). Indeed, "allegations that a securities-fraud defendant, because of his position within the company, 'must have known' a statement was false or misleading are 'precisely the types of inferences which courts, on numerous occasions, have determined to be inadequate to withstand Rule 9(b) scrutiny.'" *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 539 (3rd Cir. 1999) (citing cases).

"Similarly, it also not enough to allege that [the Individual Defendants] made certifications in public filings . . . about the company's financials and controls that turned out to be false." *Kohl's*, 266 F.3d at 1167. Indeed, courts in the Seventh Circuit have repeatedly recognized that "signature[s] on the SEC filings and Sarbanes Oxley certifications" do "not suffice to allege scienter without allegations that . . . [the defendants were] . . . aware of the material weaknesses in [the company's] internal controls over financial reporting at the time [they] signed those statements or that such weaknesses were obvious." *Roth*, 527 F. Supp. 2d at 804. "[I]f an allegation that a mandatory Sarbanes-Oxley certification was later proved to be inaccurate is sufficient to give rise to the requisite strong inference, scienter would be established in every case where there was an accounting error or auditing mistake by a publicly traded company, thereby eviscerating the pleading requirements for scienter set forth in the PSLRA." *Plumbers & Pipefitters Local Union v. Zimmer*, 673 F. Supp. 2d 718, 748 (S.D. Ind. 2009) (internal quotations omitted), *aff'd by Plumbers & Pipefitters Local Union 719 Pension Fund v. Zimmer Holdings, Inc.*, 679 F.3d 952 (7th Cir. 2012).

4867-4225-9941v10/101468-0015

In sum, Toft cannot rely on executive roles or SOX certifications, but "must state with particularity facts—known to the speaker at the time—that render the statement false or misleading." *Arazie Alizadeh v. Tellabs, Inc.*, 2015 U.S. Dist. LEXIS 15553, at *21 (N.D. Ill. 2015); *see In re Gentiva Sec. Litig.*, 932 F. Supp. 2d 352, 370 (E.D.N.Y. 2013) (dismissing complaint where plaintiff did not "allege any particularized facts which would suggest that the actions articulated in the SOX Certifications were not undertaken by the Individual Defendants or for that matter any factual allegations concerning [the company's] financial reporting processes. . . [or] any facts pertaining to the Company's internal structure for financial controls."). Despite every opportunity, Plaintiff, like his predecessor, does not even attempt to do so.

### 3. Harbor's 2020 Form 10-K is not evidence of fraud

Toft's sole attempt to bolster his predecessor's scienter allegations with facts is his unfounded assertion that the Company had a "history of improperly applying ASC 606." FAC ¶ 173. This allegation is not tethered to any factual assertion, but appears to be an implicit reference to the fact that "[f]ollowing its reemergence as a SEC-registered Company" in 2020, *i.e.*, before the relevant amendments to the United Agreement (*id.* ¶ 38) and before the Class Period began, the Company disclosed its remediation of a previous material weakness relating to "the adoption of new accounting standard related to Topic 606 and Topic 842[.]" Ex. 6 at 25-26; FAC ¶ 84.

In that disclosure, the Company described its initial efforts to remediate the prior weakness and adopt the basic internal controls necessary for public reporting companies. Harbor, however, did not identify any prior accounting error or any continuing material weakness, and did not correct or restate any financial results. *Id.* Rather, it merely describes a strengthening of the Company's controls. Thus, to the extent Toft describes that announcement as evidencing a "history of improperly applying ASC 606[,]" that assertion remains factually unfounded. FAC ¶ 173.

4867-4225-9941v10/101468-0015

Moreover, Toft does not claim that Harbor failed to implement any of the controls specifically described in the 2020 disclosure, much less that any Individual Defendant was aware of any such failure during the Class Period. As a result, to the extent that the disclosure has any relevance, it indicates that the Individual Defendants were informed of the improved state of Harbor's controls—not that they knew or had a reason to suspect that the Company's controls were inadequate, generally or specifically with respect to the accounting for Disputed Amounts arising under yet to be executed contractual amendments. Accordingly, Toft's sole addition to the factual allegations of the FAC's predecessor actually tends to negate any such inference.

