UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

JON ARNE TOFT, Individually
and on behalf of all others
similarly situated,

      Plaintiff,

      v.

HARBOR DIVERSIFIED, INC.,
CHRISTINE R. DEISTER, LIAM
MACKAY, and GREGG
GARVEY.

      Defendants.

**Case No: 24-C-556**

**MEMORANDUM OF LAW IN
OPPOSITION TO
DEFENDANTS' MOTION TO
DISMISS PLAINTIFF'S FIRST
AMENDED COMPLAINT**

# TABLE OF CONTENTS

I.      PRELIMINARY STATEMENT ................................................................................. 1

II.     STATEMENT OF FACTS ..................................................................................... 4

        A.      Background ........................................................................................... 4

        B.      Accounting Standards Certification Topic 606....................................... 5

        C.      Air Wisconsin and United Dispute Revenue Owed Under the CPA ..................... 6

        D.      Defendants' Deficient Internal Controls Relating to ASC 606 ............................. 8

        E.      Defendants' Materially False and Misleading Statements..................................... 9

        F.      The Truth Emerges ................................................................................ 11

III.    ARGUMENT...................................................................................................... 12

        A.      Applicable Standards ........................................................................... 12

        B.      The Complaint Adequately Pleads A Strong Inference of Scienter ...................... 13

                1)      Defendants' Own Statements Demonstrate Conscious Misbehavior
                        and/or Recklessness ................................................................... 14

                2)      Defendants' SOX Certifications and Persistent Internal Control
                        Deficiencies Support the Inference of Scienter ....................................... 19

                3)      Defendants' Signatures on the Misleading Financial Statements
                        Support the Inference of Scienter ............................................................ 22

                4)      The Core Operations Doctrine Supports the Inference of Scienter .......... 23

                5)      Defendants' Remaining Arguments are Unavailing ................................ 23

                6)      The Complaint Adequately Pleads Corporate Scienter ........................... 28

        C.      The Complaint Adequately Pleads Loss Causation ............................................. 29

        D.      The Complaint Adequately Pleads a Section 20(a) Claim.................................. 30

IV.     CONCLUSION.................................................................................................... 30

i

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)......................................................................................................................12

*Asher v. Baxter Int'l, Inc.*,
377 F.3d 727 (7th Cir. 2004) ...................................................................................................19, 26

*Azar v. Grubhub, Inc.*,
2021 WL 4077327 (N.D. Ill. Sept. 7, 2021) ...........................................................17, 23, 26

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ....................................................................................................................12, 24

*Bourbonnais v. Ameriprise Fin. Servs.*,
2015 WL 12991000 (E.D. Wis. Aug. 20, 2015).........................................................................17

*Brasher v. Broadwind Energy, Inc.*,
2012 WL 1357699 (N.D. Ill. Apr. 19, 2012) ............................................................................28

*Caremark, Inc. v. Coram Healthcare Corp.*,
113 F.3d 645 (7th Cir. 1997) ......................................................................................................29

*Crowell v. Ionics, Inc.*,
343 F. Supp. 2d 1 (D. Mass. 2004) .............................................................................................28

*Dura Pharms., Inc. v. Broudo*,
544 U.S. 336 (2005)......................................................................................................................29

*Flynn v. Exelon Corp.*,
2021 WL 1561712 (N.D. Ill. Apr. 21, 2021) ............................................................................23

*Gosselin v. First Tr. Advisors L.P.*,
2009 WL 5064295 (N.D. Ill. Dec. 17, 2009)........................................................................16, 24

*Hedick v. Kraft Heinz Co.*,
2021 WL 3566602 (N.D. Ill. Aug. 11, 2021) .................................................................. *passim*

*Higginbotham v. Baxter Int'l, Inc.*,
495 F.3d 753 (7th Cir. 2007) .....................................................................................................25, 28

*Holwill v. AbbVie Inc.*,
2020 WL 5235005 (N.D. Ill. Sept. 1, 2020) ..........................................................................23

ii

*In re Akorn, Inc. Sec. Litig.*,
240 F. Supp. 3d 802 (N.D. Ill. 2017) ...................................................................16, 20, 22, 27

*In re Allied Prods. Corp., Inc. Sec. Litig.*,
2000 WL 1721042 (N.D. Ill. Nov. 15, 2000) ...............................................................27

*In re ArthoCare Corp. Sec. Litig.*,
726 F. Supp. 2d 696 (W.D. Tex. 2010)...........................................................................27

*In re Bally Total Fitness Securities Litigation*,
2006 WL 3714708 (N.D. Ill. July 12, 2006)...................................................................27

*In re Diamond Foods, Inc., Sec. Litig.*,
2012 WL 6000923 (N.D. Cal. Nov. 30, 2012) ...............................................................18

*In re Groupon, Inc. Sec. Litig.*,
2013 WL 12284524 (N.D. Ill. Sept. 18, 2013) ..............................................................16

*In re LDK Solar Sec. Litig.*,
584 F. Supp. 2d 1230 (N.D. Cal. 2008) ..........................................................................18

*In re New Century*,
588 F. Supp. 2d 1206 (C.D. Cal. 2008) ..........................................................................18

*In re OCA, Inc. Sec. & Derivative Litig.*,
2006 WL 3747560 (E.D. La. Dec. 14, 2006)............................................................19, 20

*In re Quality Sys., Inc. Sec. Litig.*,
865 F.3d 1130 (9th Cir. 2017) ........................................................................................14

*In re Sears, Roebuck & Co. Sec. Litig.*,
291 F. Supp. 2d 722 (N.D. Ill. 2003) ..............................................................................23

*In re Unumprovident Corp. Sec. Litig.*,
396 F. Supp. 2d 858 (E.D. Tenn. 2005)...........................................................................26

*In re Veeco Instruments, Inc. Sec. Litig.*,
235 F.R.D. 220 (S.D.N.Y. 2006) ....................................................................................16

*In re ViroPharma Inc. Sec. Litig.*,
21 F. Supp. 3d 458 (E.D. Pa. 2014).................................................................................25

*Jones v. Corus Bankshares, Inc.*,
701 F. Supp. 2d 1014 (N.D. Ill. 2010) ............................................................................23

*Kohut v. KBR, Inc.*,
2015 WL 11995250 (S.D. Tx. Sept. 3, 2015)..................................................................24

iii

*Loreley Fin. (Jersey) No. 3 Ltd v. Wells Fargo Sec., LLC*,
797 F.3d 160 (2d Cir. 2015)..................................................................................................29

*Lowry v. RTI Surgical Holdings, Inc.*,
532 F. Supp. 3d 652 (N.D. Ill. Apr. 1, 2021).................................................... *passim*

*Makor Issues & Rights, Ltd. v. Tellabs, Inc.*,
437 F.3d 588 (7th Cir. 2006), *vacated and remanded*, 551 U.S. 308 (2007) .........................13

*Makor Issues & Rights, Ltd. v. Tellabs Inc.*,
513 F.3d 702 (7th Cir. 2008) ...................................................................................26, 28, 29

*Norfolk Cnty. Ret. Sys. v. Ustian*,
2009 WL 2386156 (N.D. Ill. July 28, 2009)...........................................................16, 19

*O'Driscoll v. Argosy Univ.*,
2014 WL 714023 (N.D. Ill. Feb. 25, 2014) ..............................................................20

*Pension Tr. Fund for Operating Eng'rs v. Kohl's Corp.*,
266 F. Supp. 3d 1154 (E.D. Wi. 2017), *aff'd*, 895 F.3d 933 (2d Cir. 2018)............................16

*Provenz v. Miller*,
102 F.3d 1478 (9th Cir. 1996) ..................................................................................19

*Puskala v. Koss Corp.*,
799 F. Supp. 2d 941 (E.D. Wisc. 2011) ..................................................................19

*Rehm v. Eagle Fin. Corp.*,
954 F. Supp. 1246 (N.D. Ill. 1997) ........................................................................27

*Ret. Sys. v. Hospira, Inc.*,
2013 WL 566805 (N.D. Ill. Feb. 13, 2013) ....................................................12, 24

*Reves v. Ernst & Young*,
507 U.S. 170 (1993)..................................................................................................18

*Ross v. Career Educ. Corp.*,
2012 WL 5363431 (N.D. Ill. Oct. 30, 2012)..........................................................14

*Schleicher v. Wendt*,
529 F. Supp. 2d 959 (S.D. In. 2007) .......................................................................16

