UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

JON ARNE TOFT,
*individually and on behalf of all
others similarly situated*,

        Plaintiff,

     v.                       Case No. 24-C-556

HARBOR DIVERSIFIED, INC.,
CHRISTINE R. DEISTER,
LIAM MACKAY, and
GREGG GARVEY,

        Defendants.

## DECISION AND ORDER GRANTING DEFENDANTS' MOTION TO DISMISS

On Friday, March 29, 2024, Defendant Harbor Diversified, Inc., publicly disclosed in a Securities Exchange Commission (SEC) filing that the company would need to restate multiple previously issued financial statements to account for $52.3 million in revenue that was improperly recognized. The market effect was significant; Harbor's stock price fell 14.25% by market close on Monday, April 1, 2024. This lawsuit followed.

On May 7, 2024, Viral Kothari filed this federal securities fraud class action against Harbor and two of its top officials, Christine R. Deister and Liam Mackay. On June 7, 2024, Defendants moved to dismiss the complaint for failure to state a claim. Dkt. No. 7. On July 7, 2024, before Defendants' motion to dismiss was fully briefed, Kothari and Jon Arne Toft filed competing motions for appointment as lead plaintiff and approval of lead counsel, in compliance with the mandatory procedures of the Private Securities Litigation Reform Act (PSLRA). Dkt. Nos.

13 &16.  Because Kothari conceded that he was not the presumptive lead plaintiff, the court appointed Toft as Lead Plaintiff.  Dkt. No. 23.  On September 10, 2024, Toft filed a First Amended Complaint (FAC) that added Gregg Garvey, another top Harbor official, as a defendant.  The FAC advances two theories of liability: violation of § 10(b) of the Securities Exchange Act of 1934 (Exchange Act) and Rule 10b–5 promulgated thereunder against all defendants and "controlling person" liability under Exchange Act § 20(a) against Deister, Mackay, and Garvey.  Broadly speaking, the FAC alleges that Harbor made fraudulent financial disclosures during the Class Period (March 30, 2022, to March 29, 2024) that artificially increased the price of Harbor stock, thereby misleading investors.  Those investors then suffered economic loss when Harbor stock prices fell in response to Harbor's disclosure that revenues were improperly recognized and would need to be restated.  Toft seeks to recover damages for himself and the class of persons that purchased or otherwise obtained Harbor stock during the Class Period.

The case is before the court on Defendants' motion to dismiss the FAC for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6).  The court has jurisdiction pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 78aa(a).  For the following reasons, the motion to dismiss will be granted.

## LEGAL STANDARD

A motion to dismiss brought under Federal Rule of Civil Procedure 12(b)(6) tests the sufficiency of the complaint to state a claim upon which relief can be granted.  *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990); *see* Fed. R. Civ. P. 12(b)(6).  When reviewing a motion to dismiss under Rule 12(b)(6), the court must accept all well-pleaded factual allegations as true and draw all inferences in the light most favorable to the non-moving party.  *Gutierrez v. Peters*, 111 F.3d 1364, 1368–69 (7th Cir. 1997); *Mosley v. Klincar*, 947 F.2d 1338, 1339 (7th Cir.

1991).  Rule 8 mandates that a complaint need only include "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  The plaintiff's short and plain statement must "give the defendant fair notice of what the claim is and the grounds upon which it rests."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  While a plaintiff is not required to plead detailed factual allegations, it must plead "more than labels and conclusions."  *Id.*  Stated differently, a "formulaic recitation of the elements of a cause of action will not do."  *Id.*  A claim is plausible on its face when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Both of Toft's claims are based in fraud and are therefore subject to the heightened pleading standards of Federal Rule of Civil Procedure 9(b).  *Pension Tr. Fund for Operating Eng'rs v. Kohl's Corp.*, 266 F. Supp. 3d 1154, 1157 (E.D. Wis. 2017), *aff'd*, 895 F.3d 933 (7th Cir. 2018); *In re Harley-Davidson, Inc. Sec. Litig.*, 660 F. Supp. 2d 969, 982 (E.D. Wis. 2009).  "In alleging fraud . . . , a party must state with particularity the circumstances constituting fraud."  Fed. R. Civ. P. 9(b).  This heightened pleading standard requires plaintiffs to "provide the who, what, when, where, and how" of the alleged fraud.  *Borsellino v. Goldman Sachs Grp., Inc.*, 477 F.3d 502, 507 (7th Cir. 2007) (internal quotations marks omitted).