The FAC thus still fails to identify any specific deficiency in the Company's internal controls *during* the Class Period, or any facts indicating that any Individual Defendant was aware of any such specific deficiency. Toft instead relies entirely on the Company's conclusory admission that it will report an unspecified material weakness relating to the erroneous accrual. Ex. 5 (Harbor's Form 8-K (Mar. 29, 2024)) at 2. This total lack of particularized facts describing the Company's internal controls during the Class Period fails to establish the falsity of any certifications with the requisite particularity, much less facts supporting a strong inference of scienter on the part of any Individual Defendant with respect to any such certification. *See, e.g.*, *In re PetroChina Co.*, 120 F. Supp. 3d 340, 358-59 (S.D.N.Y. 2015) (noting failure to plead any facts pertaining to the company's internal structure for internal controls); *Boca Raton Firefighters' & Police Pension Fund v. DeVry Inc.*, 2012 U.S. Dist. LEXIS 41305, *24 (N.D. Ill. 2012) (conclusory statements by company insider insufficient to plead falsity); *City of Monroe Emps.' Ret. Sys. v. Hartford Fin. Servs. Grp.*, 2011 U.S. Dist. LEXIS 106046, at *80 (S.D.N.Y. 2011) ("Since plaintiffs' allegations of lack of controls are conclusory assertions without any factual support, they cannot survive this motion to dismiss.") (internal citation omitted). The Court cannot infer

any Individual Defendant's knowledge of a material weakness that Plaintiff cannot describe—particularly in light of Grant Thornton's clean audit letters throughout the Class Period speaking to the adequacy of any and all controls relating to ASC 606.

Lastly, it is unclear how disclosures asserting a belief that Harbor's controls were reasonably effective could be materially false or misleading in light of the accompanying disclosures entitled "Limitations on Effectiveness of Controls." Those disclosures note, among other warnings, that "[o]ur management, including [the Individual Defendants], does not expect that our disclosure controls and procedures, or our system of internal control over financial reporting, will prevent or detect all errors." *See, e.g.*, Ex. 1 at 27-28. Indeed, the FAC explicitly cites Harbor's warning to investors in 2020 that the Company "cannot be certain that these measures will be successful in remediating the material weakness or preventing future significant deficiencies or material weaknesses in internal control over financial reporting," (FAC ¶ 85). These disclosures tend to negate any theory that the continued risk of an accounting error or a material weakness was fraudulently concealed from the market, as do all of the facts contained in the disclosures cited by the FAC.

### B. The FAC's Facts Negate Any Inference of Scienter

As established above, Plaintiff's allegations do not even support "the proposition that [the Individual Defendants] *should* have seen the looming problem," which would constitute "negligence rather than the state of mind required for fraud." *Fulton Cnty. Emp. Ret. Sys. v. MGIC Inv. Corp.*, 675 F.3d 1047, 1050 (7th Cir. 2012) (emphasis in original). Without any theory of motive, or any evidence demonstrating that an Individual Defendant made knowingly false or consciously reckless disclosures about Harbor's accounting, or that the Company's outside auditors were somehow misled or complicit, the only available inference is that Harbor's

4867-4225-9941v10/101468-0015

accounting staff and external auditor had difficulty applying complex accounting standards to the Disputed Amounts, made a mistake, and disclosed that mistake upon discovering it. But Plaintiff not only fails to muster facts supporting even a weak inference of scienter, he cites and relies upon disclosures containing facts that powerfully negate any inference of scienter.