*Silverman v. Motorola, Inc.*,
798 F. Supp. 2d 954 (N.D. Ill. 2011) ......................................................................19

*Stocke v. Shuffle Master, Inc.*,
615 F. Supp. 2d 1180 (D. Nev. 2009).......................................................................19

iv

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
    551 U.S. 308 (2007) ...........................................................................................................13, 17, 24

*Van Noppen v. InnerWorkings, Inc.*,
    136 F. Supp. 3d 922 (N.D. Ill. 2015) ........................................................................................19

**Statutes**

15 U.S.C. §78j(b) ..............................................................................................................................13, 30

15 U.S.C. §78t(b) ...................................................................................................................................30

15 U.S.C. § 78u-4 ..................................................................................................................................12

Sarbanes-Oxley Act of 2002 .................................................................................................................10

**Rules**

17 C.F.R. § 229.308 ...............................................................................................................................18

Fed. R. Civ. P. 8 ................................................................................................................................3, 4

Fed. R. Civ. P. 8's ..................................................................................................................................29

Fed. R. Civ. P. 9 ....................................................................................................................................26

Fed. R. Civ. P. 12 ..................................................................................................................................12

Fed. R. Civ. P. 15 ..................................................................................................................................30

Rule 12(b)(6)..........................................................................................................................................12

**Other Authorities**

Codification of Acct. Standards & Procs., Statement on Auditing Standards No. 1,
    § 110.03 (Am. Inst. of Certified Pub. Accts. 1972) ................................................................18

v

## I. PRELIMINARY STATEMENT

The allegations of fraud here are clear and undisputed. Enabled by a persistent material weakness in internal controls, and in clear violation of Accounting Standards Codification Topic 606 ("ASC 606"), Defendants recognized tens of millions in disputed amounts as revenue under a Capacity Purchase Agreement ("CPA") between Harbor Diversified, Inc.'s (the "Company" or "Harbor") holding company Air Wisconsin Airlines LLC ("Air Wisconsin") and United Airlines ("United"). Characterizing selective sound bites from their financial disclosures as "transparent," Defendants begin their Motion[1] with a red herring, claiming that they "disclosed the dispute, the disputed amounts (the 'Disputed Amounts'), and the fact that it was accruing and paying taxes on the Disputed Amounts." Mot. at 1. However, the Complaint[2] does not allege that Defendants failed to disclose the dispute, certain portions of the disputed amounts each quarter, or that they accrued and paid taxes thereon. The Complaint alleges that Defendants misstated the Company's contract revenue by including the full disputed amounts despite clear language in ASC 606 prohibiting recognition of revenue from a customer that expresses an intention not to pay (as United did here), failed to disclose that the disputed amounts would soar to over $52 million or that the Company would continue to perform the services at issue under the CPA despite the dispute, falsely stated that the financial statements complied with GAAP despite the violation of ASC 606, and falsely stated that the Company maintained effective internal control over financial reporting. In tacit recognition of these undisputed ***facts,*** Defendants do not challenge, ***and thus concede***, that the alleged misstatements were false and misleading when made.

---

[1] "Motion" and "Mot." references are to Defendants' Memorandum of Law in Support of Their Motion to Dismiss Plaintiff's First Amended Complaint (ECF No. 41). "Defs. Ex." references are to exhibits to the Declaration of Wesley Horton in Support of Defendants' Motion to Dismiss (ECF No. 42).

[2] "¶__" and "Complaint" references are to paragraphs in the Amended Class Action Complaint for Violations of the Federal Securities Laws (ECF No. 37). Unless otherwise indicated, internal quotation marks and citations are omitted, and emphasis is added.

1

Having conceded falsity, Defendants challenge scienter with a strategy boils down to pretending certain allegations do not exist, mischaracterizing other allegations, attacking allegations in isolation though the scienter analysis is holistic, and misstating the law. Despite their machinations (each addressed below), Defendants cannot avoid the following incontrovertible facts to which they admitted in the financial statements they each signed during the Class Period: 1) they admitted to knowing the amounts in dispute; 2) they admitted to knowing from monthly and quarterly meetings that United had stated an intention not to pay the disputed amounts; and 3) they admitted to understanding ASC 606 (there is no dispute that ASC 606 prohibits recognition of revenue where a customer states an intention not to pay), and to having performed an analysis of the CPA within the framework of ASC 606. Moreover, it is undisputed that Defendants knew they continued to perform under the relevant provisions of the CPA that purportedly triggered the disputed amounts, yet never told investors that the amounts in dispute would continue to climb unabated or how high the disputed amounts could grow.

Despite this knowledge, and enabled by deficient internal controls, Defendants recorded the disputed amounts as revenue in violation of ASC 606, never told investors how high the disputed amounts would climb, told investors the financial statements complied with GAAP, and told investors the internal controls *they had designed and supervised* were effective at all relevant times. Given these *undisputed* facts, the inference that Defendants knew and understood ASC 606's criteria for recognizing revenue and thus understood or recklessly disregarded that United's stated intention not to pay the disputed amounts precluded their recognition of those amounts as revenue in seven financial statements *is at least equally as plausible* as the inference that Defendants committed a simple accounting error due to an innocent misunderstanding of ASC 606's plain language.

2

Defendants also cannot hide behind any auditor imprimatur. The Complaint alleges misleading statements in six quarterly Forms 10-Q and two annual Forms 10-K. Quarterly financial statements are ***unaudited***. *See, e.g.*, Defs. Exs. 1-3. Moreover, in the annual financial statements, Harbor's auditor makes clear that "***[t]hese financial statements are the responsibility of the Company's management***." *See, e.g.*, Defs. Ex. 4 at 44. The inference of scienter is all the more cogent given that, despite issuing the corrective disclosure in March 2024 admitting to their misconduct and the need to restate seven financial statements, *Defendants have yet to issue a restatement. Indeed, Defendants have not filed a single financial statement since November 2023.*

For their next party trick, Defendants try to distract the Court with a cherry picked list of allegations that the Complaint does not allege—none of which are required to plead scienter (*e.g.*, confidential witness statements are not only unnecessary but "steeply" discounted in the Seventh Circuit; internal documents are uniquely in Defendants' possession pre-discovery; motive, including insider sales, is not required to plead scienter where, as here, there are allegations of conscious misbehavior or recklessness; and the lack of a government enforcement action is irrelevant particularly where Defendants *admit* to falsity).

Lastly, Defendants proffer conclusory arguments belied by the allegations, to challenge loss causation. However, the Complaint alleges that Harbor's stock dropped precipitously in response to the corrective disclosure, and thus sufficiently pleads loss causation under Rule 8's low pleading burden. Given that Defendants concede falsity and are unable to credibly challenge the allegations of scienter or loss causation, the Court should deny the Motion in its entirety.

3

## II.   STATEMENT OF FACTS

### A.  Background

Harbor was originally formed in November 1992 as Initial Acquisition Corp., a Delaware corporation. ¶ 31. In March 1997, Initial Acquisition Corp. merged with Hollis-Eden, Inc., becoming Hollis-Eden Pharmaceuticals, Inc. *Id.* In February 2010, Hollis-Eden Pharmaceuticals, Inc. merged with its wholly owned subsidiary and renamed Harbor BioSciences, Inc. *Id.* In July 2011, Harbor BioSciences sold 2 million shares of Pref A stock to Amun LLC, giving Amun 28% economic interest in the Company, 38% voting interest in the Company, and the right to appoint three directors to the Board. *Id.* In October 2011, the Company did a reverse and forward split to reduce shareholders to less than 300 so it could de-register from the SEC. ¶ 32. Indeed, on January 12, 2012, Harbor BioSciences filed a Form 15 to de-register from the SEC. *Id.* After filing one last 10-K on January 20, 2012, Harbor BioSciences went dark and stopped publishing SEC filings. *Id.* Ten days later, on January 30, 2012, Harbor BioSciences incorporated Harbor Diversified in Delaware. *Id.* The following day, Harbor purchased 80% of AWAC Aviation from Amun LLC, in return for stock (making Amun the largest shareholder) and three seats on the Board. ¶ 33. The Company acquired the remaining 20% of AWAC in January 2016. ¶ 35. AWAC owns all the equity interest in Air Wisconsin. *Id.* Harbor therefore became a holding company for Air Wisconsin, a regional airliner that provides short/medium-haul passenger flights to and from small, isolated cities and larger cities that serve as domestic or international hubs. ¶ 30.