Finally, as Judge Stadtmueller summarized in *Kohl's*, "in addition to the heightened pleading standard imposed by Rule 9, the [PSLRA], enacted by Congress as a check against abusive litigation in private securities fraud actions, heightens even further the pleading standards in actions such as this one."  266 F. Supp. 3d at 1157–58 (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 320–22 (2007)). In charging misrepresentations or omissions of material fact, the PSLRA requires that the complaint "specify each statement alleged to have been

3

misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(1). Further, in alleging scienter, the "complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." § 78u–4(b)(2). Scienter is a mental state that, for these purposes, means "knowledge of the statement's falsity or reckless disregard of a substantial risk that the statement is false." *Pugh v. Tribune Co.*, 521 F.3d 686, 693 (7th Cir. 2008) (internal quotation marks omitted).

## ALLEGATIONS OF THE FIRST AMENDED COMPLAINT

### A.    Harbor, Air Wisconsin, and United

Harbor is a holding company for Air Wisconsin Airlines LLC, a regional airline that provides passenger service to more than 80 cities across 31 states. FAC ¶ 30, Dkt. No. 37. Defendant Deister served as Harbor's Chief Executive Officer and Secretary during the Class Period; Defendant Mackay served as Air Wisconsin's Chief Financial Officer during the Class Period; and Defendant Garvey served as Air Wisconsin's Senior Vice President, Chief Accounting Officer, and Treasurer during the Class Period. *See id.* ¶¶ 22–24.

Harbor's success is wholly dependent on that of Air Wisconsin. *Id.* ¶ 37; Defs.' Br. in Supp. at 10, Dkt. No. 41. So, Air Wisconsin's financial picture is of paramount importance to Harbor and its shareholders. Like other regional airlines, Air Wisconsin enters into capacity purchase agreements (CPAs) with large airlines to provide short- and medium-haul flights that connect passengers in smaller, isolated cities to larger cities serving as domestic and international airline hubs. FAC ¶ 30.

4

In February 2017, Air Wisconsin entered into a CPA with United Airlines, Inc., in which Air Wisconsin operated exclusively as a United Express regional airline. *Id.* ¶ 37. Air Wisconsin therefore generated approximately 100 percent of its operating revenues from the United CPA. *Id.* Under the CPA, "Air Wisconsin received fixed daily revenue for each aircraft covered under the agreement, a fixed payment for each departure and block hour flown, and reimbursement of certain direct operating expenses in exchange for providing regional flying service for United." *Id.* The CPA also provided for the payment or accrual of certain amounts by United to Air Wisconsin based on certain scheduling benchmarks." *Id.* In October 2020, the United CPA was amended to settle then existing disputes between Air Wisconsin and United, as well as create "a new performance obligation requiring Air Wisconsin to stand ready to deliver flight services." *Id.* ¶ 38. The 2020 amendment further required United "to accrue amounts due under the stand ready performance obligation and, upon request by Air Wisconsin, deliver a note evidencing this amount each quarter." *Id.* ¶ 172.

On March 30, 2022, Harbor disclosed to investors that a dispute existed between Air Wisconsin and United concerning amounts purportedly owed to Air Wisconsin under the CPA, but no further details were disclosed. *Id.* ¶¶ 59, 94. On June 30, 2022, Harbor disclosed that United did not intend to pay certain provisional cash payments made to Air Wisconsin under the CPA, as well as notes delivered to Air Wisconsin for the stand ready obligation created by the 2020 CPA amendment. *Id.* ¶ 60. By August 2022, the disputed amounts had grown to $52.3 million, and United initiated arbitration proceedings seeking a determination that it was not obligated to pay Air Wisconsin any of the disputed amounts. *Id.* ¶ 64. In December 2022, Air Wisconsin sent United a notice of termination of the CPA. *Id.* ¶ 66. Air Wisconsin sent a second

notice of termination in February 2023, and that same month, the parties agreed to a wind-down schedule where Air Wisconsin would cease flying for United by June 2023. *Id.*

In February 2024, arbitrators determined that United was not obligated to pay Air Wisconsin any of the disputed amounts. *Id.* ¶ 67. On Friday, March 29, 2024, Harbor filed a Restatement Announcement through SEC Form 8-K that disclosed the result of the arbitration and stated that certain previously issued financial disclosures would need to be restated. *Id.* ¶¶ 163–64. In short, Harbor had determined that it should not have recorded the disputed amounts, some $52.3 million, as recognized revenue. The Restatement Announcement had a significant impact on the market; Harbor's stock fell by 14.25%, or $0.28 per share, to close at $1.73 on Monday, April 1, 2024. *Id.* ¶ 166.