*First*, the FAC "does not include allegations that the company's auditors alerted [the Individual Defendants], or anyone else at [Harbor] to errors in the company's [] accounting before the review that ultimately led to the [anticipated] restatement." *Kohl's*, 266 F.3d at 1167-68. Courts regularly point to the absence of such an allegation in dismissing securities fraud complaints. *Id.* "[O]utside auditors are required under the Exchange Act to report material illegal acts to company management and the audit committee and, if not rectified, to the SEC" and, for this reason, a "failure to allege that the company's auditor expressed concern undermines an inference of fraudulent intent." *Id.*; *see also In re Bausch & Lomb, Inc. Sec. Litig.*, 592 F. Supp. 2d 323, 341 (W.D.N.Y. 2008) (no scienter where "outside auditor[s] did not question [the company's] accounting practices"). Here, Harbor not only received clean audit opinions from its auditors throughout the Class Period, those opinions specifically address and validate the especially challenging, subjective, and complex accounting for the Disputed Amounts. *See, e.g.,* Ex. 4 at 44-46. This strongly supports an inference that the Individual Defendants were "unaware" of the accounting error during the Class Period. *In re Jiangbo Pharma., Inc., Sec. Litig.*, 884 F. Supp. 2d 1243, 1263 (S.D. Fla. 2012); *In re Intelligroup Sec. Litig.*, 527 F. Supp. 2d 262, 349 n.63 (D.N.J. 2007 ("[A] 'clean' audit provides certain grounds for Defendants' placid state of mind and advocates against [an] inference of scienter.").

*Second,* the FAC contains six mind-numbing pages describing ASC 606, in which Toft depicts a complex, subjective, and at times contradictory standard. FAC ¶¶ 44-54. For example,

Plaintiff describes ASC 606 as stating: "In evaluating whether collectability of an amount of consideration is probable, an entity shall consider only the customer's ability and intention to pay that amount of consideration when it is due." *Id.* ¶ 46(e). Just two paragraphs later, Plaintiff describes ASC 606 as stating the opposite: "The collectability assessment . . . is not necessarily based on the customer's ability and intention to pay the entire amount of promised consideration for the entire duration of the contract." *Id.* ¶ 48. Thus, according to the FAC, ASC 606 does not flatly prohibit accrual of disputed receivables.

Moreover, Grant Thornton's clean audit opinion contradicts any such suggestion, as does ASC 606 itself. For instance, Example 9 in ASC 606 illustrates a situation in which revenue is properly recognized, even though one party contests the contractual obligation, based on the entity's determination that it has a legally enforceable right. In that example, even though the customer disagreed with the claim, once the "entity assesses the legal basis of the claim and determines, on the basis of the underlying contractual terms, that it has enforceable rights[,]" it may proceed to accrue the receivable consistent with the remainder of the guidance. *See* ASC 606-10-55-134, 606-10-55-135. This complexity negates any inference that anyone at Harbor, even someone intimately familiar with ASC 606, *must* have understood that standard to prohibit accrual of the Disputed Amounts—and Toft does not allege that any Individual Defendant had expert knowledge regarding ASC 606.[3]

---

[3] To the extent that Toft asserts that the accounting error was patently obvious based on the mere fact of the dispute with United Airlines, that theory is not viable for an additional reason: Harbor publicly disclosed both the dispute and the accrual. If that knowledge is enough to make the accounting error obvious to anyone, then the accounting error was apparent to the market and there could be no fraud. *See, e.g.*, *In re First Marblehead Corp. Sec. Litig.*, 639 F. Supp. 2d 145, 155 (D. Mass. 2009) ("A plaintiff fails to plead an actionable § 10(b) claim predicated on the concealment of information if that information was, in fact, disclosed."); *Bartesch v. Cook*, 941 F. Supp. 2d 501, 508 (D. Del. 2013) (same).

4867-4225-9941v10/101468-0015

*Third*, Defendants spent $10.7 million repurchasing 7,664,033 of the Company's shares during the Class Period, *i.e.*, while Harbor's stock supposedly was inflated by Defendants' own fraud. *See* Ex. 3 at 22, 33. Such extensive "[s]tock repurchase programs actually *negate* a finding of scienter, [because] it would have made no sense to purchase the stock if defendants knew the prices to be inflated." *Plumbers & Pipefitters*, 673 F. Supp. 2d at 749 (quotation omitted) (emphasis in original). "It is well settled that such an action—*i.e.*, the purchase of additional company shares during the class period—is inconsistent with an intent to commit fraud." *In re Mela Sciences Sec. Litig.*, 2012 U.S. Dist. LEXIS 144150, at *15 (S.D.N.Y. 2012)).