In February 2017, Air Wisconsin and United entered into the CPA pursuant to which United agreed to purchase certain Air Wisconsin CRJ-200 regional jets and Air Wisconsin agreed to operate all its flights out of Chicago O'Hare and Washington-Dulles airports exclusively as United Express. ¶ 37. ***The Company earned almost 100% of its operating revenues under the CPA***. ¶ 37.

4

The CPA provided for Air Wisconsin to receive daily revenue for each aircraft covered under the agreement, a fixed payment for reach departure and block hour flown, reimbursement for certain direct operating expenses in exchange for providing regional flying service for United, and for accrual of certain amounts based on certain scheduling benchmarks. *Id.*

In October 2020, the parties amended the CPA pursuant to which Air Wisconsin agreed to stand ready to deliver flight services. ¶ 38. The October 2020 amendment also extended the CPA until February 2023 and provided for a renewal option to 2025 and another to 2027. *Id.* An April 2021 amendment to the CPA addressed the scheduling of block hours after a date certain and through the balance of the agreement. *Id.* The most significant streams of revenue under the CPA included:

(1) Fixed payments for the covered aircraft per day and fixed payment for each departure and block hour flown;

(2) Incentive payments, net of penalties, based upon Air Wisconsin's operational performance and the results of customer satisfaction surveys;

(3) Quarterly payments or interest-bearing notes payable for the fulfillment of the stand ready obligation determined based on certain scheduling benchmarks;

(4) Other payments and expense reimbursements (these may have been recorded as reduction of expenses rather than revenue).

¶ 39.

### B. Accounting Standards Certification Topic 606

In 2018, ASC 606 became effective and set a new accounting guidance for revenue recognition. ¶ 44. ASC 606 explicitly prohibits recognition of revenue under a contract with a customer unless, *inter alia*,

> ***It is probable that the entity will collect substantially all of the consideration to which it will be entitled in exchange for the goods and services that will be transferred to the customer …*** In evaluating whether the collectability of an amount of consideration is probable, an entity shall consider only the ***customer's ability and intention to pay that amount of consideration when it is due.***

5

¶ 46.

With respect to recording revenue, when the amount of consideration in a contract to which an entity expects to be entitled in exchange for transferring promised goods or services to a customer is variable, GAAP requires the revenue estimate to be constrained so as to avoid a significant reversal in the amount of cumulative revenue recognized when the uncertainty associated with the variable consideration is resolved. ¶ 49. ASC 606 is unequivocal that the following factors (among others) increase the probability of a significant reversal: "**[t]he uncertainty about the amount of consideration is not expected to be resolved for a long period of time**" and "**[t]he contract has a large number and broad range of possible consideration amounts**." ¶ 49.

As a result of an investor suit alleging that Harbor had over 300 shareholders and had to hold an annual stockholder meeting and start filing financial statements with the SEC again, Harbor filed its first Form 10-K in nine years on July 10, 2020 ("2019 10-K"), revealing its acquisition of Air Wisconsin and a material weakness in internal control relating to ASC 606, which Defendants promised they had successfully remediated (*see infra*). ¶ 36. In each quarterly and annual financial statement Defendants filed with the SEC, they acknowledged their familiarity with the ASC 606, and admitted to analyzing the CPA within ASC 606's framework. ¶ 55; *See, e.g.*, Defs. Ex. 4 at 52.

### C. Air Wisconsin and United Dispute Revenue Owed Under the CPA

In Harbor's Form 10-K for the year ended December 31, 2021, Defendants disclosed that United disputed that it owed certain amounts to Air Wisconsin. ¶ 59. In the Form 10-Q filed for the second quarter ended June 30, 2022 ("Q2 2022"), Defendants explained that the disputed

6

amounts related to provisional cash payments for projected flight schedules as well as notes for the stand ready obligation under the October 2020 amendment to the CPA. ¶ 60.

The Company's Class Period filings make clear that Air Wisconsin and United met to reconcile provisional cash payments to actual completed flight activity on a monthly basis and that United communicated to Air Wisconsin that it disputed ***almost the entire amount*** in provisional cash payment revenue that Air Wisconsin told United it owed. ¶ 171. The Company recorded the entire amount each quarter despite United's stated intention not to pay. *Id.* The Company's Class Period filings also make clear that under the October 2020 CPA amendment, United was required to accrue amounts due under the stand ready performance obligation and, upon request by Air Wisconsin, deliver a note evidencing this amount each quarter. ¶ 172. For each relevant quarter, the filings indicate that United disputed that it owes the ***entire amount*** and "refused to deliver notes for those quarters." *Id.*

Despite their constant monitoring of the amounts in dispute during regular meetings with United, Defendants ***never disclosed how high the disputed amounts would grow nor did they disclose that their recognition of this revenue violated ASC 606 and would ultimately necessitate a restatement. Id. Moreover, in recognizing the full amount of disputed revenue under the CPA and assessing the probability of collecting substantially all of the consideration to which Air Wisconsin claimed it was entitled under the CPA, Defendants failed to properly consider, or ignored, <u>United's stated intention</u> not to pay the disputed amounts and thus misstated the total amount of contract revenue the Company actually earned, thus violating ASC 606***. ¶¶ 62-63.

In October 2022, United initiated an arbitration seeking a declaration that it did not owe the disputed amounts, totaling over $52 million which Defendants *had already recorded as revenue on the books* despite United's consistently stated intention not to pay. ¶ 64. Despite the ongoing

arbitration and the fact that United had never paid ***and made clear it would not pay*** any of the disputed $52.3 million, Defendants continued to record the disputed revenue in violation of ASC 606. ¶ 64. In December 2022 and February 2023 (a few months after executing a new CPA with American Airlines), Air Wisconsin sent United two separate notices of termination of the CPA; as part of the arbitration, United contested Air Wisconsin's right to do so under the CPA. ¶ 66. In February 2023, the parties agreed to a sixth amendment to the CPA which included a wind down schedule that provided for all of Air Wisconsin's aircraft to be withdrawn from the CPA and for Air Wisconsin to cease flying for United by June 2023. *Id.*

In February 2024, arbitrators determined that United did not owe Air Wisconsin the disputed payments which Defendants had previously recorded as revenue in the Company's financial statements in contravention of ASC 606. ¶ 67.

### D.  Defendants' Deficient Internal Controls Relating to ASC 606

While the Company was not required to issue an auditor's opinion on its internal controls over financial reporting, its management did have an obligation to provide an assessment of the effectiveness of the Company's disclosure controls and procedures and internal control over financial reporting. ¶ 82. In each of the Forms 10-K filed with the SEC, Defendants acknowledged that the Board of Directors and its executive management were responsible for ensuring that the Company had effective internal controls. ¶ 83. In the 2019 Form 10-K, the Company disclosed a material weakness in internal control over financial reporting relating to, *inter alia*, "***the adoption of new accounting standards related to Topic 606***." ¶ 84. Defendants falsely assured investors that they had ***already successfully remediated the internal control weaknesses pertaining to "the adoption of new accounting standards related to Topic 606***." ¶ 85. In the subsequent Forms 10-Q the Company filed, Defendants continued to falsely reaffirm to investors that management had

8

remediated any weaknesses in its internal controls related to ASC 606. ¶ 86. In reality, Defendants had not successfully remediated the material weakness in internal controls, which enabled their repeated violations of ASC 606 throughout the Class Period. ¶ 88.

### E.  Defendants' Materially False and Misleading Statements

In every quarterly and annual filing during the Class Period, despite their consistent violations of ASC 606, Defendants falsely assured investors that "[t]he accompanying consolidated financial statements have been prepared in conformity with accounting principles generally accepted in the United States of America (GAAP)." ¶ 91.

Moreover, throughout the Class Period, beginning with the filing of the Form 10-K on March 30, 2022, Defendants told investors that a dispute existed between United and Air Wisconsin under the CPA regarding certain recurring revenue amounts that United stated it did not owe, explained the nature of the disputed revenue (beginning with the 2Q22 Report filed on August 10, 2022), and reported that the Company had recognized the disputed amounts as revenue. However, Defendants did not disclose that their recognition of the amounts in dispute as revenue contravened ASC 606 and should not have been included in reported contract revenue, did not disclose that their belief (whether reasonable or not) that Air Wisconsin would collect the disputed amounts from United did not justify the recognition of the disputed amounts as revenue given United's stated intention not to pay, did not disclose that the disputed amounts (which they began to report in the 1Q22 Report on May 9, 2022) would balloon to over $52 million by the termination of the CPA, and did not disclose that their recognition of disputed revenue created a material risk that the Company would have to restate its financials for every quarter in which they recognized disputed revenue. *See, e.g.*, ¶¶ 94, 96, 104, 106, 114, 131, 139, 147, 155.