### B.     Harbor's Financial Disclosures

In 2020, because Harbor had amassed over 300 shareholders, it became obligated to file financial disclosures with the SEC. *Id.* ¶ 36. Between mid-2020 and the end of the Class Period, Harbor filed "Annual Reports" on SEC Form 10-K, as well as "Quarterly Reports" on SEC Form 10-Q. Harbor filed the first relevant disclosure on July 10, 2020. *Id.* This disclosure, Harbor's 2019 Annual Report, acknowledged the prior existence of "a material weakness in its internal control over financial reporting" related to Accounting Standards Codification Topic 606: Revenue from Contracts with Customers (ASC 606), *id.* ¶ 84, but assured investors the weakness "ha[d] been remediated as of the date of the filing of [the Report]," *id.* ¶ 85. Harbor qualified the assurance, however, by stating that it could not be certain that any of the implemented measures would remediate the material weakness or prevent future material weaknesses. *Id.* In its 2020 Quarterly Reports and 2020 Annual Report, Harbor reiterated that the material weakness first identified in Harbor's 2019 Annual Report had been remediated. *Id.* ¶ 86. Specifically, in its 2020

Annual Report, Harbor explained that it had "[d]evelop[ed] and implement[ed] formal processes, procedures, and controls pertaining to the adoption of the new accounting standards, including those related to Topic 606" and "hir[ed] . . . outside consultants to assist management with the implementation of the new accounting standards." *Id.* ¶ 87.

A short aside. ASC 606 is an accounting standard adopted by the Financial Accounting Standards Board that advances a five-step process for recognizing revenue from contracts for goods or services. *See id.* ¶¶ 44–45. ASC 606 was made effective in 2018 and is a constituent part of the Generally Accepted Accounting Principles (GAAP). *Id.* ¶¶ 42, 44. Thus, a failure to comply with ASC 606 is also a failure to comply with GAAP. SEC filings that are not GAAP compliant are presumed to be misleading or inaccurate. *Id.* ¶ 43 (citing 17 C.F.R. § 210.4-01(a)(1) ("Financial statements . . . not prepared in accordance with [GAAP] will be presumed to be misleading or inaccurate.")).

Returning to Harbor's financial disclosures. Harbor made eight financial disclosures during the Class Period, each containing certain common assurances. First, Harbor assured investors that its financial statements were prepared in accordance with GAAP. *Id.* ¶ 91. Second, Harbor assured investors that, as of the day of filing for each respective disclosure, "management, including our principal executive officer, our principal financial officer and our principal accounting officer, concluded that our internal control over financial reporting was effective." *E.g.*, *id.* ¶ 100. Third, Harbor warned that "due to inherent limitations in all control systems, no evaluation of controls can provide absolute assurance that all control failures and instances of fraud, if any, within the Company have been detected." *E.g.*, *id.* ¶ 102. Finally, attached to each report were certifications made pursuant to the Sarbanes-Oxley Act of 2002 (SOX Certifications)

that were signed by Deister and Mackay and attested to the accuracy of Harbor's financial disclosures and reporting. *E.g.*, *id.* ¶ 93.

Statements individual to each Class Period disclosure are also relevant. Harbor's first Class Period disclosure, its 2021 Annual Report, first alerted investors to the Air Wisconsin-United dispute. *Id.* ¶ 94. Specifically, the report stated that "a dispute between United and Air Wisconsin exists with respect to certain amounts owed to Air Wisconsin under the United [CPA]. [Harbor] cannot predict the outcome of this dispute, or any related negotiations, on the terms of the United [CPA] or our relationship with United." *Id.* The report disclosed annual contract revenues of $247,519,000 but did not state what share of those revenues were in dispute. *Id.* ¶ 96.

The second Class Period disclosure, Harbor's Quarterly Report for the first quarter of 2022, provided more detail about the nature of the Air Wisconsin-United dispute. *Id.* ¶ 103. The report stated that "[a]s of March 31, 2022, the amount in dispute was approximately [$9,371,000]."[1] *Id.* ¶ 104. Harbor maintained, however, that it believed United's claims had no support under the CPA, though it could not be certain of the outcome of the dispute. *Id.* ¶ 104. Harbor therefore recognized all of disputed amounts. *Id.*

Harbor's Quarterly Report for the second quarter of 2022 disclosed that the disputed amounts had grown to $19,571,000. *Id.* ¶ 114. The report reiterated that Harbor believed "it ha[d]

---

[1] The FAC includes frequent reference to dollar amounts. Where the FAC quotes portions of Harbor's financial disclosures, the dollar amounts are presented in the thousands. *E.g.*, FAC ¶ 114 ("United is disputing that it owes $10,462 of this amount."). Where the FAC is not quoting portions of Harbor's financial disclosures, the dollar amounts are presented in the millions. *E.g.*, *id.* ("In the 2Q22 Report, Defendants reported contract revenue of $77,923,000 for the quarter."). The discrepancy is resolved by the language of Harbor's disclosures: "All of the dollar and share amounts set forth in these condensed notes . . . are presented in thousands." *E.g.*, Horton Decl., Exhibit 1 at 10, Dkt. No. 42-1. Accordingly, where necessary, the court has converted any dollar amounts reported in the thousands to millions for clarity.