*Fourth*, management's efforts to investigate, rectify and disclose the technical accounting error further suggest that the Individual Defendants were acting in good faith. *See* FAC ¶ 165. "If the defendants possessed a fraudulent intent and arguably were aware of any errors, . . . the most reasonable response from the defendants would have been silence." *Stark Trading & Shepherd Invs. Int'l, Ltd. v. Falconbridge Ltd.*, 2008 U.S. Dist. LEXIS 2677, at *28 (E.D. Wis. 2008), *aff'd* 552 F.3d 568 (7th Cir. 2009). Here, Defendants could have stayed silent, and relied on the adverse outcome of the arbitration to forever bury the prior accounting error: the adverse arbitration award meant that Harbor was not going to collect the Disputed Amounts and that the entire $52.3 million accrual would be stricken from Harbor's ledger, regardless of whether some or none of the Disputed Amounts were properly accrued.

The Company's filings also indicate that the Company included the accrued revenue in its taxable income and paid tax on it. *See* Ex. 3 at 22, 33; Ex. 5 at 2. As Toft would have it, the Individual Defendants booked and paid taxes on $52.3 million of receivables knowing they should not be accrued, publicly disclosed this blatantly erroneous accrual while somehow duping Grant Thornton, masochistically purchased $10.7 million worth of Harbor's stock at fraudulently inflated

26

prices, and then gratuitously investigated and disclosed their erroneous (and now moot) accounting to Grant Thornton and the market. That factually unfounded theory "has no basis in logic or common experience." *Nguyen v. Endologix, Inc.*, 962 F.3d 405, 407 (9th Cir. 2020). "People sometimes act irrationally, but indulging ready inferences of irrationality would too easily allow the inference that ordinary business reverses are fraud." *Dileo*, 901 F.2d at 629. Accordingly, "[o]ne who believes that another has behaved irrationally has to make a strong case." *Id*.

The evidence cited by the FAC thus not only fails to make a strong case, it repeatedly negates Plaintiff's proffered inferences. The only compelling inference to be drawn from the *facts* alleged in the FAC is an innocent one: Harbor's accounting staff and external auditor erred in applying a particularly vexing accounting standard, and the Individual Defendants sought to disclose and rectify the error as soon as they learned of it. Because Plaintiff "fail[s] to establish the primary liability of an Individual Defendant, the alleged misconduct is not imputable to [Harbor]." *Harley-Davidson*, 660 F. Supp. 2d at 1003. And, because the plaintiff "fail[s] to state a claim under Section 10(b) or Rule 10b-5 as discussed above, there can be no liability under Section 20(a)." *Kohl's*, 266 F. Supp. 3d at 1169 (*citing Pugh*, 521 F.3d at 693). The FAC thus entirely fails for the same reasons as its predecessor. Indeed, like its predecessor, the FAC is so utterly frivolous as to put Toft's compliance with Rule 11 in question.[4]

## II.     The FAC Does Not Attribute Loss to The Alleged Fraud

Remarkably, Toft actually manages to add to the defects in his predecessor's complaint. Plaintiffs are required to plead "a causal connection between [the alleged] material misrepresentation[s] and the loss, not simply that the misrepresentation touches upon a later economic loss." *Tricontinental Indus., Ltd. v. PricewaterhouseCoopers, LLP*, 475 F.3d 824, 843

---

[4] Defendants continue to seek the imposition of sanctions based on the initial complaint, and will address the propriety of sanctions with respect to the FAC, if necessary, by separate motion.

27

(7th Cir. 2007). Toft, like Kothari, plainly alleges misrepresentations regarding an accounting error. *See* FAC ¶¶ 3-12. But when Toft tries to allege a corresponding loss, he admits that the Company's stock price fell in response to Air Wisconsin's eventual defeat in its litigation with United Airlines: "Shocked by the arbitral determination, investors fled the stock causing the Company's stock price to plummet more than 15% following the announcement." *Id*. ¶ 68. Thus, by Toft's admission, the alleged damage to the Company's stock price was caused by the arbitrators' determination that United Airlines would not have to pay Air Wisconsin, not an accounting error. That admission makes sense, but it is fatal to the FAC.