9

Each Class Period filing also attached false certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Deister and Mackay attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud. ¶¶ 93, 103, 113, 122, 130, 138, 146, 154. The SOX certifications made clear that Defendants Deister and Mackay designed and supervised Harbor's internal controls.

Defendants further misled investors throughout the Class Period by making additional false and misleading statements regarding the effectiveness of Harbor's internal controls over financial reporting in each quarterly and annual filing during the Class Period. Specifically, Defendants falsely represented that, after an evaluation by its principal executive officer, principal financial officer, and principal accounting officer, it's ***internal control over financial reporting was effective***. ¶¶ 100, 110, 119, 127, 135, 143, 151, 159. Defendants also falsely and generically warned that the Company "cannot be certain [it] will be successful in preventing or remediating *future* material weaknesses or significant deficiencies in internal control over financial reporting," and that due to "***inherent limitations in <u>all</u> control systems, no evaluation of controls can provide absolute assurance that all control failures and instances of fraud, if any, within the Company have been detected***." ¶¶ 98, 102, 108, 112, 117, 121, 125, 129, 133, 137, 141, 145, 149, 153, 157, 161. These statements were false and misleading because the Company did not have effective internal control over financial reporting and Defendants knew that they had not prevented or adequately remediated the "***certain***" *and* ***existing*** material weakness in Harbor's internal control over financial reporting relating to the application of ASC 606, which enabled their fraudulent dissemination of false and misleading financial statements that they'd ultimately need to restate.

10

### F. The Truth Emerges

On March 29, 2024, Defendants filed a Form 8-K with the SEC revealing that they would need to restate multiple prior financial statements due to their improper recognition of $52.3 million in disputed amounts as revenue in violation of ASC 606:

> [T]he Company's previously issued (i) consolidated financial statements and related disclosures as of and for the year ended December 31, 2022 contained in the Company's Annual Report on Form 10-K, (ii) interim consolidated financial statements and related disclosures contained in the Quarterly Reports on Form 10-Q as of and for the first three quarters of the year ended December 31, 2022, and (iii) interim consolidated financial statements and related disclosures contained in the Quarterly Reports on Form 10-Q as of and for the first three quarters of the year ended December 31, 2023 (collectively, the "Non-Reliance Periods") should no longer be relied upon due to misstatements contained in such financial statements, and that such financial statements should be restated.

¶ 164.

The Form 8-K went on to disclose, *inter alia*, that "***management determined that the decision to recognize all of the approximately $52.3 million in revenue and interest income*** (the 'Disputed Amounts') in the consolidated financial statements and related disclosures … ***was not consistent with [ASC 606]*.**" *Id.*

Defendants further revealed that the Company still had a material weakness in internal controls, despite their prior assurances of remediation to investors: "The Company will report a ***material weakness in internal control over financial reporting*** in its Annual Report on Form 10-K for the year ended December 31, 2023" and that the Company "***did not maintain effective internal control over financial reporting*.**" ¶ 165. Following these shocking revelations, Harbor's stock price fell by $0.28 per share, or 14.25%, to close at $1.73 on April 1, 2024. ¶ 166.

Notably, after reemerging from the dark on July 10, 2020 to file its first financial statement in eight years, the Company once again stopped filing financial statements following the filing of its 3Q 2023 10-Q on November 14, 2023. Moreover, to date, the Company has not issued any

11

restated financial statements and has filed three late filing notices with the SEC on April 2, 2024, May 16, 2024, and August 14, 2024. ¶ 167. Due to its failure to file required financial statements, the Company now trades only the Expert Market. *Id.*

### III. ARGUMENT

#### A. Applicable Standards

In ruling on a Rule 12(b)(6) motion to dismiss, the Court must accept as true all well-pled factual allegations and draw all reasonable inferences in Plaintiff's favor. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 572 (2007) (Stevens, J., dissenting). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims," *i.e.*, complaints need not plead detailed evidentiary matter. *City of Sterling Heights Gen. Emps.' Ret. Sys. v. Hospira, Inc.*, 2013 WL 566805, at *15 (N.D. Ill. Feb. 13, 2013). Thus, to survive a Rule 12(b)(6) motion, the Complaint need only contain enough facts "to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Hedick v. Kraft Heinz Co.*, 2021 WL 3566602, at *3 (N.D. Ill. Aug. 11, 2021).

To state a Section 10(b) claim, plaintiffs must plead: (1) a material misrepresentation or omission; (2) in connection with a purchase or sale of a security; (3) made with scienter; (4) reliance; (5) economic loss; and (6) loss causation. *Hedick*, 2021 WL 3566602, at *2. Under the Private Securities Litigation Reform Act ("PSLRA"), a plaintiff must specify each misstatement, the reasons the statement is misleading, and, if an allegation "is made on information and belief," "state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1)(B). Defendants challenge only scienter and loss causation, thus conceding that the Complaint adequately pleads the remaining four elements of the Section 10(b) claim.

12

## B. The Complaint Adequately Pleads A Strong Inference of Scienter

A complaint pleads scienter by alleging facts that give rise to a strong inference of either recklessness or conscious misbehavior. *Hedick*, 2021 WL 3566602, at \*11. The inference "need not be irrefutable, *i.e.*, of the smoking gun genre, or even the most plausible of competing inferences," so long as it is as likely as any other inference. *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 324 (2007) (*Tellabs II*). To make this determination, the Court must review all the allegations holistically. *Id.* at 326. "One of the classic fact patterns giving rise to a strong inference of scienter is that defendants published statements when they knew facts or had access to information suggesting that their public statements were materially inaccurate." *Makor Issues & Rights, Ltd. v. Tellabs, Inc*., 437 F.3d 588, 603 (7th Cir. 2006) (*Tellabs I*), *vacated and remanded*, 551 U.S. 308 (2007). It is undisputed that Defendants each knew about the disputed amounts, each knew that United did not intend to pay, each knew the disputed amounts would grow to over \$52 million, each knew the criteria for revenue recognition under ASC 606, each knew that they had nonetheless recognized the full disputed amounts as revenue each quarter of the Class Period, each knew that the financial statements therefore did not conform to GAAP, and each knew that persistent deficiencies in internal controls pertaining to ASC 606 enabled their fraudulent dissemination of false and misleading financial statements. Defendants concede that their Class Period statements regarding contract revenue, their compliance with GAAP, the United dispute, and the effectiveness of the Company's internal controls were false. These allegations, especially when assessed holistically with the additional allegations of scienter set forth *infra*, suffice to plead an inference of scienter at least as compelling as any opposing inference.

### 1) Defendants' Own Statements Demonstrate Conscious Misbehavior and/or Recklessness

The falsity of Defendants' statements, *which they concede*, contributes to the inference of scienter. *See, e.g.*, *Hedick*, 2021 WL 3566602, at *11. Specifically, scienter is adequately pled because the Complaint alleges a "difference between [what Defendants knew] and what Defendants said publicly." *Id.*

There is no dispute that Defendants Deister, Mackay, and Garvey each knew that United plainly communicated that it had no "intention to pay [the disputed amount] when it is due." ¶¶ 46, 63. The Complaint alleges, *based on the filings that Defendants Deister, Mackay, and Garvey each signed*, that they met with United *monthly* to reconcile provisional cash payments to actual completed flight activity and that United communicated during those meetings that it disputed, and would not pay, *almost the entire amount* in provisional cash payment revenue that Air Wisconsin claimed United owed. ¶ 171. The Complaint also alleges that the CPA required United to accrue amounts due under the stand ready performance obligation and, upon request by Air Wisconsin, deliver a note evidencing this amount *each quarter* but for each relevant quarter, United disputed that it owed the *entire amount* and "refused to deliver notes for those quarters." ¶ 172. *See In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1145 (9th Cir. 2017) (scienter pled where "QSI's executives themselves told investors they had real-time access to, and knowledge of, sales information"); *Ross v. Career Educ. Corp.*, 2012 WL 5363431, at *10 (N.D. Ill. Oct. 30, 2012) ("[o]ne may readily and reasonabl[y] infer from" company's "numerous public pronouncements" that "[defendants] made it [their] business to look into" issue).