8

a strong position under the United [CPA], and believe[d] the probability of an adverse outcome [was] remote." *Id.* Thus, Harbor recognized all the disputed amounts as revenue. *Id.*

The pattern continued in Harbor's Quarterly Report for the third quarter of 2022. Harbor reported that the disputed amounts had grown to $33,042,000 but maintained that it strongly believed it was entitled to the disputed amounts under the terms of the United CPA. *Id.* ¶ 123. In this disclosure, Harbor also informed investors that United had initiated arbitration under the CPA but noted that "Air Wisconsin cannot, with any degree of certainty, estimate the likely outcome of the arbitration including any potential award of the disputed amounts." *Id.*

On April 3, 2023, Harbor filed its 2022 Annual Report. *Id.* ¶ 130. The report again disclosed the existence of a dispute with United and informed investors that the disputed amounts had grown to approximately $47,900,000. *Id.* ¶ 131. Harbor remained firm in its position that it was entitled to the disputed amounts under the United CPA and recognized all the disputed amounts as revenue. *Id.* Arbitration proceedings remained in the early stages, but the report reiterated that no prediction could be made concerning any potential award. *Id.* The report also alerted investors to Air Wisconsin's termination of the CPA and that Air Wisconsin would cease flying for United by June 2023. *Id.*

Harbor's Quarterly Reports for the first, second, and third quarters of 2023 reiterated much of what investors had already been informed of: a dispute existed with United, the disputed amounts plateaued around $52,300,000, arbitration proceedings were ongoing but no prediction as to outcome could be made, and Air Wisconsin strongly believed it was entitled to the disputed amounts. *See id.* ¶¶ 139, 147, 155.

After a filing hiatus, Harbor issued its Form 8-K Restatement Announcement on March 29, 2024. *Id.* ¶ 163. The Restatement Announcement informed investors that each of Harbor's Class

Period disclosures "should no longer be relied upon due to misstatements" and would need to be restated. *Id.* ¶ 164. The Restatement Announcement explained that Harbor's Audit Committee had concluded the company's decision to recognize all of the approximately $52,300,000 in disputed amounts as revenue was not consistent with ASC 606. *Id.* Relatedly, prior assurances that Harbor "had remediated any internal control deficiencies related to ASC 606 and maintained effective internal control over financial reporting" were in error as a material weakness in fact existed throughout the Class Period. *Id.* ¶ 165. As a result, the Restatement Announcement also indicated Harbor would "report a material weakness in internal control of financial reporting in its [2023 Annual Report]." *Id.* As of the date of the FAC, Harbor has not filed an Annual Report for 2023. *Id.* ¶ 167.

## ANALYSIS

### A.   Violation of Section 10(b) and Rule 10b–5

Toft's first claim, brought against all defendants, alleges violation of Exchange Act § 10(b) and Rule 10b–5. Section 10(b) of the Exchange Act makes it unlawful "[t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe." 15 U.S.C. § 78j(b). "Rule 10b–5 forbids a company or an individual 'to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.'" *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 704 (7th Cir. 2008) (quoting 17 C.F.R. § 240.10b–5(b)). The elements of a claim based on violations of § 10(b) and Rule 10b–5 are "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or

omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 810 (2011) (quoting *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37–38 (2011)). Defendants' primary argument is that the FAC fails to plausibly allege the element of scienter, so the court will narrow its focus to that element.

Scienter is "a mental state embracing intent to deceive, manipulate, or defraud." *Tellabs*, 551 U.S. at 319 (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193–94 & n.12 (1976)). It can be "demonstrated by knowledge of the statement's falsity or reckless disregard of a substantial risk that the statement is false." *Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 756 (7th Cir. 2007) (citing *Ernst & Ernst*, 425 U.S. at 193). In this context, "recklessness" is defined as "an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it. *City of Livonia Emps.' Ret. Sys. & Loc. 295/Loc. 851 v. Boeing Co.*, 711 F.3d 754, 756 (7th Cir. 2013) (citations omitted). To be sure, negligence or "careless mistakes at the management level" are not tantamount to scienter. *Makor Issues*, 513 F.3d at 709; *Pension Tr. Fund for Operating Eng'rs v. Kohl's Corp.*, 895 F.3d 933, 939 (7th Cir. 2018); *Fulton Cnty. Emps. Ret. Sys. v. MGIC Inv. Corp.*, 675 F.3d 1047, 1050 (7th Cir. 2012) ("The most the complaint's allegation could support is the proposition that [the company's] managers should have seen the looming problem, but that's negligence rather than the state of mind required for fraud." (emphasis omitted)).