Toft's admission makes sense because the adverse arbitration award was the bad news: it meant that the Company would not be allowed to collect the Disputed Amounts from United Airlines. *See* Ex. 5 (Harbor's Form 8-K (Mar. 29, 2024)) at 2. Upon receipt of that bad news, the question whether GAAP permitted the Company's prior accrual of some or all of the Disputed Amounts during the pendency of the dispute became academic—it was now clear, for the first time, that the Company would not collect those amounts from United Airlines. Any suggestion that the price of the company's stock dropped in response to an *anticipated* change in the historical accounting treatment of the Disputed Amounts, rather than the immediate result of the dispute itself, is not plausible. Toft's admission is fatal because it severs the causal connection between his alleged misrepresentations and his alleged loss. *See Tricontinental*, 475 F.3d at 843.

Elsewhere in the FAC, Toft makes inconsistent, conclusory, and implausible allegations that Harbor's disclosure of the now-moot historical accounting error somehow caused the negative market reaction. *See* FAC ¶¶ 13, 166, 190. But that does not rescue Toft's claim. "[A]llegations related to loss causation which are not merely offered in the alterative, but are self-contradictory, [are] a defect which is fatal to [the] claims." *Payne v. DeLuca*, 433 F. Supp.

4867-4225-9941v10/101468-0015

Case 1:24-cv-00556-WCG    Filed 09/24/24    Page 29 of 31    Document 41

2d 547, 612 (W.D. Pa. 2006); *see Hosack v. Utopian Wireless Corp.*, 2011 U.S. Dist. LEXIS 48687, at *5 (D. Md. May 6, 2011) ("when a complaint contains inconsistent and self-contradictory statements, it fails to state a claim."). This Court is not "constrained to accept as truth conflicting pleadings that make no sense, or that would render a claim incoherent, or that are contradicted either by statements in the complaint itself or by documents upon which its pleadings rely, or by facts of which the court may take judicial notice." *In re Livent Noteholders Sec. Litig.*, 151 F. Supp. 2d 371, 405-06 (S.D.N.Y. 2001). Rather, "Rule 8 prohibits the pleading of 'conflicting factual assertions,' which serve as the 'predicates for an independent, unitary claim.'" *Colden v. W. Coast Life Ins. Co.*, 2013 U.S. Dist. LEXIS 37817, at *5 (D. Md. Mar. 19, 2013) (quoting *In re Livent*, F. Supp. 2d at 406). Thus, even if Toft had alleged a fraud, which he has not, the FAC still fails at the gate.

## CONCLUSION

As in *Kohl's*, Plaintiffs have not pled particularized facts giving rise to a strong inference that Defendants knew of, or consciously ignored, technical errors in Harbor's accounting. Toft's filing of an amended complaint that does not even attempt to bolster his predecessor's non-existent scienter allegations shows utter disdain for this court's precedent in *Kohl's*, the harm inflicted by frivolous securities fraud complaints, and the Reform Act itself. This Court should dismiss the FAC with prejudice.

29

Dated this 24th day of September, 2024.

By: */s/ David R. Konkel*
John L. Kirtley
State Bar No. 1011577
David R. Konkel
State Bar No. 1097244
GODFREY & KAHN, S.C.
833 East Michigan Street, Suite 1800
Milwaukee, WI 53202-5615
Phone: 414-273-3500
Fax: 414-273-5198
Email: jkirtley@gklaw.com
Email: dkonkel@gklaw.com

Jason de Bretteville
Wesley Horton
STRADLING YOCCA CARLSON &
RAUTH LLP
660 Newport Center Drive, Suite 1600
Newport Beach, CA 92660
Phone: 949-725-4000
Fax: 949-725-4100
Email: jdebretteville@stradlinglaw.com
Email: whorton@stradlinglaw.com

*Attorneys for Defendants Harbor Diversified, Inc., Christine R. Deister, Liam Mackay, and Gregg Garvey*

30