It is further undisputed, *as demonstrated by the filings that Defendants Deister, Mackay, and Garvey each signed*, that they understood the "variable constraint guidance under Topic 606." *See, e.g.*, Defs. Ex. 4 at 41, 53. *See also* ¶¶ 49, 55-56. Defendants also admitted to "performing an

14

analysis of the United [CPA] within the framework of … ASC 606." *See, e.g.*, Defs. Ex. 4 at 52. While Defendants conveniently <u>now</u> blame the supposed complexity of ASC 606 for their "accounting error," Mot. at 19, 23-24, 27, at no point <u>during the Class Period</u> did any of the Individual Defendants suggest that they saw any ambiguity or had any difficulty understanding ASC 606 or its application to the recognition of disputed revenue. Indeed, the language of ASC 606 is unequivocal: "An entity shall account for a contract with a customer that is within the scope of this Topic ***only when***…***It is probable that the entity will collect substantially all of the consideration to which it will be entitled in exchange for the goods or services that will be transferred to the customer*** …. In evaluating whether collectability of an amount of consideration is probable, an entity shall consider only the customer's ability and ***intention to pay that amount of consideration when it is due***." ¶ 46. Defendants admit that United communicated its intention ***not*** to pay; *i.e.*, it was highly improbable under ASC 606's definition of "collectability" that the Company would "collect all of the consideration to which it will be entitled."[3] It does not matter whether Defendants believed Air Wisconsin was entitled to the disputed amounts (their assertions in the SEC filings that they had a "strong position" and that the "probability of an adverse outcome" was "remote" are thus irrelevant); what matters under ASC 606 is whether United communicated an intention not to pay and the Complaint makes clear that it did. ¶¶ 171-72.

Therefore, in recognizing the full amount of disputed revenue and assessing the probability of collecting substantially all of the consideration to which Air Wisconsin claimed it was entitled

---

[3] Defendants' acerbic reference to the recitation of ASC 606 in the Complaint as "mind numbing" and contradictory, Mot. at 24-25, speaks to Defendants' penchant for selective analysis and mischaracterizations but does nothing to deflate the inference of scienter. The two provisions of ASC 606 that Defendants cite are not contradictory as is plainly apparent. ASC 606, as reflected in ¶ 46, states that an entity cannot recognize revenue when a customer states an intention not to pay, *as here,* but explains further, as reflected in ¶ 48 that the collectability analysis does not depend on whether the customer intends to pay "the ***entire*** amount of promised consideration for the ***entire*** duration of the contract," *i.e.*, it's enough for the customer to state it does not intend to pay a portion of the consideration.

15

under the CPA*, Defendants recklessly failed to properly consider, or ignored, United's stated intention not to pay the disputed amounts and thus knowingly or recklessly misstated the total amount of contract revenue the Company actually earned in violation of ASC 606 and falsely stated that the financial statements conformed with GAAP.* See Norfolk Cnty. Ret. Sys. v. Ustian, 2009 WL 2386156, at \*10 (N.D. Ill. July 28, 2009) ("[N]ature of accounting errors may belie a defendant's claim that she or it was unaware of any improprieties."); In re Groupon, Inc. Sec. Litig., 2013 WL 12284524, at \*3 (N.D. Ill. Sept. 18, 2013) (violations of GAAP along with allegations reading access to information sufficient to allege scienter); Schleicher v. Wendt, 529 F. Supp. 2d 959, 971 (S.D. In. 2007) ("violation of GAAP" support strong inference of scienter); In re Akorn, Inc. Sec. Litig., 240 F. Supp. 3d 802, 820 (N.D. Ill. 2017) (accounting violations supported inference of scienter); Gosselin v. First Tr. Advisors L.P., 2009 WL 5064295, at \*6 (N.D. Ill. Dec. 17, 2009); In re Veeco Instruments, Inc. Sec. Litig., 235 F.R.D. 220, 231-32 (S.D.N.Y. 2006) ("[A]ccounting manipulations involving premature revenue recognition … are especially indicative of conscious misbehavior since such violations do not commonly occur inadvertently, but instead suggest a conscious decision to improperly recognize revenue."). In other words, unlike the complaint in Pension Tr. Fund for Operating Eng'rs v. Kohl's Corp., 266 F. Supp. 3d 1154 (E.D. Wi. 2017), aff'd, 895 F.3d 933 (2d Cir. 2018), on which Defendants heavily rely, the Complaint here ties Defendants to knowledge of ASC 606 and to knowledge that it was not being followed, which contradicted their Class Period statements regarding GAAP compliance and the amount of contract revenue the Company could recognize. See id. at 1166; Mot. at 16. Defendants' reliance on Kohl's is therefore wholly misplaced because the Complaint alleges with particularity that Defendants were "so familiar with [ASC 606] as to see a problem in the company's accounting" before disseminating their misstatements. Mot. at 16, 19.

16

Additionally, Defendants implicitly conceded that they monitored the amounts in dispute (as evidenced by the repeated alteration of the reported disputed amounts) and had consistent communications with United about these amounts. ¶¶ 171-72. It is also undisputed that Defendants knew they continued to perform under the relevant provisions of the CPA that purportedly triggered the disputed amounts, yet never told investors that the amounts in dispute would continue to climb unabated and how high the disputed amounts could grow. Their ongoing tracking and analysis of the disputed amounts further contributes to the inference of scienter. *Azar v. Grubhub, Inc.*, 2021 WL 4077327, at \*5 (N.D. Ill. Sept. 7, 2021).

Tellingly, Defendants provide *no explanation* in their Motion for why they purportedly believed they could recognize the disputed amounts as revenue under ASC 606—thus there is no plausible alternative inference, much less a more plausible competing inference that can defeat scienter. At bare minimum, the inference that Defendants knew about and understood ASC 606's criteria for recognizing revenue and thus understood or recklessly disregarded that United's stated intention not to pay the disputed amounts precluded their recognition of those amounts as revenue *is equally as plausible* as the inference that Defendants committed an accounting error due to an innocent misunderstanding of ASC 606's clear directives. *Tellabs II*, 551 U.S. at 324; *Hedick*, 2021 WL 3566602, at \*14 (finding scienter where, "after the Court's … weighing of the competing inferences, it concludes that the innocent interpretation of the amended complaint that Defendants urge is not *more* plausible or compelling than the inference that the Executive Defendants acted recklessly or intentionally"); *Bourbonnais v. Ameriprise Fin. Servs.*, 2015 WL 12991000, at \*4 (E.D. Wis. Aug. 20, 2015) (same). The inference that this was not merely an innocent accounting error is all the more cogent given that it has been ***almost a year*** since Defendants last filed a

17

financial statement with the SEC, much less any of the restated financials. Indeed, due to that failure, Harbor now trades on the Expert Market. ¶¶ 81, 167.

Defendants' attempts to hide behind their auditor are disingenuous. Mot. at 24. First, they falsely state that the Company "received clean audit opinions for its auditors throughout the Class Period." *Id.* However, *the auditor did not audit the six **quarterly** financial statements at issue*. Second, the auditor made clear in the two *annual* financial statements at issue, that *management, not outside auditors, are responsible for the Company's financial statements* (*see, e.g.*, Defs. Ex. 4 at 44). *See Reves v. Ernst & Young*, 507 U.S. 170, 190-91 (1993) (Souter, J., dissenting); *see In re New Century*, 588 F. Supp. 2d 1206, 1231 (C.D. Cal. 2008) ("[A] clean outside audit opinion does not rule out a finding of scienter …."); *In re Diamond Foods, Inc., Sec. Litig*., 2012 WL 6000923, at *8 (N.D. Cal. Nov. 30, 2012) (unqualified audit opinion does not negate scienter inference); *In re LDK Solar Sec. Litig.*, 584 F. Supp. 2d 1230, 1246 (N.D. Cal. 2008) (denying motion to dismiss where "unqualified [audit] opinion did not necessarily exonerate [defendant]"). *See also* Codification of Acct. Standards & Procs., Statement on Auditing Standards No. 1, § 110.03 (Am. Inst. of Certified Pub. Accts. 1972) (accuracy of financial statements, and the establishment and maintenance of internal controls, are "management's responsibility"); SEC Regulation S-K Item 308 (17 C.F.R. § 229.308 (2017)) (management responsible for establishing and maintaining internal controls). Moreover, the auditor reported on the "collectability of disputed receivable balances from United Airlines," as a "critical audit matter," and made clear that it was ***not*** "providing a separate opinion on the critical audit matter or on the accounts or disclosures to which it relates." Defs. Ex. 4 at 45. In any event, a "clean audit" from an external accounting firm does not negate factual allegations of scienter. *Lowry v. RTI Surgical Holdings, Inc*., 532 F. Supp. 3d 652, 662 (N.D. Ill. Apr. 1, 2021). *See also Hedick*, 2021 WL 3566602, at *9