To adequately allege scienter, a plaintiff must meet the "exacting pleading requirements" of the PSLRA—requirements that rise above the threshold set by Federal Rule of Civil Procedure 8(a) and even Rule 9(b). *Tellabs*, 551 U.S. at 313; *Appvion, Inc. Ret. Sav. & Emp. Stock Ownership Plan by & through Lyon v. Buth*, 99 F.4th 928, 951 (7th Cir. 2024) (qualifying the scienter element

as a "difficult hurdle"); *see also Hedick v. Kraft Heinz Co.*, No. 19-cv-1339, 2021 WL 3566602, at *3 (N.D. Ill. Aug. 11, 2021). A plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). The phrase doing most of the work, "strong inference," is not defined in the statute, but the Supreme Court has held that "[t]o qualify as 'strong' . . . , an inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314. "The strength of an inference cannot be decided in a vacuum" because "[t]he inquiry is inherently comparative." *Id.* at 323. Thus, "the court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically," with the ultimate question being: "When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?" *Id.* at 326. If the former inference is not at least as compelling as the later, dismissal is appropriate. *Kohl's*, 895 F.3d at 937.

There are two competing inferences at play that frame the court's analysis. The first is the version alleged by Toft: Over the course of the United dispute, Deister, Mackay, and Garvey knew United never intended to pay the disputed amounts; and therefore, the disputed amounts never should have been recognized as revenue under ASC 606. Thus, the trio was at the very least reckless in attesting that Harbor's Class Period disclosures were GAAP compliant and that Harbor had sufficient internal controls over financial reporting. But there is another version. As Defendants would tell it, Diester, Mackay, and Garvey indeed knew that United had no intention of paying the disputed amounts, absent an authoritative ruling that it was required to do so, but they also knew that Air Wisconsin strongly believed it was entitled to the payments under the terms of the CPA. Thus, Harbor recognized the disputed amounts as revenues and thought doing

12

so was consistent with ASC 606 and therefore GAAP. In this account, Diester, Mackay, and Garvey's misleading attestations that Harbor was GAAP compliant and had sufficient internal controls over financial reporting were not the product of recklessness—they were at worst the product of negligence. Considering the FAC in its entirety, the inference proffered by Defendants better fits the facts alleged.

It is clear that if Diester, Mackay, and Garvey knew facts or had access to information suggesting that Harbor's recognition of the disputed amounts was contrary to GAAP, then attesting that the Class Period disclosures were GAAP compliant would strongly suggest scienter. *Plumbers & Pipefitters Loc. Union v. Zimmer*, 673 F. Supp. 2d 718, 746 (S.D. Ind. 2009), *aff'd sub nom. Plumbers & Pipefitters Loc. Union 719 Pension Fund v. Zimmer Holdings, Inc.*, 679 F.3d 952 (7th Cir. 2012) (citing *Florida State Bd. of Admin. v. Green Tree Fin. Corp.*, 270 F.3d 645, 665 (8th Cir.2001) ("One of the classic fact patterns giving rise to a strong inference of scienter is that defendants published statements when they knew facts or had access to information suggesting that their public statements were materially inaccurate.")); *see also Schleicher v. Wendt*, 529 F. Supp. 2d 959, 972 (S.D. Ind. 2007). *But see Davis v. SPSS, Inc.*, 385 F. Supp. 2d 697, 715 (N.D. Ill. 2005) ("While violations of GAAP provide some evidence of scienter, they fall far short of raising a strong inference of knowing or reckless misrepresentation." (citing other sources)). It follows then that the lynchpin to Toft's proffered inference is whether the FAC has alleged with particularity that Diester, Mackay, and Garvey knew or were reckless in not discovering that Harbor was flouting GAAP when recognizing the disputed amounts as revenue. The FAC does not allege that Diester, Mackay, or Garvey received any internal communications or documents that explicitly put them on notice that the company's financial disclosures may not be GAAP compliant. Nor that they themselves ever made a statement indicating they believed as much.

13

Instead, Toft argues the allegations in the FAC demonstrate that Diester, Mackay, and Garvey had access to information which would have led anyone but the reckless to know Harbor was not calculating revenues consistent with GAAP.

Specifically, Toft argues the FAC alleges that "Deister, Mackay, and Garvey each knew that United plainly communicated that it had no intention to pay the disputed amount." Br. in Opp'n at 14, Dkt. No. 43 (cleaned up). Toft continues that "as demonstrated by the filings that Deister, Mackay, and Garvey each signed, they understood the variable constraint guidance under ASC 606" and "admitted to performing an analysis of the United CPA within the framework of ASC 606." *Id.* at 14–15 (cleaned up). And, according to Toft, "the language of ASC 606 is unequivocal" in prohibiting recognition of revenue where the customer states an intention not to pay. *Id.* at 15. Toft therefore concludes that Diester, Mackay, and Garvey "recklessly failed to properly consider, or ignored, United's stated intention not to pay the disputed amounts and thus knowingly or recklessly misstated the total amount of contract revenue . . . in violation of ASC 606 and falsely stated that [Harbor's] financial statements conformed with GAAP." *Id.* at 16 (emphasis omitted). But the inferential thread Toft attempts to weave does not hold up upon consideration of the FAC as a whole.