18

(upholding claim for misleading financial statements despite clean audit opinion from non-defendant PricewaterhouseCoopers LLP); *Van Noppen v. InnerWorkings, Inc.*, 136 F. Supp. 3d 922, 951 (N.D. Ill. 2015) (upholding claim for misleading financial statements despite clean audit opinions from Ernst & Young who was not named as a defendant); *Utisan*, 2009 WL 2386156, at *11 (upholding claim for misleading financial statements despite clean audit opinion from defendant Deloitte who was dismissed from the case); *Puskala v. Koss Corp.*, 799 F. Supp. 2d 941, 948 (E.D. Wisc. 2011) (upholding claim for misleading financial statements despite clean audit opinion from defendant Grant Thornton, same auditor as here, who was dismissed from the case). At best, the probative value of the auditor opinion raises an affirmative defense that is inappropriate at the motion to dismiss stage. *See Provenz v. Miller*, 102 F.3d 1478, 1491 (9th Cir. 1996); *Silverman v. Motorola, Inc.*, 798 F. Supp. 2d 954, 968-70 (N.D. Ill. 2011).[4]

### 2) Defendants' SOX Certifications and Persistent Internal Control Deficiencies Support the Inference of Scienter

"Courts have found that certifications filed under the [Sarbanes-Oxley Act] may provide additional evidence of scienter if the certifications were false and misleading and the defendant knew that, or was deliberately reckless in issuing the certifications." *Stocke v. Shuffle Master, Inc.*, 615 F. Supp. 2d 1180, 1190 (D. Nev. 2009); *In re OCA, Inc. Sec. & Derivative Litig.*, 2006 WL 3747560, at *22 (E.D. La. Dec. 14, 2006). Where "certifications show that both defendants stated that they designed and evaluated [the company's disclosure controls] to ensure that they worked to provide them with material information … while at the same time failing to disclose serious,

---

[4] Defendants also cannot hide behind a truth on the market argument. Mot. at 25 n.3. First, truth on the market defenses are an inappropriate basis for dismissal. *Asher v. Baxter Int'l, Inc.*, 377 F.3d 727, 734 (7th Cir. 2004) ("A 'truth-on-the-market' defense is available in principle . . . but not at the pleading stage.") Second, investors are not tasked with looking up and analyzing accounting rules to ascertain if a company's assertions that it complied with GAAP and properly recognized revenue are accurate. Defendants told investors that the financial statements were GAAP compliant and also told investors that their opinion as to whether Air Wisconsin was entitled to the disputed amounts justified their recognition of that revenue, even though ASC 606 makes clear that collectability cannot be presumed where a customer states an intention not to pay.

19

unremedied internal control problems[,]" there is an inference of scienter. *See Akorn*, 240 F. Supp. 3d at 819 (granting weight to SOX certifications); *In re OCA*, 2006 WL 3747560, at \*22. The SOX certifications here state that Defendants Deister and Mackay were responsible for designing and supervising the Company's internal controls over financial reporting "to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared." *See, e.g.*, Weinrib Decl.[5], Exs. A-B ¶ 4(a). *See Lowry,* 532 F. Supp. 3d at 662.

Moreover, as the perpetrators of the fraud, Defendants Deister, Mackay, and Garvey each knew that a persistent material weakness in internal controls pertaining to ASC 606 enabled their improper recognition of the disputed amounts as revenue, yet publicly stated that the Company's internal control over financial reporting was effective for every quarter during the Class Period. ¶¶ 100, 110, 119, 127, 135, 143, 151, 159. In the 2019 Form 10-K, the Company admitted that its auditor, BDO USA, LLP, had identified a material weakness in internal control over financial reporting relating to, *inter alia*, "the adoption of new accounting standards related to Topic 606." ¶ 84. In that same Form 10-K, and in three subsequent Forms 10-Q, Defendants assured investors that the material weakness relating to ASC 606, "ha[s] been remediated as of the date of the filing of this [] Report." ¶¶ 85-86. Three months later, Defendants *fired BDO, the auditor that identified the weakness*. Weinrib Decl., Ex. C.[6] Thereafter, with a new auditor on board, Defendants recognized the disputed amounts as revenue in violation of ASC 606 throughout the Class Period,

---

[5] "Weinrib Decl." references are to the Declaration of Tamar A. Weinrib, filed contemporaneously herewith.

[6] Defendants try to spin their prior admission of a material weakness as a mere "strengthening of the Company's controls" rather than showing a history of improperly applying ASC 606. Mot. at 21. That baseless contention contradicts allegations the Court must accept as true and amounts to a factual dispute that is not ripe for resolution. *See O'Driscoll v. Argosy Univ.*, 2014 WL 714023, at \*5 (N.D. Ill. Feb. 25, 2014) ("As the Seventh Circuit explained approximately 27 years ago, 'the defendant cannot, in presenting its 12(b)(6) challenge, attempt to refute the complaint or to present a different set of allegations.'").

20

enabled by continuing internal control deficiencies they had not in fact successfully remediated, as they later admitted on March 29, 2024.

Given their persistent violations of ASC 606, Defendants knew or recklessly disregarded that any efforts they purportedly undertook to cure the prior deficiency had no effect; *i.e.*, whether they actually undertook the remedial efforts they described is irrelevant, Mot. at 22, because the Complaint is clear that, if implemented, they did not work and as the admitted designers of and supervisors over the internal controls, Defendants Deister and Mackay should have known as such. Defendants Deister and Mackay's admissions that they had a duty to design or supervise the Company's internal controls, and that each "signed SOX certifications attesting to the adequacy of [the Company's] internal controls, but the Company later admitted that it lacked adequate controls," support the inference of scienter. *Hedick*, 2021 WL 3566602, at *13 (collecting cases); *Lowry*, 532 F. Supp. 3d at 662. Moreover, to try and remediate the prior material weakness, Defendants would have had to familiarize themselves with ASC 606 and thus would have known that recognizing disputed revenue that a customer stated it would not pay violated its provisions.

Additionally, this was not one anomalous accounting error (or a simple "mistake," Mot. at 24) enabled by weak internal controls during a single reporting period. The "sheer number of inaccurate financial reports" containing false statements regarding the effectiveness of internal controls demonstrates scienter. *Lowry*, 532 F. Supp. 3d at 661. Defendants admitted that the Company had materially deficient internal control over financial reporting at the time they filed each Form 10-K and 10-Q throughout the *entirety of the Class Period*. ¶¶ 164, 165.

Defendants ask this Court to abandon its mandate to assess the scienter allegations *holistically*, and to instead conclude that SOX certifications *in isolation* do not suffice to establish the requisite inference of scienter. Mot. at 20. The Complaint alleges, however, that the SOX

21

certifications and Defendants' countless statements that they maintained effective internal controls during multiple consecutive quarters where a material weakness relating to ASC 606 in fact persisted, *contribute* to the inference of scienter along with the other particularized allegations of conscious misbehavior and/or recklessness.

Further, once again, Defendants try to use their auditor as a shield, though only two of the eight misleading financial statements were audited. Mot. at 23. Moreover, even for the two annual financial statements that included an auditor opinion, the auditor made clear that "[t]he Company is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting." Defs. Ex. 4 at 44. As such, any misstatements as to the effectiveness of Harbor's internal controls are the fault of Defendants Deister and Mackay alone.

Boilerplate warnings that disclosure controls hypothetically may not detect all errors are also not exculpatory, Mot. at 23, in the face of actual errors enabled by the deficient internal controls that Defendants knew or recklessly disregarded had already occurred. *Akorn*, 240 F. Supp. 3d at 816; *Hedick*, 2021 WL 3566602, at *16.

### 3) Defendants' Signatures on the Misleading Financial Statements Support the Inference of Scienter

Defendants Deister, Mackay, and Garvey each signed the admittedly false and misleading financial statements. In other words, they "made and controlled public statements on the topic[s of GAAP compliance, revenue recognition, the dispute with United, and internal control effectiveness], and approved and reported its false financial results. The Court may readily and reasonably infer from their repeated references to the[se topics] that they made it their business to look into these issues." *Hedick*, 2021 WL 3566602, at *13 (collecting cases). *See also Lowry*, 532 F. Supp. 3d at 663. "The fact that each defendant attested to the accuracy of information in quarterly and annual SEC filings yet failed to even once detect a risk of erroneous financial

22

reporting during the class period is more than sufficient at the pleading stage to indicate recklessness." *Lowry*, 532 F. Supp. 3d at 663.