Toft is correct that some courts have found that violation of straightforward accounting rules creates strong evidence of scienter. *E.g.*, *Norfolk Cnty. Ret. Sys. v. Ustian*, No. 07 C 7014, 2009 WL 2386156, at *10 (N.D. Ill. July 28, 2009). But ASC 606 is not as straightforward or "unequivocal" as Toft suggests. Toft cites to no court decision holding as much. And while the specific language Toft quotes may seem relatively straightforward, ASC 606 includes far more than the quoted language. In fact, one prominent auditor notes in its 1,031-page guidance document that "application of [ASC] 606 is not a simple one-time exercise—it requires significant

14

judgment, estimation and disclosures." REVENUE RECOGNITION HANDBOOK, KMPG 1 (Dec. 2024), *available at* https://kpmg.com/us/en/frv/reference-library/2024/handbook-revenue-recognition.html (last visited Jan. 29, 2025). Concerning GAAP generally, the Supreme Court has remarked that "[a]ccountants long have recognized that 'generally accepted accounting principles' are far from being a canonical set of rules that will ensure identical accounting treatment of identical transactions." *Thor Power Tool Co. v. Comm'r*, 439 U.S. 522, 544 (1979). It thus follows that even if Diester, Mackay, and Garvey knew United had no intention of paying the disputed amounts absent an authoritative ruling, it would not have been plainly obvious to them that ASC 606 was being violated when Harbor recognized the disputed amounts as revenue. *In re Baxter Int'l Inc. Sec. Litig.*, No. 19 C 7786, 2021 WL 100457, at *17 (N.D. Ill. Jan. 12, 2021) (citing other sources).

What is more, Grant Thornton LLP, Harbor's independent auditor, did not discover the misapplication of ASC 606. *See* Horton Decl., Ex. 4 at 48–50, Dkt. No. 42-1. Toft attempts to diminish the import of the audit in three ways. First, Toft recognizes that a "clean audit" does not necessarily negate an otherwise cogent and compelling inference of scienter. *See Lowry v. RTI Surgical Holdings, Inc.*, 532 F. Supp. 3d 652, 662 (N.D. Ill. 2021). True enough, but the cases Toft cites to involve some form of irregularity in the audit or are otherwise inapposite. *Reves v. Ernst & Young*, 507 U.S. 170, 186 (1993) (noting the auditor created, at least in part, the company's financial statements); *In re New Century*, 588 F. Supp. 2d 1206, 1231 (C.D. Cal. 2008) (noting "serious auditing violations by KPMG"); *In re Diamond Foods, Inc., Sec. Litig.*, No. C 11-05386 WHA, 2012 WL 6000923, at *8 (N.D. Cal. Nov. 30, 2012) (noting "financial statements were 'scrubbed' prior to providing them to Deloitte"); *In re LDK Solar Sec. Litig.*, 584 F. Supp. 2d 1230, 1244–50 (N.D. Cal. 2008) (finding the clean audit did not defuse several other instances where

management was put on notice of improper accounting practices); *Lowry*, 532 F. Supp. 3d at 661 (finding clean audit did not outweigh plaintiff's allegations that the defendants instructed employees to violate internal policy, confidential witness statements indicating it was commonplace to ignore revenue recognition policies, and an SEC investigation).  Here, Toft does not allege any irregularities in the Grant Thornton audit, nor do other allegations in the FAC overwhelm the inferential value of the audit.

Second, Toft observes that Grant Thornton did not audit Harbor's "six quarterly financial statements at issue."  Br. in Opp'n at 18.  No matter, Grant Thornton audited Harbor's 2021 and 2022 Annual Reports, both of which erroneously recognized the disputed amounts and required restatement.  As to the Annual Reports, Grant Thornton concluded: "In our opinion, the financial statements present fairly, in all material respects, the financial position of the Company . . . and the results of its operations and cash flows . . . , in conformity with accounting principles generally accepted in the United States of America."  Horton Decl., Ex. 4 at 48.

Third, Toft points to the fact that Grant Thornton considered the United dispute "a 'critical audit matter,' and made clear that it was not 'providing a separate opinion on the critical audit matter or on the accounts or disclosures which it relates.'"  Br. in Opp'n at 18 (emphasis omitted) (quoting Horton Decl., Ex. 4 at 49).  But Toft leaves out the first half of the quoted sentence: "The communication of critical audit matters does not alter in any way our opinion on the financial statements."  Horton Decl., Ex. 4 at 49.  And the audit report further recognizes that there was a "high degree of complexity associated with evaluating management's conclusion that the amount in dispute with United [was] collectable."  *Id.*

Finally, it is important to note that Defendants' actions were not intended to conceal its dispute with United over the amounts due under the CPA.  In each of its SEC filings, for example,