### 4) The Core Operations Doctrine Supports the Inference of Scienter

The *tens of millions* in disputed revenue concerned two components of Air Wisconsin's CPA with United—provisional cash payments for projected flight schedules and notes for the stand ready obligation created by the October 2020 amendment. The Company earned *all* of its revenue from the United CPA. Courts in the Seventh Circuit assume that officers of a company are "aware of matters central to that business's operation." *Flynn v. Exelon Corp*., 2021 WL 1561712, at *10 (N.D. Ill. Apr. 21, 2021); *Azar*, 2021 WL 4077327, at *5 ("[O]fficers can be assumed to know of facts critical to a business's core operations."); *Holwill v. AbbVie Inc*., 2020 WL 5235005, at *5 (N.D. Ill. Sept. 1, 2020) (finding scienter where "sales of Humira constituted a majority or even supermajority of AbbVie's yearly net revenues"); *In re Sears, Roebuck & Co. Sec. Litig*., 291 F. Supp. 2d 722, 727 (N.D. Ill. 2003); *see also Jones v. Corus Bankshares, Inc*., 701 F. Supp. 2d 1014, 1029 (N.D. Ill. 2010) ("[W]hile a court cannot presume scienter, a strong inference of scienter may still be credited where it is almost inconceivable that an individual defendant would be unaware of the matters at issue."). The core operations doctrine thus contributes to the inference of scienter.

### 5) Defendants' Remaining Arguments are Unavailing

Unable to dispel the Complaint's undisputed and outcome determinative allegations, Defendants resort to misstating the law, mischaracterizing facts, attacking isolated allegations despite the mandate of a holistic analysis, and offering irrelevant red herrings.

*First*, Defendants misstate the law by arguing that the Complaint must allege a motive to adequately plead scienter. Mot. at 15, 26. The law in this Circuit (and indeed every other Circuit)

is clear that while "motive can be a relevant consideration. . . the absence of a motive allegation is not fatal." *Tellabs II*, 551 U.S. at 325; *Hospira*, 2013 WL 566805, at *16; *Lowry*, 532 F. Supp. 3d at 662.[7] Nevertheless, Defendants attempt to negate motive via reference to the Company's stock repurchase program but leave out several important facts that demonstrate why it is of little probative value. Mot. at 16. The Company's Board of Directors adopted the repurchase program on March 30, 2021, *a full year before the start of the Class Period*, and *all* of the repurchases (even those that took place during the Class Period) were made pursuant to a 10b5-1 trading plan[8]. Defs. Ex. 3, at 49. Moreover, *none of the Individual Defendants sat on the Company's Board of Directors* (consisting of Richard Bartlett, Nolan Bederman, and Kevin Degen). *Id.* at 73, 87. The actions of the Board thus bear no relevance to the state of mind of Defendants Deister, Mackay, or Garvey. Even putting aside the fact that the stock repurchase program was adopted a year before ethe start of the Class Period by a Board that did not include any of the Individual Defendants, Defendants inappropriately ask this Court to infer in their favor (contrary to Supreme Court precedent directing courts to make all inferences in plaintiffs' favor at the pleading stage, *see Twombly*, 550 U.S. at 572) that speculative undisclosed reasons for the stock repurchase program negate scienter. However, companies repurchase stock for a myriad of reasons. *Kohut v. KBR, Inc.*, 2015 WL 11995250, at *17 n.11 (S.D. Tx. Sept. 3, 2015) (rejecting argument that stock repurchase negates scienter because, "there are many inferences that a court could draw from a stock repurchase," including that the company wanted to "augment[] market demand" or "viewed its stock price as

---

[7] In other words, despite Defendants' conclusory statements otherwise, the purported lack of insider sales does not negate scienter. Mot. at 5-6, 19.

[8] A 10b5-1 trading plan is a binding contract with *pre-determined* trading instructions. None of the Company's disclosures indicate when the Board executed the 10b5-1 trading plans pursuant to which it repurchased all the stock under the stock repurchase program.

24

undervalued."[9]). Indeed, it is particularly inappropriate to conclude that the mere existence of a stock repurchase program negates scienter where, as here, there are allegations of conscious misbehavior and recklessness. *See, e.g.*, *In re ViroPharma Inc. Sec. Litig*., 21 F. Supp. 3d 458, 474 n.23 (E.D. Pa. 2014).

The cases on which Defendants rely do not hold otherwise. For example, the *Higginbotham* Court did not find scienter sufficiently pled because the "steep[ly]" discounted confidential witness statements failed to demonstrate that the *parent* defendants knew when they issued their financial statements that they included "nonexistent sales" for their Brazilian *subsidiary*. *Higginbotham v. Baxter Int'l, Inc*., 495 F.3d 753, 757-59 (7th Cir. 2007). Though a restatement ensued, the complaint there contained no allegations that defendants knowingly violated a clear cut accounting rule (*i.e.*, like ASC 606), admitted to the facts underlying that knowing or reckless violation (*i.e.*, a customer's stated intention not to pay), and admitted to an internal control weakness pertaining to that exact accounting rule which a prior auditor had identified and which defendants had falsely told investors they had successfully remediated. As set forth in detail *supra*, the Complaint here alleges that Defendants knew or disregarded with severe recklessness that their statements regarding GAAP compliance, contract revenue, the United dispute, and internal controls were therefore false and misleading *when made*.

*Second*, Defendants misstate the facts in arguing that their "efforts to investigate, rectify, and disclose the technical accounting error further suggest that the Individual Defendants were acting in good faith." Mot. at 24. This revisionist history, at odds with the Complaint's detailed allegations, is illogical. Defendants did not admit to their violation of ASC 606 until the arbitration

---

[9] Indeed, the Company stated that "the repurchase program is intended to enhance long-term stockholder value." Defs. Ex. 3 at 48.

had concluded and determined that Air Wisconsin had no claim on the disputed amounts. However, even if the arbitrators had ruled in Air Wisconsin's favor, that would not change the fact that Defendants' recognition of the disputed revenue violated ASC 606 because *at the time they recognized the disputed amounts*, they knew United had stated an intention not to pay. That Defendants were forced to admit to their misconduct in light of the arbitral determination does not evince good faith, nor do Defendants' post-Class Period actions depict any real effort at rectifying their fraud. To date, the Company has not filed any restated financials; indeed, the Company improperly retreated back into the dark and has not filed a single financial statement since November 2023.[10]

*Third*, in addition to their vitriolic conclusory attacks calling the Complaint "bloated" and "frivolous," Defendants cherry pick scienter allegations and argue that they, standing alone, do not support an inference of scienter. Courts, however, are tasked with assessing the allegations of scienter holistically. Thus, "defendants cannot defeat a complaint by 'cherry picking' particular allegations that, standing alone, might not meet the heightened pleading standard under Rule 9(b) or the PSLRA." *Azar*, 2021 WL 4077327, at *6. For example, Defendants argue that the mere fact of a restatement is insufficient to allege scienter. The Complaint does not allege a restatement *alone*.[11] The Complaint alleges that, *as Defendants' own statements demonstrate*: 1) they

---

[10] Moreover, Plaintiff has no obligation to prove that Defendants' misconduct was rational to plead fraud. Mot. at 26-27. *See Tellabs III*, 513 F.3d at 710 (finding that the fact that defendants' "gamble—concealing bad news in the hope that it [would] be overtaken by good news—fail[ed] is not inconsistent with its having been a considered, though because of the risk a reckless, gamble"); *Asher*, 377 F.3d at 728 (the "securities laws forbid foolish frauds along with clever ones"); *In re Unumprovident Corp. Sec. Litig.*, 396 F. Supp. 2d 858, 894 (E.D. Tenn. 2005) ("[H]uman beings . . . regularly make irrational decisions based on reckless and/or naïve assumptions that no one will notice, we will not get caught, and if we do get caught the benefits will still outweigh the costs."). It is equally as plausible (and seemingly more plausible) that Defendants booked and paid taxes on the $52.3 million in disputed revenue because they *hoped* (rationally or not) that the arbitrators would decide in their favor or that United would cave and pay the disputed amounts. Again, that *hope* does not equate to *collectability* under ASC 606.