Harbor described its dispute with United and the amount then at issue and explained that it had recognized the disputed amount in its consolidated financial statements. While Harbor expressed its belief that it had a strong position under the CPA and that the probability of an adverse outcome was remote, it also acknowledged that it was unable to predict the amount or range of potential losses resulting from this dispute. Horton Decl., Exs. 1–6. Thus, Defendants' error was in classification, not concealment. "A plaintiff fails to plead an actionable § 10(b) claim predicated on the concealment of information if that information was, in fact, disclosed." *In re The First Marblehead Corp. Sec. Litig.*, 639 F. Supp. 2d 145, 155 (D. Mass. 2009)

In sum, Toft's arguments are not persuasive, and the Grant Thornton audit only serves to combat any inference of scienter. *Kohl's*, 266 F. Supp. 3d at 1167–68 ("The accounting rules the plaintiffs allege were violated are complex and technical, and the plaintiffs have not alleged with sufficient particularity why or how senior executives at Kohl's would have been so familiar with those rules so as to see a problem in the company's accounting before their auditors did." (citing *In re Turquoise Hill Res. Ltd. Sec. Litig.*, No. 13 Civ. 8846, 2014 WL 7176187, at *6 (S.D.N.Y. Dec. 16, 2014)); *see also* 15 U.S.C. § 78j-1(b) (requiring outside auditors to report material illegal acts to the appropriate level of management and, in certain instances, to the SEC).

Toft also argues that other allegations in the FAC support a strong inference of scienter. The court disagrees. First, Toft cannot rely on the SOX Certifications signed by Diester and Mackay as supporting a strong inference of scienter. In those certifications, Deister and Mackay attested that they were "responsible for establishing and maintaining disclosure controls and procedures," including designing internal controls over financial reporting. *See, e.g.*, FAC ¶ 93; Weinrib Decl., Ex. A at 2, Dkt. No. 44-1. Executives' signatures on SOX Certifications do "not suffice to allege scienter without allegations that those executives were aware of the material

weaknesses in the company's controls at the time they signed those statements or that such weaknesses were obvious." *Kohl's*, 266 F. Supp. 3d at 1167. This is because a plaintiff cannot allege "fraud by hindsight." *Higginbotham*, 495 F.3d at 759–60 (quoting *Tellabs*, 551 U.S. at 320); *DiLeo v. Ernst & Young*, 901 F.2d 624, 628 (7th Cir. 1990); *see also Zimmer*, 673 F. Supp. 2d at 748 ("[I]f an allegation that a mandatory Sarbanes–Oxley certification was later proved to be inaccurate is sufficient to give rise to the requisite strong inference, 'scienter would be established in every case where there was an accounting error or auditing mistake by a publicly traded company, thereby eviscerating the pleading requirements for scienter set forth in the PSLRA.'" (quoting another source)).

To show that Diester and Mackay were aware of the material weaknesses in Harbor's controls, Toft contends that Harbor's 2019 disclosure of "a material weakness in internal control over financial reporting relating to . . . the adoption of new accounting standards related to Topic 606" would have required Deister and Mackay "to familiarize themselves with ASC 606." FAC ¶ 84; Br. in Opp'n at 21. But adoption is not the same thing as application. Harbor's 2019 Annual Report disclosed a material weakness related to *adoption* of ASC 606—a new accounting standard that became effective only a year earlier. Harbor explained that to remediate the weakness in adoption, it did the following: "[d]evelop[ed] and implement[ed] formal processes, procedures, and controls pertaining to the adoption of the new accounting standards, including those related to Topic 606 . . . and . . . hir[ed] . . . outside consultants to assist management with the implementation of the new accounting standards. FAC ¶ 87. So, Deister and Mackay's involvement in remediating the material weakness related to *adoption* of ASC 606 would not have had any significant impact on their ability to recognize a material weakness in *application* of ASC 606. Thus, the SOX

18

Certifications signed by Diester and Mackay do little, if anything, to support a strong inference of scienter.

Second, the duration of the misrepresentations—that they occurred in eight financial disclosures made over roughly two years—does not support a strong inference of scienter because, as explained above, Toft has not alleged with particularity that Deister, Mackay, or Garvey had any reason to suspect the financial disclosures were false. *Pension Tr. Fund for Operating Eng'rs v. DeVry Educ. Grp., Inc.*, No. 16 C 5198, 2017 WL 6039926, at *15 (N.D. Ill. Dec. 6, 2017) ("As for duration, the fact that defendants made the [accounting error] many times over a period of several years provides no support for any inference of scienter if they never had reason to suspect that it was false."). Condoning such an inference would be engaging in the prohibited act of inferring scienter by hindsight. *See Higginbotham*, 495 F.3d at 759–60; *Tellabs*, 551 U.S. at 320; *DiLeo*, 901 F.2d at 628.