[11] Defendants' reliance on cases such as *In re Bally Total Fitness Securities Litigation*, 2006 WL 3714708, at *4 (N.D. Ill. July 12, 2006) to argue that a restatement alone is insufficient for scienter is therefore misplaced. Moreover, in *Bally* Defendants' admission were "imprecise" and used terms like "aggressive accounting" and "aggressively

26

knowingly recorded disputed revenue that United stated it would not pay; 2) in violation of ASC 606's unambiguous language; 3) with which they were well versed given admissions of internal control deficiencies relating to ASC 606 *the prior year* which they promised they had remediated; and 4) yet told investors that they had complied with GAAP.

However, while it may not suffice *alone*, the fact of the restatement contributes to the inference of scienter particularly given that it spanned multiple quarters and that, since November 2023 – ***over four months before admitting to their improper revenue recognition*** – Defendants have not filed a single financial statement with the SEC much less the restated financials. *Akorn*, 240 F. Supp. 3d at 820 ("The nature and extent of Defendants' misrepresentations of the 2014 financial results make the inference of scienter even more reasonable."); *Rehm v. Eagle Fin. Corp.*, 954 F. Supp. 1246, 1256 (N.D. Ill. 1997) ("The more serious the [accounting] error, the less believable are defendants protests that they were completely unaware of [the company's] true financial status and the stronger is the inference that defendants must have known about the discrepancy."); *In re Allied Prods. Corp., Inc. Sec. Litig.*, 2000 WL 1721042, at *5 (N.D. Ill. Nov. 15, 2000) ("The alleged circumstances surrounding the reallocation raise enough flags for this Court so as to withstand a motion to dismiss. The amount reallocated was relatively large, the actual reallocation was deferred as late as possible, and the accounting violation was, according to the plaintiffs, obvious."); *In re ArthoCare Corp. Sec. Litig.*, 726 F. Supp. 2d 696, 722 (W.D. Tex. 2010) ("[T]he magnitude of the Restatement in this case, the fact it occurred over a substantial period of time, the relative simplicity of the issues involved—while perhaps not sufficient on their

---

optimistic." *Id.* at *7. Moreover, the admissions demonstrated hindsight conclusions rather than defendants' state of mind at the time of the alleged misstatements. *Id.* Here, the admissions show a violation of ASC 606, the precise circumstances of that violation, the exact amount implicated, a related material weakness in internal controls and further alleges based on Defendants' own statements *during the Class Period* that they issued their misstatements with conscious misbehavior or recklessness.

own to establish scienter—do significantly contribute to a finding of scienter on the part of the Individual Defendants."); *Crowell v. Ionics, Inc.*, 343 F. Supp. 2d 1, 16-17 (D. Mass. 2004) (finding that while a restatement alone does not support scienter, "the Court must ask whether the GAAP violations, combined with other circumstances indicative of fraudulent intent, raise a strong inference that defendants knowingly or recklessly misled investors").

*Finally*, Defendants' conclusory and unsupported statements that the lack of confidential witness allegations somehow undermines the inference of scienter is a red herring. Not only are confidential witness allegations unnecessary to adequately plead scienter, but the Seventh Circuit has directed district courts to "steeply" discount confidential witness allegations (an argument Defendants undoubtedly would have advanced had the Complaint included confidential witness allegations). *Hedick*, 2021 WL 3566602, at \*4; *Higginbotham*, 495 F.3d at 757.

### 6) The Complaint Adequately Pleads Corporate Scienter

The Complaint adequately pleads scienter as to Defendants Deister, Mackay, and Garvey, and thus pleads corporate scienter as to the Company. However, "it is possible to draw a strong inference of corporate scienter without being able to name the individuals who concocted and disseminated the fraud." *Makor Issues & Rights, Ltd. v. Tellabs Inc*., 513 F.3d 702, 708, 710 (7th Cir. 2008) (*Tellabs III*); *see also Brasher v. Broadwind Energy, Inc*., 2012 WL 1357699, at \*24 (N.D. Ill. Apr. 19, 2012) ("At this point, two Defendants remain: [the Company] and [CEO]. Plaintiffs have adequately pled corporate scienter as to the timing of the impairment write-down so the case against [the Company] will go forward."). As explained by the Seventh Circuit, "[t]he plausibility of an explanation depends on the plausibility of the alternative explanations." *Tellabs III*, 513 F.3d at 711. Of course, it is possible for a company to make false statements without scienter, meaning "a cascade of innocent mistakes, or acts of subordinate employees, either or both

28

resulting in a series of false statements." *Id*. But it is also possible that there was "scienter at the corporate level at which the statements were approved," meaning someone sufficiently high in the corporate hierarchy acted with knowledge or recklessness when the company made false statements. *Id*. at 710-11 (acknowledging "[t]here would be a strong inference of corporate scienter" when a company makes "an announcement")

Applying this standard, Plaintiff has adequately pled corporate scienter for Harbor. During the Class Period, Defendants misstated two years of contract revenue (which they have yet to restate), repeatedly misrepresented that the Company had effective internal controls, and falsely claimed to be GAAP compliant. The Company's Audit Committee found that the practice of improperly recognizing revenue persisted during quarters where the Individual Defendants were at the helm. ¶ 164. Innocent mistakes and acts of subordinate employees may explain a misstated metric in a single quarter but not across two years or seven quarters. *Id.* At the pleading stage, the inference of corporate scienter—*i.e.*, that the Company's corporate management acted at least recklessly—is at least as compelling as any alternative inference. This is particularly so given that Defendants do not proffer *any* alternative inference to try and justify or explain why they purportedly believed they could recognize the disputed amounts as revenue under ASC 606.

### C. The Complaint Adequately Pleads Loss Causation

Fed. R. Civ. P. 8's "short and plain statement" standard applies to loss-causation allegations. *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 346-47 (2005).[12] The Complaint easily satisfies this standard by alleging that the Company's stock plummeted 14.25% in response to Defendants' revelations that they violated ASC 606 by recognizing $52.3 million of disputed

---

[12] *Accord*, *Loreley Fin. (Jersey) No. 3 Ltd v. Wells Fargo Sec., LLC*, 797 F.3d 160, 187 (2d Cir. 2015) (plaintiffs' burden of pleading loss causation "is not a heavy one"); *Caremark, Inc. v. Coram Healthcare Corp.*, 113 F.3d 645, 649 (7th Cir. 1997) (similar).

amounts as revenue throughout the Class Period, had a material weakness in internal control relating to ASC 606, and would thus need to restate seven financial statements (including the 1Q22, 2Q22 and 3Q22 Forms 10-Q, the 2022 Form 10-K, and the 1Q23, 2Q23, and 3Q23 Forms 10-Q).

Defendants' efforts to separate the announcement of the arbitral decision from the announcements of their accounting violations and internal control deficiencies fall flat, as they are clearly and inextricably intertwined. Mot. at 28. As a result of the arbitral decision, Defendants had no choice but to reveal that, enabled by materially weak internal controls, they had improperly recognized the disputed amounts as revenue in violation of ASC 606, and would therefore need to restate because these material errors (¶ 73) meant their financial statements did not comply with GAAP. In any event, Defendants mischaracterize the Complaint by citing one paragraph, ¶ 68, while ignoring others that clearly state the loss resulted from the revelation of the truth as to Defendants' wrongful acts and omissions. ¶¶ 166, 168. Defendants otherwise proffer nothing but conclusory assertions that the loss causation allegations are "inconsistent," "conflicting" and "implausible," unaccompanied by any support. Mot. at 28-29.

The Complaint thus adequately pleads loss causation.

### D. The Complaint Adequately Pleads a Section 20(a) Claim

The Complaint pleads a predicate Section 10(b) violation, and thus pleads a Section 20(a) violation, *cf.* Mot. at 27. *See Lowry*, 532 F. Supp. 3d at 664.

### IV. CONCLUSION

Defendants' Motion should be denied in its entirety. If the Court grants Defendants' Motion, or any part of it, Plaintiff respectfully requests leave to amend under Rule 15(a).

Dated: October 15, 2024

**POMERANTZ LLP**

By: *s/ Tamar A. Weinrib*
Jeremy A. Lieberman
Tamar A. Weinrib
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone:　(212) 661-1100
Facsimile:　(917) 463-1044
Email: jalieberman@pomlaw.com
Email: taweinrib@pomlaw.com

*Lead Counsel for Plaintiff and the Class*

31