Similarly, allegations concerning the magnitude of the disputed amounts do not save the FAC. While some courts have found that the magnitude of a financial reporting error supports an inference of scienter, such is not the case here. *See In re Akorn, Inc. Sec. Litig.*, 240 F. Supp. 3d 802, 820 (N.D. Ill. 2017); *Rehm v. Eagle Fin. Corp.*, 954 F. Supp. 1246, 1256 (N.D. Ill. 1997) ("The more serious the error, the less believable are defendants' protests that they were completely unaware of Eagle's true financial status and the stronger is the inference that defendants must have known about the discrepancy."). For starters, Toft does not specifically develop this argument. By the court's own calculations, it appears the disputed amounts represented roughly ten percent of Air Wisconsin's total revenues over the two-year period. *See* FAC ¶¶ 96, 130 (identifying annual operating revenues for 2021 and 2022, respectively). The Seventh Circuit has affirmed dismissal where the misrepresentations at issue were proportionally more significant. *See Kohl's*,

895 F.3d at 935, 937–41 ("Kohl's had understated its liabilities from about 26 to 39 percent annually."). More to the point, inferring scienter by magnitude—like inferring scienter by duration—sounds of inference by hindsight and is therefore impermissible. *See Higginbotham*, 495 F.3d at 759–60; *Tellabs*, 551 U.S. at 320; *DiLeo*, 901 F.2d at 628; *see also La. Sch. Emps.' Ret. Sys. v. Ernst & Young, LLP*, 622 F.3d 471, 484 (6th Cir. 2010) ("[T]o infer scienter solely from the magnitude of the fraud would require hindsight, speculation, and conjecture."). Thus, the allegations concerning the magnitude of the misrepresentations do not provide the support necessary to make out a strong inference of scienter.

The court has taken Toft's arguments one at a time, but as *Tellabs* instructs, the ultimate inquiry must be holistic. 551 U.S. at 326. Holistic evaluation ushers the same result. While the allegations in the FAC could suggest Diester, Mackay, and Garvey knowingly or recklessly misled investors, they more plausibly suggest that Diester, Mackay, and Garvey were at worst negligent in their oversight. After careful review of all the allegations in the FAC, the court finds that Toft has not put forth a "'cogent and compelling' inference of scienter." *Kohl's*, 895 F.3d at 940 (quoting *Tellabs*, 551 U.S. at 324). It follows then that because the FAC fails to allege a strong inference of scienter as to Diester, Mackay, or Garvey, scienter cannot be imputed upon Harbor. *Pugh*, 521 F.3d at 697; *In re Harley*, 660 F. Supp. 2d at 1003.

Thus, for all the reasons above, Toft's first claim brought under Exchange Act § 10(b) and Rule 10b–5 must be dismissed.

## B.    Violation of Section 20(a)

Count Two of the FAC, brought only against Deister, Mackay, and Garvey, alleges violation of Exchange Act § 20(a). That section provides a basis for holding "controlling persons" jointly and severally liable for securities fraud if they exert control over other individuals or

businesses that violate the securities law. 15 U.S.C. § 78t(a); *Kohl's*, 266 F. Supp. 3d at 1169. "Thus, to state a claim under § 20(a), a plaintiff must first adequately plead a primary violation of securities laws—here, a violation of § 10(b) and Rule 10b–5." *Pugh*, 521 F.3d at 693. Because Toft has not plausibly alleged a primary violation of § 10(b) and Rule 10b–5, it follows that his claim under § 20(a) must also be dismissed.

## CONCLUSION

For the reasons above, the court will grant Defendants' motion to dismiss the FAC for failure to state a claim, but it will give Toft an opportunity to file a second amended complaint. In *Kohl's*, the Seventh Circuit provided the following directive:

> We repeatedly have said that "a plaintiff whose original complaint has been dismissed under Rule 12(b)(6) should be given at least one opportunity to try to amend her complaint before the entire action is dismissed." This admonition carries special weight in securities fraud cases because "[i]n this technical and demanding corner of the law, the drafting of a cognizable complaint can be a matter of trial and error."

895 F.3d at 941 (first quoting *Runnion ex rel. Runnion v. Girl Scouts of Greater Chi. & Nw. Ind.*, 786 F.3d 510, 519 (7th Cir. 2015); and then quoting *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003)). Although the complaint has already been amended once, the original complaint was filed by a different attorney and, due to Toft's filing of an FAC, the court did not issue a ruling on it. Accordingly, and in perhaps an abundance of caution, the dismissal here will be without prejudice and Toft will be given 30 days from the date of this Order to file a second amended complaint if he wishes to proceed in this case.

**IT IS THEREFORE ORDERED** that Defendants' motion to dismiss (Dkt. No. 40) is **GRANTED**.

**IT IS FURTHER ORDERED** that Lead Plaintiff Jon Arne Toft may file a second amended complaint within 30 days of this Order. If Toft does not file a second amended complaint by the deadline, the case will be dismissed, and final judgment entered.

Dated at Green Bay, Wisconsin this <u>30th</u> day of January, 2025.

William C. Griesbach
United States District Judge